**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | Chapter 11 |
| DELTA PETROLEUM CORPORATION, et al.,[1] | Case No. 11-14006 (KJC) |
| Debtors. | Jointly Administered |

**SECOND AMENDED DISCLOSURE STATEMENT FOR THE
SECOND AMENDED JOINT CHAPTER 11 PLAN
OF REORGANIZATION OF DELTA PETROLEUM CORPORATION
AND ITS DEBTOR AFFILIATES**

HUGHES HUBBARD & REED LLP
Kathryn A. Coleman
W. Peter Beardsley
Christopher Gartman
Ashley J. Laurie
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 837-6000

MORRIS NICHOLS ARSHT & TUNNELL LLP
Derek C. Abbott
Ann C. Cordo
1201 North Market Street, 18th Floor
Wilmington, DE 19899
Telephone: (302) 658-9200

*Counsel to the Debtors and Debtors in Possession*

Dated: As of July 5, 2012

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M.,
PREVAILING EASTERN TIME, ON AUGUST 8, 2012, UNLESS EXTENDED BY THE
DEBTORS IN A NOTICE PROVIDED TO ELIGIBLE VOTERS**

---

1. The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Delta Petroleum Corporation (0803), DPCA LLC (0803), Delta Exploration Company, Inc. (9462), Delta Pipeline, LLC (0803), DLC, Inc. (3989), CEC, Inc. (3154), Castle Texas Production Limited Partnership (6054), Amber Resources Company of Colorado (0506), and Castle Exploration Company, Inc. (9007). The Debtors' headquarters are located at: 370 17th Street, Suite 4300, Denver, Colorado 80202.

# DISCLAIMER

FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE, AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

THE NEW COMMON STOCK HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "**SECURITIES ACT**"), OR SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS.  THE ISSUANCE OF SUCH SECURITIES UNDER THE PLAN WILL BE EFFECTED PURSUANT TO THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THE TRANSACTIONS CONTEMPLATED HEREIN OR DETERMINED IF THIS DISCLOSURE STATEMENT IS TRUTHFUL OR COMPLETE.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS PROVIDED IN THIS DISCLOSURE STATEMENT SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS INCLUDING, BUT NOT LIMITED TO, THOSE RISKS DESCRIBED IN ARTICLE VII OF THIS DISCLOSURE STATEMENT AND EACH OF THE OTHER RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT.  DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

ALTHOUGH THE DEBTORS HAVE ATTEMPTED TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE SPECIFICALLY NOTED, NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE DEBTORS' MANAGEMENT WITH THE ASSISTANCE OF THEIR FINANCIAL ADVISORS PREPARED THE FINANCIAL PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT. THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATION CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED AND/OR MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF.  MOREOVER, THERE MAY BE ERRORS IN THE STATEMENTS AND/OR FINANCIAL INFORMATION CONTAINED HEREIN AND/OR ASSUMPTIONS UNDERLYING SUCH STATEMENTS AND/OR FINANCIAL INFORMATION. THE DEBTORS AND THEIR ADVISORS EXPRESSLY DISCLAIM ANY OBLIGATION TO UPDATE OR CORRECT ANY SUCH FINANCIAL INFORMATION OR ASSUMPTIONS.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN, SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR AN INTEREST.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION OF THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT ALL SUCH SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF UNDERLYING DOCUMENTS AND TO THE EXTENT THAT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW. THE DEBTORS' MANAGEMENT HAS PROVIDED FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS AND EXISTING EQUITY INTERESTS ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EXISTING EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EXISTING EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

    A.    Overview ...................................................................................................1

    B.    Summary of the Chapter 11 Cases ...........................................................2

    C.    Who Is Entitled to Vote...........................................................................10

    D.    How to Vote and Voting Deadline ..........................................................11

    E.    Confirmation Hearing...............................................................................12

    F.    Additional Information .............................................................................13

II.   GENERAL INFORMATION REGARDING THE DEBTORS .......................13

    A.    Background ...............................................................................................13

    B.    The Debtors' Business Operations ...........................................................13
        1.    Sources of Revenue ......................................................................14
        2.    Financial Results ..........................................................................15

    C.    The Debtors' Prepetition Organizational Structure.................................15
        1.    Tracinda Corporation's Investment ..............................................17
        2.    Board of Directors and Management ............................................18

    D.    Capital Structure......................................................................................20
        1.    The Senior Credit Facility.............................................................21
        2.    The 7% Senior Unsecured Notes ..................................................22
        3.    The 3 ¾% Senior Convertible Notes .............................................22
        4.    Impending Maturity ......................................................................23

III.  EVENTS LEADING TO RESTRUCTURING ................................................23

    A.    Natural Gas Industry Downturn and the Global Financial Crisis ...........23

    B.    Management Turnover ..............................................................................24

    C.    The Debtors' Unsuccessful Exploration Efforts ......................................24

    D.    The Debtors' Prepetition Restructuring Initiatives .................................24

IV.   EVENTS DURING THE CHAPTER 11 CASES ............................................27

    A.    Commencement of the Chapter 11 Cases.................................................27

**TABLE OF CONTENTS** - Continued

**Page**

| | | | |
|---|---|---|---|
| B. | | Significant Developments Since the Petition Date | 27 |
| | 1. | First Day Motions | 27 |
| | | a. Joint Administration | 27 |
| | | b. Cash Management | 27 |
| | | c. Utilities | 28 |
| | | d. Prepetition Taxes and Fees | 28 |
| | | e. Critical Vendors | 28 |
| | | f. Royalties | 28 |
| | | g. Employee Wages and Benefits | 29 |
| | | h. Notification and Hearing Procedures for Trading in Equity and Debt Securities | 29 |
| | | i. Insurance | 30 |
| | | j. Cash Collateral | 30 |
| | | k. DIP Financing | 30 |
| | 2. | Filing of Schedules and Statements of Financial Affairs | 31 |
| | 3. | Applications to Retain Professionals | 32 |
| | 4. | Claims Process | 32 |
| | | a. Bar Date for Filing Proofs of Claim and Administrative Expense Requests | 32 |
| | | b. Claims Reconciliation | 32 |
| | 5. | Contract and Lease Rejections | 32 |
| | 6. | Exclusivity Extensions | 33 |
| | 7. | Adversary Proceedings | 33 |
| | 8. | Bid Procedures and Sale Process | 34 |
| | 9. | Relevant Milestones in DIP Credit Agreement | 36 |
| | 10. | Overview of the Debtors' Marketing Efforts in Connection with the Plan Sponsor | 36 |
| | 11. | Information Regarding The Plan Sponsor | 38 |
| | 12. | Plan Support Agreement | 39 |
| | 13. | Sheep Creek | 39 |
| | 14. | The Creditors' Committee | 40 |
| C. | | Currently Pending Litigation; Causes of Action of the Estates | 40 |
| | 1. | Pre-Petition Litigation Being Pursued by the Debtors | 40 |
| | | a. Delta Petroleum Corporation vs. Richard B. Evans, Case No. CIV25819, District Court of Polk County, Texas, 411 Judicial District. | 40 |
| | | b. Delta Petroleum Corporation vs. Caprock Pipe & Supply, Inc. and Enquest Energy Services Corp., Case Number 2010CV8475, District Court, Denver County, Colorado | 40 |
| | | c. The Long Trusts v. Castle Texas Limited Partnership, et al., Case No. 11-0161, Texas Supreme Court | 40 |
| | 2. | Causes of Action Belonging to the Debtors' Estates | 41 |
| | | a. Preferences | 41 |
| | | b. Fraudulent Transfers | 42 |
| | | c. Transfers by the Debtors | 42 |

V.    SUMMARY OF THE PLAN .................................................................................42

    A.    Overview of Chapter 11 and the Plan Process ........................................44

    B.    Classification and Treatment of Claims and Equity Interests; Cram Down ...........44
        1.    Treatment of Unclassified Claims Under the Plan .......................................45
            a.    Administrative Expense Claims Generally.......................................45
            b.    Professional Compensation and Reimbursement Claims; Other Administrative Claims ..........................................................46
            c.    Priority Tax Claims.....................................................46
        2.    Treatment of Classified Claims Against and Equity Interests In Delta ........47
            a.    DIP Facility Claims (Class A1) ....................................47
            b.    Priority Non-Tax Claims (Class A2) ...............................47
            c.    Other Secured Claims (Class A3) ..................................47
            d.    General Unsecured Claims (Class A4) .............................47
            e.    Noteholder Claims (Class A5).....................................48
            f.    Intercompany Claims (Class A6).................................48
            g.    Existing Equity Interests (Class A7)..............................48
            h.    Securities Litigation Claims (Class A8) ..........................48
        3.    Treatment of Classified Claims Against and Equity Interests In Debtors Other Than Delta.............................................................48
            a.    Priority Non-Tax Claims Against Amber (Class H1).........................48
            b.    Other Secured Claims Against Debtors Other Than Delta (Classes B2, C2, D2, E2, F2, G2, H2, and I2) ....................................49
            c.    General Unsecured Claims Against Debtors Other Than Delta (Classes B3, C3, D3, E3, F3, G3, H3, and I3) .....................................49
            d.    Noteholder Claims Against Debtors Other Than Delta (Classes B4, C4, D4, E4, F4, G4, H4, and I4) .....................................49
            e.    Existing Equity Interests in Debtors Other Than Delta (Classes B5, C5, D5, E5, F5, G5, H5, and I5) ....................................49

    C.    Summary of the Capital Structure of Reorganized Delta.......................................50
        1.    Description of New Common Stock ..........................................................50
            a.    New Stockholders' Agreement ...................................................50
            b.    Restrictions on Resale of Securities to Protect Net Operating Losses.....................................................................50
        2.    JV Company Credit Facility ........................................................50
        3.    Exit Loan .............................................................................51

    D.    Means for Implementation and Execution of the Plan ...........................................52
        1.    Corporate Action...............................................................52
        2.    Restated Certificate of Incorporation and Restated Bylaws .........................52
        3.    Plan Exhibits ..................................................................53
        4.    Plan Supplements................................................................53
        5.    Directors and Officers of the Reorganized Debtors and Reorganized Delta....................................................................53
        6.    The Joint Venture Company ......................................................54

## TABLE OF CONTENTS - Continued

|  |  | a. | The Joint Venture Company LLC Agreement | 54 |
|  |  | b. | The Contribution Agreement | 55 |
|  |  | c. | The Management Services Agreement | 56 |
|  | 7. | JV Company Credit Agreement | | 56 |
|  | 8. | Issuance of New Common Stock | | 56 |
|  | 9. | Recovery Trusts | | 56 |
|  | 10. | Cancellation of Agreements | | 59 |
|  | 11. | Surrender of Existing Securities | | 59 |
|  | 12. | Cancellation of the Notes and Equity Interests | | 59 |
|  | 13. | Preservation of Documents. | | 60 |
| E. | Existing Liens | | | 61 |
| F. | Compromise of Controversies | | | 61 |
| G. | Effectuating Documents; Further Transactions | | | 61 |
| VI. | PROVISIONS GOVERNING DISTRIBUTIONS | | | 61 |
| A. | Date of Distributions on Account of Allowed Claims | | | 61 |
| B. | Sources of Cash for Plan Distribution | | | 61 |
| C. | Time Bar to Cash Payments | | | 62 |
| D. | Disbursement Agent | | | 62 |
| E. | Record Date for Distributions | | | 62 |
| F. | Objections to and Estimation of Claims; Resolution of Disputed Claims | | | 63 |
|  | 1. | Right to Object to Claims | | 63 |
|  | 2. | Deadline for Objecting to Claims | | 63 |
|  | 3. | Deadline for Responding to Claims Objections | | 63 |
|  | 4. | Right to Request Estimation of Claims | | 63 |
|  | 5. | Setoff Against Claims | | 64 |
|  | 6. | Special Rules for Distributions to Holders of Disputed Claims | | 64 |
|  | 7. | Limited Recourse for Disputed Claims | | 65 |
|  | 8. | Disputed Claim Reserve | | 65 |
| G. | Delivery of Distributions | | | 65 |
| H. | Noteholder Claims and DIP Facility Claims | | | 65 |
| I. | Recovery Trust Distributions | | | 66 |
| J. | Manner of Cash Payments Under Plan | | | 66 |
| K. | Fractional Shares | | | 66 |

**TABLE OF CONTENTS** - Continued

L.    Setoffs and Recoupment ................................................................................66

M.    Exemption from Securities Law ...................................................................66

N.    Allocation of Payments ................................................................................66

O.    No Postpetition Interest on Claims ..............................................................67

P.    Treatment of Executory Contracts and Unexpired Leases ..........................67

Q.    Conditions Precedent to Effective Date ......................................................68
    1.    Confirmation Order ..........................................................................68
    2.    Exit Loan ..........................................................................................69
    3.    Contracts and Leases ........................................................................69
    4.    Execution and Delivery of Other Documents ..................................69
    5.    Corporate Formalities ......................................................................69
    6.    SEC Filings ......................................................................................70
    7.    Other Acts ........................................................................................70
    8.    Debtors' Waiver of Conditions Precedent .......................................70
    9.    Substantial Consummation ...............................................................70

R.    Effect of Confirmation .................................................................................70
    1.    Vesting of Assets ..............................................................................70
    2.    Corporate Existence ..........................................................................71
    3.    Binding Effect ..................................................................................71
    4.    Settlements, Releases and Discharges ..............................................71
    5.    Discharge of the Debtors ..................................................................71
    6.    Exculpation ......................................................................................72
    7.    Releases By the Debtors and their Estates .......................................72
    8.    Consensual Releases By Holders of Claims .....................................73
    9.    Abrogation of Successor Liability. ...................................................74
    10.    Term of Injunctions or Stays ...........................................................74
    11.    Termination of Subordination Rights and Settlement of Related
        Claims ...............................................................................................75
    12.    Indemnification Obligations .............................................................75
    13.    Limitation on Indemnification ..........................................................75
    14.    Preservation of Claims .....................................................................76
    15.    No Acquisition of a Majority of Voting Interests ............................76

S.    Retention of Jurisdiction ..............................................................................76

T.    Miscellaneous ...............................................................................................78
    1.    Payment of Statutory Fees ...............................................................78
    2.    Payment of Noteholder Professional Fees ........................................78
    3.    Further Assurances ...........................................................................79
    4.    Exhibits, Appendices and Schedules Incorporated ..........................79
    5.    Intercompany Claims ........................................................................79

**TABLE OF CONTENTS** - Continued

|   | 6. | Amendment or Modification of the Plan | 79 |
|---|---|---|---|
|   | 7. | Inconsistency | 79 |
|   | 8. | Section 1125(e) of the Bankruptcy Code | 80 |
|   | 9. | Compliance with SEC Requirements | 80 |
|   | 10. | Compliance with Tax Requirements | 80 |
|   | 11. | Determination of Tax Filings and Taxes | 80 |
|   | 12. | Exemption from Transfer Taxes | 81 |
|   | 13. | Dissolution of Any Statutory Committees and Cessation of Fee and Expense Payment | 81 |
|   | 14. | Severability of Provisions in the Plan | 81 |
|   | 15. | Governing Law | 81 |
|   | 16. | No Admissions | 81 |
|   | 17. | Reservation of Rights | 82 |

| VII. | | CERTAIN RISK FACTORS AFFECTING THE DEBTORS | 82 |
|---|---|---|---|
|   | A. | Risk Factors Relating to the Chapter 11 Cases | 82 |
|   |   | 1. Parties in Interest May Object to the Debtors' Classification of Claims | 82 |
|   |   | 2. The Debtors May Object to the Amount, Secured Status or Priority Status of a Claim | 82 |
|   |   | 3. In Certain Instances, Any Chapter 11 Case May Be Converted to a Case Under Chapter 7 of the Bankruptcy Code | 83 |
|   |   | 4. The Bankruptcy Court May Decline to Confirm the Plan | 83 |
|   |   | 5. The Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Plan | 84 |
|   |   | 6. The Supporting Noteholders May Withdraw Their Support of the Plan | 84 |
|   |   | 7. The Plan Sponsor May Withdraw Its Support of the Plan | 84 |
|   |   | 8. The Debtors May Seek to Amend, Waive, Modify or Withdraw the Plan at Any Time Prior to the Confirmation Date | 84 |
|   |   | 9. The Contribution Agreement May Not Achieve Its Intended Results and May Result in The Joint Venture Company Assuming Unanticipated Liabilities and Properties of Lower Value Than Originally Contemplated | 85 |
|   |   | 10. Inherent Uncertainty of Projections | 85 |
|   | B. | Risk Factors Regarding the Debtors' Businesses | 86 |
|   |   | 1. Leverage | 86 |
|   |   | 2. Dependence on the Performance of the Joint Venture Company | 87 |
|   |   | 3. The JV Company Credit Agreement Contains Financial and Other Covenants That Impose Restrictions on the Debtors' Financial and Business Operations | 87 |
|   |   | 4. The JV Company LLC Agreement Contains Provisions that May Cause Dilution of Reorganized Delta's Interests in the Joint Venture Company | 87 |

**TABLE OF CONTENTS - Continued**

5.    The Board of Managers of the Joint Venture Company Do Not Have a Duty of Loyalty to the Joint Venture Company..........................................87
6.    The Government May Not Grant an Extension of the Sheep Creek Agreement..............................................................................................88
7.    Natural Gas and Oil Prices are Volatile..........................................................88
8.    The Current Financial Environment ..............................................................89
9.    Information Concerning Reserves is Uncertain ..............................................89
10.   Replacing Production with New Reserves.......................................................89
11.   Commercially Productive Reserves ...............................................................89
12.   Writedowns ................................................................................................90
13.   Inherent Risks in the Exploration, Development and Operation of Oil and Gas Properties .....................................................................................90
14.   Third Party Gas Gathering Systems, Pipelines and Processing Facilities....................................................................................................91
15.   Prices May be Affected by Regional Factors; Geographic Concentration.............................................................................................91
16.   Industry Operating Hazards ........................................................................92
17.   Competition with Larger Companies.............................................................92
18.   Hedging Transactions .................................................................................92
19.   Future Production.......................................................................................93
20.   No Long-Term Contracts to Sell Oil and Gas ...............................................93
21.   Terrorist Attacks ........................................................................................93
22.   Federal, State and Local Oil and Gas Operations Laws and Regulations ...............................................................................................93
23.   Water Sources to Facilitate the Fracturing Process and Water Disposal.....................................................................................................94
24.   Federal and State Legislation and Regulatory Initiatives Relating to Hydraulic Fracturing .................................................................................95
25.   Credit Risk as it Affects Third Parties ..........................................................95
26.   The Elimination of Certain Federal Income Tax Deductions Currently Available with Respect to Oil and Natural Gas Exploration and Development ........................................................................................95
27.   Potential Legislative and Regulatory Actions Addressing Climate Change .....................................................................................................96
28.   Legal Proceedings.......................................................................................96
29.   Certain Tax Considerations..........................................................................96

C.    Certain Risk Factors Relating to Securities to Be Issued Under the Plan ...............97
1.    No Current Public Market for Securities .......................................................97
2.    Potential Dilution.......................................................................................97
3.    Dividends ..................................................................................................97
4.    The Supporting Noteholders Will Control Reorganized Delta....................98
5.    Transfer Restrictions on the New Common Stock Contained in the Restated Certificate of Incorporation ...........................................................98

**TABLE OF CONTENTS** - Continued

VIII.  VOTING PROCEDURES AND REQUIREMENTS .......................................................99

    A.  Voting Deadline ..................................................................................................99

    B.  Parties in Interest Entitled to Vote; Record Date ......................................99

    C.  Further Information; Additional Copies .........................................................101

IX.  CONFIRMATION OF THE PLAN ...............................................................................101

    A.  Confirmation Hearing.........................................................................................101

    B.  Requirements for Confirmation of the Plan – Consensual Confirmation .............102
        1.  Best Interests Test .................................................................................104
        2.  Acceptance ..............................................................................................105
        3.  Feasibility...............................................................................................105

    C.  Confirmation Without Acceptance of All Impaired Classes:  The "Cram Down" Alternative ...........................................................................................105
        1.  Fair and Equitable .................................................................................105
            a.  Secured Creditors.......................................................................106
            b.  Unsecured Creditors...................................................................106
            c.  Holders of Interests....................................................................107
            d.  Unfair Discrimination ................................................................107

    D.  Valuation of the Debtors ...................................................................................107

X.  CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS.........108

    A.  Exemption from Registration Requirements for Issuance of New Securities.......108

    B.  Restrictions in the New Stockholders' Agreement and the Restated Certificate of Incorporation ..................................................................................108

    C.  Subsequent Transfers of Securities .....................................................................108

XI.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION.........................109

    A.  Liquidation Under Chapter 7.............................................................................109

    B.  Alternative Plan(s) of Reorganization ...............................................................110

XII.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........110

    A.  Certain U.S. Federal Income Tax Consequences to the Holders of Allowed Claims and Interests ..........................................................................................111
        1.  Consequences to Holders of Allowed DIP Facility Claims, Allowed Priority Non-Tax Claims, and Other Secured Claims ................................111

**TABLE OF CONTENTS** - Continued

2. Consequences to Holders of Allowed General Unsecured Claims.............112
3. Consequences to Holders of Allowed Noteholder Claims ........................113
4. Consequences to Holders of Existing Equity Interests in Delta ................113
5. Accrued But Unpaid Interest ...................................................................114
6. Market Discount........................................................................................114
7. Bad Debt Deduction..................................................................................115
8. Limitation on Use of Capital Losses ........................................................115
9. Information Reporting and Backup Withholding ......................................115

B. Certain U.S. Federal Income Tax Consequences to Reorganized Debtors ...........116
1. Cancellation of Debt and Reduction of Tax Attributes ............................116
2. Limitation of Net Operating Loss Carry Forwards and Other Tax Attributes.................................................................................................117
   a. General Section 382 Annual Limitation ............................................117
   b. Special Bankruptcy Exceptions .......................................................118
3. Restrictions on Resale of Securities to Protect NOLs ..............................119
4. Section 269 of the Tax Code......................................................................119
5. Transfer of Assets to the Joint Venture Company ....................................119
6. Alternative Minimum Tax ........................................................................120

XIII. CONCLUSION AND RECOMMENDATION.............................................................120

**EXHIBITS**

Exhibit 1    Joint Plan of Reorganization of Delta Petroleum Corporation and its Debtor Affiliates

Exhibit 2    Disclosure Statement Order

Exhibit 3    Liquidation Analysis

Exhibit 4    Financial Projections

Exhibit 5    Valuation Analysis

Exhibit 6    Summary of Assets Contributed by Plan Sponsor and Delta to Joint Venture Company

# I.    INTRODUCTION

## A.    Overview

Delta Petroleum Corporation ("**Delta**") and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"),[2] submit this disclosure statement (as amended, the "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code, as now in effect or as hereafter amended (the "**Bankruptcy Code**"), and rule 3017 of the Federal Rules of Bankruptcy Procedure, as now in effect or as hereafter amended (the "**Bankruptcy Rules**"), and ballots for use in the solicitation of votes in accordance with section 1126(b) of the Bankruptcy Code (the "**Solicitation**") on the *Second Amended Joint Chapter 11 Plan of Reorganization of Delta Petroleum Corporation and its Debtor Affiliates*, dated as of July 5, 2012 (as amended through the date hereof, and including all Plan Exhibits and the Plan Supplements, the "**Plan**").[3]  The Plan is being proposed by the Debtors and is annexed as <u>Exhibit 1</u> to this Disclosure Statement.  The Debtors filed the Disclosure Statement and an initial version of the Plan on June 4, 2012, an amended version on June 29, 2012, obtained approval of the Disclosure Statement at a hearing on July 5, 2012.  The Disclosure Statement is amended through the date hereof.

The purpose of this Disclosure Statement is to assist each Holder of Claims entitled to vote on the Plan in making an informed judgment regarding whether to vote to accept or reject the Plan.  This Disclosure Statement sets forth certain information regarding (i) the Debtors' prepetition operating and financial history; (ii) the Debtors' need for restructuring of their financial obligations and operations; (iii) significant events that have occurred during the Debtors' chapter 11 cases (the "**Chapter 11 Cases**"); (iv) the terms of the Plan; (v) certain effects of confirmation of the Plan; (vi) certain risk factors associated with the Plan; (vii) the manner in which distributions will be made under the Plan; (viii) the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted; and (ix) the anticipated organization, operations, liquidity and financial projections of Delta and the other Debtors upon emergence from chapter 11 of the Bankruptcy Code ("**Reorganized Delta**" and the "**Reorganized Debtors**", respectively).

On July [6], 2012, the Bankruptcy Court approved this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor to make an informed judgment about the Plan.  A copy of the order approving the Disclosure Statement [D.I. ___] is attached hereto as <u>Exhibit 2</u> (the "**Disclosure Statement Order**").  Under section 1125 of

---

2 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Delta Petroleum Corporation (0803), DPCA LLC (0803), Delta Exploration Company, Inc. (9462), Delta Pipeline, LLC (0803), DLC, Inc. (3989), CEC, Inc. (3154), Castle Texas  Production Limited Partnership (6054), Amber Resources Company of Colorado (0506), and Castle  Exploration Company, Inc. (9007).  The Debtors' headquarters are located at: 370 17th Street, Suite 4300, Denver, Colorado 80202.

3 Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between the summary herein and the Plan, the Plan will govern.

the Bankruptcy Code, this approval enabled the Debtors to send the Disclosure Statement and solicit acceptances of the Plan.  The Bankruptcy Court has not considered approval of the Plan itself or conducted a detailed investigation into the contents of the Disclosure Statement.

The Official Committee of Unsecured Creditors (the "**Creditors' Committee**") was appointed on June 15, 2012. Due to its recent appointment, the Creditors' Committee has not, as of the date of this Disclosure Statement, had an opportunity to thoroughly review this Disclosure Statement, the Plan and the various transactions contemplated by the Plan, including the Contribution Agreement with the Plan Sponsor. As such, the Creditors' Committee does not, as of the date of this Disclosure Statement, have a view with respect to whether the Plan is confirmable as a matter of law or whether the Plan and the transactions contemplated by the Plan are in the best interest of unsecured creditors. The Creditors' Committee anticipates that it will complete its review and have a position with respect to the Plan prior to the voting and objection deadline set by the Bankruptcy Court.

### B.    Summary of the Chapter 11 Cases

Due to unprecedented economic conditions affecting the natural gas industry and certain other unforeseen events, the Debtors' current level of debt became unsustainable.  After a variety of unsuccessful out-of-court attempts to address the Debtors' financial obligations, the Debtors concluded that the only feasible way to restructure their debt was through the Chapter 11 process.  The Debtors' single largest obligation is owed to the Noteholders.  As of the date of this Disclosure Statement, the Noteholders were owed an aggregate amount of approximately $267.7 million in outstanding obligations on account of the Notes.  The Debtors also owe an aggregate amount of approximately $49.97 million in principal outstanding under the DIP Credit Facility to the DIP Lenders as of the date hereof, and approximately $1.7 million in payment-in-kind interest.  The DIP Credit Facility has maximum availability of $58.9 million.  It is possible that the Debtors will need to request an increase in the size of their DIP Credit Facility prior to the Confirmation Hearing.

The Plan reflects the terms negotiated by and between the Debtors and Laramie Energy II, LLC ("**Laramie,**" and, the "**Plan Sponsor**") following the conclusion of a competitive bidding process.  On June 4, 2012, certain Noteholders, with approximately 79.7% of the total amount of the Noteholder Claims (collectively, the "**Supporting Noteholders**"), the DIP Agent, the Debtors and the Plan Sponsor agreed in form and substance to the terms of a Plan Support Agreement (the "**Plan Support Agreement**"), pursuant to which the Supporting Noteholders have agreed to vote in favor of confirmation of the Plan on the terms and conditions outlined in the Plan Support Agreement and related ancillary documents attached thereto.  As of the date of this Disclosure Statement, the Plan Support Agreement has not been executed.  Please refer to Section IV.B.12 for a more detailed description of the Plan Support Agreement.

The Plan allows the Debtors to deleverage their balance sheets through their agreement with the Plan Sponsor to form a new limited liability company (the "**Joint Venture Company**") with assets contributed by the Plan Sponsor and the Debtors, including each party's oil and gas, surface real estate, and related assets located in Garfield and Mesa Counties, Colorado. Reorganized Delta will retain (i) a 33.34% interest in the Joint Venture Company, and (ii) $75 million in Cash, subject to certain adjustments set forth in the Contribution Agreement, drawn from a senior secured term loan credit facility obtained by the Plan Sponsor on behalf of the

Joint Venture Company (the "**JV Company Credit Facility**").  Approximately $75,000,000 in proceeds from the JV Company Credit Facility will be applied, along with certain other funds (as described in Section VI.B below) to pay the administrative expenses (including the DIP Facility Claims).  To the extent that the $75 million is not enough to repay the DIP Facility Claims in full on the Effective Date, the Debtors may enter into an Exit Loan facility to repay the DIP Facility Claims in full.  Precise sources and uses of the approximately $75 million in Cash will depend on the amount of Allowed Administrative Expense Claims.

The Plan further provides that the Holders of General Unsecured Claims and Noteholder Claims will receive their Pro Rata shares of Reorganized Delta's New Common Stock (and in the case of Holders of Noteholder Claims, any distribution that such Holder is entitled to receive from Debtors other than Delta) in full satisfaction of their Claims.

Holders of General Unsecured Claims and Noteholder Claims against Delta should be aware of certain risks relating to their treatment under the Plan. First, as described in more detail in Article VII of this Disclosure Statement, there are various risk factors relating to the New Common Stock, including that there will likely be limited liquidity and market for the New Common Stock.  Second, the existing Holders of Noteholder Claims will own the substantial majority of the New Common Stock after the Effective Date and as such, will control the operations and corporate decision-making of Reorganized Delta. Third, it is possible that the provider of the Exit Loan will require that a portion of the equity of Reorganized Delta be transferred to the Exit Loan lender in consideration for the Exit Loan financing being made available. If the Exit Loan is provided by the Debtors' current DIP lenders, who also hold Noteholder Claims and therefore will comprise the majority of the shareholders of Reorganized Delta, the effect of ceding a portion of the New Common Stock to the exit lenders would be to both increase the existing DIP Lenders' ownership stake in Reorganized Delta and create a structure in which the same parties would hold both the secured debt and the overwhelming majority of the equity in Reorganized Delta. Finally, if Reorganized Delta were to default on its obligations under the Exit Loan, the result could be that the exit lender would enforce its remedies, which in turn could result in the equity interests in Reorganized Delta being extinguished.

Existing Equity Interests in Delta shall be extinguished, canceled and discharged and such Holders of Existing Equity Interests shall not receive any distribution or consideration in connection with such Existing Equity Interests.  Existing Equity Interests against a Debtor other than Delta shall be extinguished, canceled and discharged and such Holders of Existing Equity Interests shall not receive any distribution or consideration in connection with such Existing Equity Interests and such Debtor shall be liquidateed, provided, however, that if Holders of Allowed General Unsecured Claims and Noteholder Claims against such Debtor's Estate have been paid in full on account of such Allowed Claim, such Existing Equity Interests will not be extinguished, canceled or discharged, and any remaining assets owned by such Debtor will be held by the Recovery Trustee on behalf of such Debtor's Estate pending a decision by such Debtor's board of directors on if and when to distribute the proceeds of such Assets.

Except for Delta, each of the other Debtors is non-operational and owns few, if any, assets.  To the extent a Claim exists against a Debtor other than Delta, such Claim, if Allowed, will be paid solely from the assets (if any) of such Debtor, and any such assets owned by a Debtor will be distributed solely to the creditors and shareholders of such Debtor.

The significant majority of Reorganized Delta's value is derived from its 33.34% interest in the Joint Venture Company. Reorganized Delta will retain certain additional assets including, among other things, Delta's Point Arguello interests, certain compressors located in Wyoming, frac tanks, rights to certain proceeds under the Contribution Agreement, and receivables and other working capital. The value of these assets outside the Joint Venture Company, net of Reorganized Delta corporate overhead, is estimated to be approximately $8.5 million. Each Reorganized Debtor is also a beneficiary of the Recovery Trusts, but only to the extent of the Recovery Trust Assets contributed to the Recovery Trusts by each Debtor. However, due to the uncertainty of the potential recoveries around certain Causes of Action, the Reorganized Debtors' stake in the two Recovery Trusts has been valued at $0. For more details on the financial condition of Reorganized Delta, an analysis of Reorganized Delta's enterprise value and opening balance sheet, and a summary of assets contributed to the Joint Venture Company by the Plan Sponsor, please see the Financial Projections, Valuation Analysis and Summary of Assets Contributed by Plan Sponsor attached as Exhibits 4, 5, and 6 respectively, to this Disclosure Statement.

Under the Plan, Delta's other creditors and equity holders will receive the following treatments:

- Each Priority Non-Tax Claim and each Other Secured Claim will be unimpaired in accordance with section 1124(1) of the Bankruptcy Code.

- Each General Unsecured Claim against Delta will receive its Pro Rata Share of the New Common Stock of Reorganized Delta. The aggregate amount of New Common Stock distributable to such Holders of General Unsecured Claims and Noteholder Claims is subject to dilution to the extent that a grant of New Common Stock to lenders is necessary to obtain financing under the Exit Loan. For purposes of distribution of the stock of Reorganized Delta under the Plan, Pro Rata shall be determined by taking into account (i) the total amount of Noteholder Claims plus (ii) the total amount of General Unsecured Claims.

- Each Noteholder Claim will receive such Claim's Pro Rata share of the New Common Stock of Reorganized Delta. As set forth above, Pro Rata shall be determined by taking into account (i) the total amount of Noteholder Claims plus (ii) the total amount of General Unsecured Claims.

- Intercompany Claims against Delta will not receive any recovery under the Plan.

- All Existing Equity Interests in Delta will be canceled and the Holders thereof will receive no value under the Plan (except as provided in Section 4.13 of the Plan for certain Debtors other than Delta, depending on how certain Claims against such Debtors are resolved).

- All creditors of Debtors other than Delta (including General Unsecured Claims and Noteholder Claims against Debtors other than Delta) will receive distributions on account of whatever assets are held by such Debtor's Estate. As the Debtors other than Delta contain generally de minimis assets, recoveries for creditors of such Debtors will be extremely small or non-existent.

In view of the deemed rejection by Class A6 (Intercompany Claims against Delta), Class A7 (Existing Equity Interests in Delta),Class A8 (Securities Litigation Claims against Delta), and Existing Equity Interests in Debtors other than Delta, the Debtors will seek confirmation of the Plan pursuant to the "cram down" provisions of section 1129 of the Bankruptcy Code as to these classes. Further, if any of the Classes of Holders of General Unsecured Claims or Noteholder Claims do not vote to confirm the Plan, the Debtors intend to "cram down" the Plan over the objections of such Classes as well. Such treatment complies with section 1129 of the Bankruptcy Code. It would be "fair and equitable" pursuant to 1129(b) because no Class of Claims or Equity Interests junior to General Unsecured Claims or Noteholder Claims would receive or retain any property under the Plan on account of such junior Claims or Equity Interests, and it would meet the "best interests" test pursuant to 1129(a)(7) because General Unsecured Claims or Noteholder Claims are treated as favorably as they would be in a chapter 7 liquidation, in which the recovery to the Holders of General Unsecured Claims and Noteholder Claims would be severely limited. Thus, if the Plan otherwise satisfies the confirmation requirements of section 1129 of the Bankruptcy Code, then it could provide no recovery to Holders of Claims in Classes A6, A8, and Existing Equity Interests.

The Debtors believe that implementation of the Plan will maximize value for the benefit of their stakeholders. The Debtors further believe that the value of their businesses would be damaged significantly if they are unable to implement the transactions with the Plan Sponsor contemplated by the Plan. Therefore, if the requisite acceptances of the Plan have been obtained, the Debtors will seek approval of this Disclosure Statement and consummation of the Plan as quickly as possible. If the Plan is not confirmed and consummated, the alternatives to the Plan include liquidation of the Debtors under chapter 7 of the Bankruptcy Code or formulation of a different plan of reorganization.

A brief summary of the Classes established under the Plan, including the treatment and the voting rights of each Class, is set forth in the table below. A complete description of the treatment of each Class is set forth in Article IV of the Plan and Section V.B of this Disclosure Statement. Parties should refer to those sections for a complete description of the proposed treatment for each Class.

Unclassified Claims and Estimated Aggregate Liabilities Through the Effective Date:

**Administrative Claims**:        $68MM - 87MM
(includes DIP Facility Claims)

**Priority Claims**:              $4MM
(includes Priority Tax Claims)

Delta Petroleum Corporation:

| Class | Claims & Interests | Status | Treatment | Voting Rights | Estimated Recovery Under Plan | Estimated Liquidation Recovery | Approx. Amount of Claims Filed[4] | Est. Total Post Reconciliation Claims |
|-------|-------------------|--------|-----------|---------------|-------------------------------|--------------------------------|----------------------------------|---------------------------------------|
| A1 | DIP Facility Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | 100.0% | 100.0% | $0 | $58.9MM |
| A2 | Priority Non-Tax Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | 100.0% or Unaffected by Plan | 100.0% | $0.23MM | $0.013MM |
| A3 | Other Secured Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | 100.0% or Unaffected by Plan | 100.0% | $276.67MM[5] | $0.46MM |
| A4 | General Unsecured Claims | Impaired | Pro Rata Share of the New Common Stock of Reorganized Delta[6] | Entitled to Vote | 28.0 - 30.0%[7] | 6.0 - 11.7% | $17.37MM | $2.96MM |
| A5 | Noteholder Claims | Impaired | Pro Rata Share of the New Common Stock of Reorganized Delta | Entitled to vote | 28.0 - 30.0% | 6.0 - 11.7% | $363.65MM | $267.69MM |
| A6 | Intercompany Claims | Impaired | No Recovery | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | $0 | $0 |

---

[4] The approximate dollar amount of Claims filed against each Class does not represent a concession by the Debtors that any or all such Claims are Allowed Claims. Such amounts are shown herein solely for disclosure purposes. The Debtors will likely object to the vast majority of Claims filed against each Debtor. Estimated recoveries take into account the Debtors' estimated recoveries after the Claims reconciliation process has been completed.

[5] The majority of the Other Secured Claims filed against Delta are claims for insurance proceeds relating to personal injury litigation pending against Delta. To the extent Delta has any liability in such litigation, these claims are improperly classified by the claimants as being secured claims, and the Debtors plan to object to such claims.

[6] Neither the Debtors nor any of their advisors make any representation or warranty as to the liquidity of the New Common Stock on the Effective Date of the Plan, nor the ability of a Holder of New Common Stock to sell the New Common Stock at its indicated value. For more information about the risk factors that may affect the New Common Stock, please see Article VII.C of this Disclosure Statement.

[7] There are a significant number of claims subject to dispute by the Debtors and other parties that may ultimately be litigated. The resolution of these disputes and whether portions of such claims are ultimately classified as Administrative Claims or General Unsecured Claims may materially impact projected recoveries for holders of General Unsecured Claims, Noteholder Claims, and Existing Equity Interests in Debtors other than Delta.

| Class | Claims & Interests | Status | Treatment | Voting Rights | Estimated Recovery Under Plan | Estimated Liquidation Recovery | Approx. Amount of Claims Filed[4] | Est. Total Post Claims Reconciliation |
|---|---|---|---|---|---|---|---|---|
| A7 | Existing Equity Interests | Impaired | No Recovery | Not Entitled to Vote (Deemed to Reject) | $0 | $0 | $0 | $0 |
| A8 | Securities Litigation Claims | Impaired | No Recovery | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | $0 | $0 |

## DPCA LLC:

| Class | Claims & Interests | Status | Treatment | Voting Rights | Estimated Recovery Under Plan | Estimated Liquidation Recovery | Approx. Amount of Claims Filed | Est. Total Post Claims Reconciliation |
|---|---|---|---|---|---|---|---|---|
| B1 | DIP Facility Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | 100.0% | 100.0% | $0 | $58.9MM |
| B2 | Other Secured Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | N/A | N/A | $0 | $0 |
| B3 | General Unsecured Claims | Impaired | Pro Rata Share of Cash[8] | Entitled to Vote | N/A | N/A | $0 | $0 |
| B4 | Noteholder Claims | Impaired | Pro Rata Share of Cash | Entitled to vote | ~0.01% | 0.0% | $362.97MM | $267.69MM |
| B5 | Existing Equity Interests | Impaired | No Recovery | Not Entitled to Vote (Deemed to Reject) | $0 | $0 | $0 | $0 |

## Delta Exploration Company, Inc.:

| Class | Claims & Interests | Status | Treatment | Voting Rights | Estimated Recovery Under Plan | Estimated Liquidation Recovery | Approx. Amount of Claims Filed | Est. Total Post Claims Reconciliation |
|---|---|---|---|---|---|---|---|---|
| C1 | DIP Facility Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | 100.0% | 100.0% | $0 | $58.9MM |
| C2 | Other Secured Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | N/A | N/A | $0 | $0 |
| C3 | General Unsecured Claims | Impaired | Pro Rata Share of Cash | Entitled to Vote | N/A | N/A | $0 | $0 |

---

[8]  In the event where a class of General Unsecured Claims or Noteholder Claims of Debtors other than Delta is to receive the "Pro Rata Share of Cash", such Cash includes proceeds from the wind down or liquidation of any remaining assets that may exist in such Debtor's estate.

| Class | Claims & Interests | Status | Treatment | Voting Rights | Estimated Recovery Under Plan | Estimated Liquidation Recovery | Approx. Amount of Claims Filed | Est. Total Post Claims Reconciliation |
|---|---|---|---|---|---|---|---|---|
| C4 | Noteholder Claims | Impaired | Pro Rata Share of Cash | Entitled to vote | ~0.01% | 0.0% | $362.97MM | $267.69MM |
| C5 | Existing Equity Interests | Impaired | No Recovery | Not Entitled to Vote (Deemed to Reject) | $0 | $0 | $0 | $0 |

Delta Pipeline, LLC:

| Class | Claims & Interests | Status | Treatment | Voting Rights | Estimated Recovery Under Plan | Estimated Liquidation Recovery | Approx. Amount of Claims Filed | Est. Total Post Claims Reconciliation |
|---|---|---|---|---|---|---|---|---|
| D1 | DIP Facility Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | 100.0% | 100.0% | $0 | $58.9MM |
| D2 | Other Secured Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | N/A | N/A | $0 | $0 |
| D3 | General Unsecured Claims | Impaired | Pro Rata Share of Cash | Entitled to Vote | N/A | N/A | $0 | $0 |
| D4 | Noteholder Claims | Impaired | Pro Rata Share of Cash | Entitled to vote | ~0.01% | 0.0% | $362.97MM | $267.69MM |
| D5 | Existing Equity Interests | Impaired | No Recovery | Not Entitled to Vote (Deemed to Reject) | $0 | $0 | $0 | $0 |

DLC, Inc.:

| Class | Claims & Interests | Status | Treatment | Voting Rights | Estimated Recovery Under Plan | Estimated Liquidation Recovery | Approx. Amount of Claims Filed | Est. Total Post Claims Reconciliation[9] |
|---|---|---|---|---|---|---|---|---|
| E1 | DIP Facility Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | 100.0% | 100.0% | $0 | $58.9MM |
| E2 | Other Secured Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | N/A | N/A | $0.68MM | $0 |
| E3 | General Unsecured Claims | Impaired | Pro Rata Share of Cash | Entitled to Vote | N/A | N/A | $0 | $0 |

---

[9] As to DLC, Inc., CEC, Inc., Castle Texas Production Limited Partnership, Amber Resources Company of Colorado, and Castle Exploration Company, Inc., the Debtors' position is that these entities are not guarantors of some or all of the Notes, as further described in Articles II.D.2 and 3 herein, although the Indenture Trustee filed proofs of claim against each of these entities for amounts owing under the Notes.

| Class | Claims & Interests | Status | Treatment | Voting Rights | Estimated Recovery Under Plan | Estimated Liquidation Recovery | Approx. Amount of Claims Filed | Est. Total Post Claims Reconciliation[9] |
|---|---|---|---|---|---|---|---|---|
| E4 | Noteholder Claims | Impaired | Pro Rata Share of Cash | Entitled to vote | ~0.01% | 0.0% | $363.65MM | $115.53MM |
| E5 | Existing Equity Interests | Impaired | No Recovery | Not Entitled to Vote (Deemed to Reject) | $0 | $0 | $0 | $0 |

CEC, Inc.:

| Class | Claims & Interests | Status | Treatment | Voting Rights | Estimated Recovery Under Plan | Estimated Liquidation Recovery | Approx. Amount of Claims Filed | Est. Total Post Claims Reconciliation |
|---|---|---|---|---|---|---|---|---|
| F1 | DIP Facility Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | 100.0% | 100.0% | $0 | $58.9MM |
| F2 | Other Secured Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | N/A | N/A | $0 | $0 |
| F3 | General Unsecured Claims | Impaired | Pro Rata Share of Cash | Entitled to Vote | N/A | N/A | $1.49MM | $0 |
| F4 | Noteholder Claims | Impaired | Pro Rata Share of Cash | Entitled to vote | N/A | N/A | $362.97MM | $0 |
| F5 | Existing Equity Interests | Impaired | No Recovery | Not Entitled to Vote (Deemed to Reject) | $0 | $0 | $0 | $0 |

Castle Texas Production Limited Partnership:

| Class | Claims & Interests | Status | Treatment | Voting Rights | Estimated Recovery Under Plan | Estimated Liquidation Recovery | Approx. Amount of Claims Filed | Est. Total Post Claims Reconciliation |
|---|---|---|---|---|---|---|---|---|
| G1 | DIP Facility Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | 100.0% | 100.0% | $0 | $58.9MM |
| G2 | Other Secured Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | N/A | N/A | $0 | $0 |
| G3 | General Unsecured Claims | Impaired | Pro Rata Share of Cash | Entitled to Vote | N/A | N/A | $0 | $0 |
| G4 | Noteholder Claims | Impaired | Pro Rata Share of Cash | Entitled to vote | N/A | N/A | $362.97MM | $0 |
| G5 | Existing Equity Interests | Impaired | No Recovery | Not Entitled to Vote (Deemed to Reject) | $0 | $0 | $0 | $0 |

Amber Resources Company of Colorado:

| Class | Claims & Interests | Status | Treatment | Voting Rights | Estimated Recovery Under Plan | Estimated Liquidation Recovery | Approx. Amount of Claims Filed | Est. Total Post Claims Reconciliation |
|-------|-------------------|--------|-----------|---------------|-------------------------------|--------------------------------|--------------------------------|----------------------------------------|
| H1 | Priority Non-Tax Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | 100.0% or Unaffected by Plan | 100.0% | $0.023MM | $0.023MM |
| H2 | Other Secured Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | N/A | N/A | $0.01MM | $0 |
| H3 | General Unsecured Claims | Impaired | Pro Rata Share of Cash | Entitled to Vote | ~ 0.1 - 100% | 1.7% | $44.74MM | $0.012MM |
| H4 | Noteholder Claims | Impaired | Pro Rata Share of Cash | Entitled to vote | N/A | N/A | $362.97MM | $0 |
| H5 | Existing Equity Interests | Impaired | No Recovery | Not Entitled to Vote (Deemed to Reject) | $0 | $0 | $0 | $0 |

Castle Exploration Company, Inc.:

| Class | Claims & Interests | Status | Treatment | Voting Rights | Estimated Recovery Under Plan | Estimated Liquidation Recovery | Approx. Amount of Claims Filed | Est. Total Post Claims Reconciliation |
|-------|-------------------|--------|-----------|---------------|-------------------------------|--------------------------------|--------------------------------|----------------------------------------|
| I1 | DIP Facility Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | 100.0% | 100.0% | $0 | $58.9MM |
| I2 | Other Secured Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | N/A | N/A | $0 | $0 |
| I3 | General Unsecured Claims | Impaired | Pro Rata Share of Cash | Entitled to Vote | ~ 0.1 - 100% | 0.1% | $1.52MM | $0.038MM |
| I4 | Noteholder Claims | Impaired | Pro Rata Share of Cash | Entitled to vote | N/A | N/A | $362.97MM | $0 |
| I5 | Existing Equity Interests | Impaired | No Recovery | Not Entitled to Vote (Deemed to Reject) | $0 | $0 | $0 | $0 |

## C.    Who Is Entitled to Vote

This Disclosure Statement is being transmitted to certain Holders of Claims for the purpose of soliciting votes on the Plan and to others for informational purposes. For those Holders of Claims entitled to vote, the purpose of this Disclosure Statement is to provide adequate information to enable those Holders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan.

Under section 1126 of the Bankruptcy Code, only classes of claims or equity interests that are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such plan are entitled to vote on a plan.   PURSUANT TO THE PLAN, ONLY GENERAL UNSECURED CLAIMS AND NOTEHOLDER CLAIMS ARE IMPAIRED BY AND ENTITLED TO RECEIVE A DISTRIBUTION UNDER THE PLAN, AND ONLY THE HOLDERS OF GENERAL UNSECURED CLAIMS AND NOTEHOLDER CLAIMS ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.   You should review this Disclosure Statement to determine whether you hold a General Unsecured Claim or Noteholder Claim.  DIP Facility Claims, Other Secured Claims and Priority Non-Tax Claims in Classes A2 and H1 are unimpaired by the Plan, and such Holders are conclusively presumed to have accepted the Plan.  Holders of Intercompany Claims in Class A6, Existing Equity Interests, and Securities Litigation Claims in Class A8, are deemed to have rejected the Plan, and the Holders of Claims or Equity Interests in such Classes are not entitled to vote.

### D.      How to Vote and Voting Deadline

After carefully reviewing the Plan, this Disclosure Statement and the detailed instructions accompanying your ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying ballot.  You should complete and sign your original ballot and return it according to the instructions enclosed with the ballot.  Copies of ballots will not be accepted, nor will any other form of vote.

Each ballot reflects the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the ballot(s) sent to you with this Disclosure Statement.

PLEASE READ AND CAREFULLY FOLLOW THE VOTING INSTRUCTIONS BEFORE COMPLETING YOUR BALLOT.   IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BENEFICIAL OWNER BALLOT OR MASTER BALLOT MUST BE PROPERLY SIGNED AND COMPLETED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT.   UNLESS YOU HAVE RECEIVED A PRE-VALIDATED BENEFICIAL OWNER BALLOT (AS DESCRIBED HEREIN) FOR DIRECT RETURN TO THE VOTING AGENT, YOU MUST RETURN YOUR BENEFICIAL OWNER BALLOT TO YOUR NOMINEE IN ENOUGH TIME FOR YOUR VOTE TO BE PROCESSED ON A MASTER BALLOT AND SUBMITTED TO THE VOTING AGENT. MASTER BALLOTS AND BENEFICIAL OWNER BALLOTS MUST BE  ACTUALLY RECEIVED BY AUGUST 8, 2012 AT 4:00 P.M. PREVAILING EASTERN TIME BY DPC PROCESSING CENTER AS FOLLOWS:

***By hand delivery, mail or overnight courier:***

DPC Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY  10017

BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS OR OTHER EVIDENCE OF YOUR CLAIM WITH YOUR BALLOT.[10]

The record date for determining which Holders of Claims are entitled to vote on the Plan is July 5, 2012 (the "**Record Date**").  The Indenture Trustee will not vote on behalf of the Holders.  Each Holder of an existing Noteholder Claim must submit its own ballot, which it will receive from the Voting Agent.

### E.    Confirmation Hearing

The Bankruptcy Court has set August 15, 2012 at 2:00 p.m. (prevailing Eastern time) for a hearing (the "**Confirmation Hearing**") to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for confirmation of the Plan have been satisfied.  The Confirmation Hearing will be held before the Honorable Kevin J. Carey, at the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 5th Floor, Courtroom No. 5, Wilmington, Delaware 19801.  The Confirmation Hearing may be continued from time to time and day to day without further notice. If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties in interest, by no later than August 8, 2012 at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.  Unless objections to Confirmation are timely served and filed in compliance with the

---

10      Section 10.8 of the Plan provides that each Person who votes to accept the Plan and does not indicate its preference to opt-out of the releases contained in Section 10.8 of the Plan on its ballot shall be deemed to forever release, waive and discharge the Released Parties, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, demands, causes of action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise that is based on, relates to, or in any manner arises from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party relating to the restructuring of Claims prior to or in the Chapter 11 Cases or the negotiation, formulation or preparation of the Plan, or any related agreements, instruments or other documents (except for any liability that results from bad faith, willful misconduct or gross negligence as determined by a Final Order).  Holders of Claims not voting to accept the Plan are not granting the releases contained in Section 10.8.  For the avoidance of doubt, to the extent the Holder of a Claim in a voting Class votes to accept the Plan with respect to that Claim and does not opt-out of the releases under Section 10.8 of the Plan, also holds a Claim in a non-voting Class, any release granted as a result of such Holder's vote with respect to its voting Class Claim shall not be deemed a release of such Holder's non-voting Class Claim. Notwithstanding the foregoing, in the event that the Plan is not confirmed, no party shall be deemed to have released or shall release any claims or be released hereby.  Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of any Released Party in respect of any express contractual obligation of any such Released Party incurred in connection with the Plan or of any express contractual obligation of any non-Debtor party due to any other non-Debtor party.

Disclosure Statement Order, which is attached to this Disclosure Statement as Exhibit 2, they may not be considered by the Bankruptcy Court.

## F.    Additional Information

If you have any questions about (a) the procedure for voting on your General Unsecured Claim or Noteholder Claim, (b) the package of materials that you have received or (c) the amount of your Claim, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent (as defined in Section VIII.A) at:

Epiq Bankruptcy Solutions, LLC
Phone:  (646) 282-2400
E-mail: tabulation@epiqsystems.com

For further information and general instructions on voting to accept or to reject the Plan, see Article VIII of this Disclosure Statement and the instructions accompanying your ballot.

## II.    GENERAL INFORMATION REGARDING THE DEBTORS

### A.    Background

The Debtors collectively are an independent oil and gas company engaged primarily in the exploration for, and the acquisition, development, production, and sale of, natural gas and crude oil.  Natural gas comprises over 90% of the Debtors' production services.  The core area of the Debtors' operations is the Rocky Mountain Region of the United States, where the majority of their proved reserves, production and long-term growth prospects are located.

### B.    The Debtors' Business Operations

The Debtors' primary business is exploring for mineral production opportunities to produce natural gas and crude oil, identifying those opportunities and entering into leases with land owners to exploit the mineral rights on the land, and then producing the natural gas and crude oil.  The Debtors do not have an affiliate that conducts drilling activities, and thus require outside contractors to drill wells.[11]   In the case of natural gas, once the gas has been extracted, the product typically travels through pipelines owned by third parties, who transport the product to a processing plant for a fee.  The processing plant owner processes the gas and delivers the residue gas to Delta's market, with Delta's chosen processing facility receiving the liquid products, selling them, and remitting proceeds to Delta.  In the case of oil production, the Debtors sell their product to a small number of "first purchasers", which consist of larger natural gas and oil companies who enter into contracts to purchase natural gas and crude oil from the

---

[11]    Previously, Delta owned a 49.8% interest in a drilling company known as DHS Drilling Company ("**DHS**").  DHS was the borrower under a secured credit facility with Lehman Commercial Paper, Inc. ("**LCPI**"), and as of September 30, 2011, owed LCPI approximately $71.9 million on account of such credit facility.  The credit facility was non-recourse to Delta.  After several efforts to sell DHS, including engaging transaction advisors, Delta opted on October 30, 2011 to sell its stock in DHS to LCPI for $500,000.

Debtors to sell into the broader marketplace.  The crude oil is separated from the gas at the well site instead of going to a pipeline, and taken directly by truck from the well site to go to processing plants.

1.    **Sources of Revenue**

The Debtors' core asset and primary area of activity is in the Vega Area of the Piceance Basin in western Colorado (the "**Vega Unit**").  The Williams Fork member of the Mesa Verde formation is the primary producing interval and has been successfully developed throughout the Piceance Basin.  The geology of the Piceance Basin is characterized as highly consistent and predictable over large areas, which generally equates to reliable timing and cost expectations during drilling and completion activities, as well as minimal well-to-well variance in production and reserves when completed with the same methodology.

Since 2005, the Debtors have dedicated significant financial capital and human resources to the development of the Vega Unit and surrounding leasehold in Mesa County, Colorado (together with the Vega Unit, the "**Vega Area**").  The Vega Area is comprised of the Vega Unit, a unit in Buzzard Creek, and leaseholds in North Vega and North Buzzard Creek.  The Debtors' working interest in the Vega Area varies between 95 and 100%.

In 2008, Delta acquired an additional 17,300 net acres in the Vega Area, which increased its position to approximately 22,375 net acres, which has over 1,900 net drilling locations based on 10-acre spacing.  During fiscal year 2008, Delta increased proved reserves in the Vega Area over 295% to 719.9 Bcfe (billions of cubic feet equivalent) and increased production from approximately 25.0 Mmcf/d (million cubic feet per day) at the beginning of the year to approximately 48.0 Mmcf/d at the end of 2008.  However, during 2009, as a result of the combined effect of lower natural gas prices through the year and the new SEC reserve pricing rules and Delta's limited capital development plan, proved reserves decreased to 84.7 Bcfe.  As of April 30, 2012 proved reserves in the Vega area totaled 639.5 Bcfe. This reserve estimate assumed that, under the Joint Venture Company, sufficient development capital would be available to develop the proved undeveloped reserves included in the total proved reserve estimate.  As of April 30, 2012, Delta's proved developed producing reserves were 83.4 Bcfe and its proved undeveloped reserves were 542 Bcfe, requiring estimated future development capital of $856 million. Delta's net production currently exceeds 22 Mmcf/d.

Delta ended 2010 with 190 wells producing natural gas and crude oil.  Delta decreased its drilling program from four rigs to one rig at year end 2008, and further to zero rigs in 2009 and 2010, primarily due to the decrease in natural gas prices and liquidity concerns.  Since 2005, Delta has experienced significant reductions in drill time, and drilling and completion costs. Delta reinitiated completion activities in the latter half of 2010 on previously drilled wells. These recently completed wells utilized a larger fracture stimulation design, called "generation four" or "Gen IV", which has proven to increase the initial production and recoverable reserves per well over Delta's prior completion designs.  Additionally, Delta drilled a well in the Vega Area to test the sections that are located deeper than the Williams Fork section.  Delta also began drilling another well, which will target the section immediately beneath the Williams Fork section.  Delta is not currently undertaking any drilling activities, and has focused its operations on production services.

As the Debtors scaled back their operations as further described below, the Debtors streamlined their businesses to focus on the Vega Area. As of April 30, 2012, the Vega Area comprised approximately 98% of the Debtors' proved reserves and with its undeveloped leasehold potential comprises virtually all of their long-term growth prospects. The Debtors have sold many of their non-core assets and interests in the three years prior to the Petition Date, including their interests in producing fields in Texas and other non-core areas as further described below. These sales allowed the Debtors to reduce debt, overhead and operating expenses, while raising capital to deploy in the Vega Area. Although the Debtors retain working interests in certain fields outside their core area, such fields are now operated by third parties, and the Debtors expect limited capital expenditures in those areas in the future.

2.     **Financial Results**

Financial information concerning the Debtors' financial condition as of the Petition Date can be found in the Debtors' Schedules and Statement of Financial Affairs filed with the Bankruptcy Court [D.I. 140-160, 285, 286, 416, 417] and addressed more fully herein. Additionally, current information concerning the Debtors may be found in the Monthly Operating Reports filed with the Bankruptcy Court [D.I. 197, 331, 415, 440, 475].

C.     **The Debtors' Prepetition Organizational Structure**

Delta, the ultimate parent company of each of the other Debtors, was incorporated originally in Colorado in 1984 and reincorporated in Delaware in 2005. Delta is a public company, as is Amber Resources Company of Colorado (OTCBB:AMBE, "**Amber**"). Delta's common stock was listed on the NASDAQ (NASDAQ: DPTR) until January 17, 2012, when the listing was removed due to the NASDAQ's determination that Delta no longer met qualification requirements. Delta's common stock subsequently was traded on the OTCQB (OTCQB: DPTRQ) . Delta has not filed its annual report on Form 10-K for the fiscal year ended December 31, 2011 or any quarterly reports on Form 10-Q with the Securities and Exchange Commission since the Petition Date, but intends to remedy any past instances of noncompliance prior to the Effective Date. Amber is current in its filings with the Securities and Exchange Commission.

The other Debtors are privately held corporations, limited liability companies or limited partnerships that are either wholly-owned or majority-owned by Delta. Delta's subsidiaries are non-operational and own few, if any, assets. What assets are owned by Delta's subsidiaries tend to be undeveloped plots of real property. The Debtors have not substantively consolidated their estates.

Amber, a 91.68% owned subsidiary of Delta, was incorporated in Delaware in 1978. Amber was previously known simply as "Amber Resources Company," but when Delaware temporarily voided its charter, another company took Amber's original name. Amber sold all of its onshore producing properties to Delta on July 1, 2001. In April of 2009, Amber ceased all business activities and contends that it assigned its ownership interest in all of its remaining properties to the United States after entry of a final judgment against the United States in favor

of Amber in the amount of $1,496,235. [12]  In that lawsuit, the court found that the government had materially breached the terms of certain undeveloped federal leases, some of which involved a portion of Amber's and Delta's offshore California properties. Although the government paid the judgment, it has not accepted the assignment of the leases, and continues to maintain Amber and Delta as record owners of interests in such leases.  Delta and Amber contend that the assignment of such leases was effective.

Although the breach of contract action has been concluded, the government contends that the record working interest owners (including Amber and Delta) are still obligated to permanently plug and abandon an exploratory well that the working interest owners drilled on one of the leases (OCS Lease 320) and to clear the well site. The government contends that Amber is the record owner of a 0.97953% working interest in the affected lease, and that Delta is the record owner of 2.41934% working interest.  Noble Energy, Inc. ("**Noble**"), the entity that contends it is the former operator of the lease, and whom the government contends is the current operator of the lease, sued the United States, claiming that since the government breached the terms of the lease, the working interest owners are not responsible for any cleanup activities.  As Delta and Amber contend that the assignment of the federal leases was effective, Delta and Amber dispute the government's position and have taken the position that they are the former working interest owners of such leases, not the current working interest owners of record.  The Bureau of Ocean Energy Management (formerly the Minerals Management Service) continues to carry Amber, Delta, and Noble in its records as working interest owners in the lease, and to carry Noble in its records as the operator.

In the aforementioned suit brought by Noble, the United States District Court for the District of Columbia ruled in favor of the government, [13] but the decision was vacated on appeal by the United States Court of Appeals for the District of Columbia Circuit, [14] and the matter was remanded to the Department of the Interior for further proceedings consistent with the ruling. The United States contends that if the lessees are held responsible, Amber, Delta, and the other lessees will be responsible for decommissioning the exploratory well and well site.  Delta and Amber contend that if Noble is ultimately held responsible for permanently plugging and abandoning the well, Delta and Amber may be required to pay their respective proportional shares of any remediation expenses (which the Debtors estimate to be approximately $900,000 for Amber and $300,000 for Delta). Both Amber and Delta intend to resolve any outstanding liabilities against either of them relating to this matter during the Chapter 11 Cases.

Below is an organizational chart depicting the relationships among the Debtors and between Delta and each of the Debtors:

---

12    *Amber Res. Co. v. United States*, Case No. 02-30C, 2006 WL 3143618 (Fed. Cl. Oct. 31, 2006) *aff'd*, 538
      F.3d 1358 (Fed. Cir. 2008).
13    *Noble Energy Corp. v. Salazar*, Case No. 1:09-cv-02013-EGS (D.D.C. Apr. 22, 2011).
14    *Noble Energy Corp. v. Salazar*, Case No. 11-5114 (D.C. Cir. March 2, 2012).



### 1.    Tracinda Corporation's Investment

On December 31, 2007, Delta entered into a Company Stock Purchase Agreement with Tracinda Corporation ("**Tracinda**"), a private investment corporation wholly-owned by Kirk Kerkorian.  Pursuant to that agreement, Tracinda invested $684 million to acquire common stock from Delta at $19.00 per share, which represented a 23-percent premium to the price at the market close as of December 28, 2007 and a 26-percent premium to Delta's 30-day trading average.    Following an extended period of due diligence and the approval of Delta's shareholders, Delta and Tracinda consummated the transaction on February 22, 2008. Consequently, Tracinda nominated three individuals affiliated with Tracinda to serve on Delta's board of directors.  Prior to Tracinda's equity investment, the Debtors had been running low on capital to finance their operations, and had drawn down nearly all availability under their existing credit facilities.  However, the bulk of Tracinda's equity investment was used not to pay down debt or delever, but rather to expand exploration and production facilities, acquire new land and drill additional wells.

Despite Tracinda's equity investment, the Debtors required additional capital to support their operations.  In the first quarter of 2009, Delta planned another rights offering to sell more equity in the company.  Tracinda agreed to backstop the rights offering and on March 26, 2009, entered into a Contingent Payment Rights Purchase Agreement with Delta (the "**CPR Agreement** ").  At the time, Tracinda held approximately 40% of Delta's outstanding common stock.  Subject to the terms and conditions of the CPR Agreement, on March 26, 2009, Tracinda purchased a contingent payment right (the "**CPR**") for $14.9 million.  Tracinda subsequently purchased an additional CPR for $10.1 million on April 1, 2009, following Delta's receipt of an opinion of an independent investment banking firm relating to the transaction, as required under the indenture with respect to the 7% Notes (as defined below) for transactions with affiliates.

The 2009 rights offering raised approximately $232,000,000 in additional capital, which was primarily used at the time to pay outstanding receivables owed to vendors on account of enhanced drilling and exploration activities.

2.    **Board of Directors and Management**

As of the Petition Date, the members of the board of directors and executive officers of Delta were as follows:

**Carl E. Lakey (Chief Executive Officer and Director - July 2010 to Present)** became Chief Executive Officer of Delta effective as of July 6, 2010 and became a Director of Delta on August 4, 2010.  Mr. Lakey most recently served as Senior Vice President of Operations for Delta and has been with Delta since 2007.  Prior to joining Delta, Mr. Lakey served from 2001 to 2007 in various capacities with El Paso Production Company, most recently as the Manager of Operations and Engineering for its Western Onshore Division.  Prior to that, he served in various capacities with Mobil and ExxonMobil from 1985 to 2001.  Mr. Lakey also serves as the President, CEO and a Director of Amber.  He received a bachelor's degree in Petroleum Engineering from Colorado School of Mines in 1985.

**Kevin K. Nanke (Treasurer and Chief Financial Officer - December 1999 to Present)** joined Delta in April 1995 as Controller and has served as the Treasurer and Chief Financial Officer of Delta and Amber since 1999.  Since 1989, he has been involved in public and private accounting with the oil and gas industry.  Mr. Nanke received a Bachelor of Arts degree in Accounting from the University of Northern Iowa in 1989.  Prior to working with Delta, he was employed by KPMG LLP.  He is a member of the Colorado Society of CPA's and the Council of Petroleum Accounting Society.

**John T. Young, Jr. (Chief Restructuring Officer - November 2011 to Present)** became Chief Restructuring Officer of Delta effective as of November 2, 2011.  Mr. Young is a Senior Managing Director at Conway MacKenzie, Inc., which Delta retained to assist with its strategic alternatives process.  Mr. Young has substantial knowledge and experience providing restructuring advisory services, including interim management and debtor advisory, bankruptcy preparation and management, litigation support, post-merger integration and debt restructuring and refinancing. Mr. Young's experience also includes serving in a multitude of advisory capacities within the energy and oilfield services industries.

**Stanley F. ("Ted") Freedman (Executive Vice President, General Counsel and Secretary - January 2006 to Present)** has served as Executive Vice President, General Counsel and Secretary of Delta since January 1, 2006.  He also serves as Executive Vice President and Secretary of Amber and formerly as a director of Direct Petroleum Exploration, Inc., a privately-held oil and gas company with projects in Morocco, Bulgaria, Russia and southeastern Colorado. He graduated from the University of Wyoming with a Bachelor of Arts degree in 1970 and a Juris Doctor degree in 1975.  From 1975 to 1978, Mr. Freedman was a staff attorney with the United States Securities and Exchange Commission.  From 1978 to December 31, 2005, he was engaged in the private practice of law, and was a shareholder and director of the law firm of Krys Boyle, P.C. in Denver, Colorado.

**Daniel J. Taylor (Chairman of the Board - February 2008 to Present)** has been an executive of Tracinda since February 2007 and has served as a Director of MGM Resorts International since March 2007.  Mr. Taylor does not have a specific title at Tracinda but his primary responsibilities include assisting with the management of Tracinda's investments.  He was initially employed by Tracinda from May 1991 until July 1997, and has been employed in his current position at Tracinda since February 2007.  During the interim period he was employed by Metro-Goldwyn-Mayer Inc., a then public corporation ("**MGM**"), first as Executive Vice President-Finance, and then as Chief Financial Officer from August 1997 to April 2005, at which time MGM was sold.  He then served as President of MGM until January 2006.  Mr. Taylor received a Bachelor of Science degree in Business Administration with an emphasis in Accounting from Central Michigan University in 1978.  He served as a director of Inforte Corp. until July 2007.

**Kevin R. Collins (Director - March 2005 to Present)** currently serves as Executive Vice President and Chief Financial Officer of Bear Tracker Energy, a position he has held since July 1, 2010.  Prior to his current position, Mr. Collins served as President and Chief Executive Officer of Evergreen Energy, Inc. from September 2006 until his retirement on June 1, 2009.  He also served on Evergreen's Board of Directors until he resigned effective July 1, 2009.  Prior to that, he served as Evergreen's Executive Vice President —Finance and Strategy from September 2005 to September 2006, and acting Chief Financial Officer from November 2005 until March 31, 2006.  From 1995 until 2004, Mr. Collins was an executive officer of Evergreen Resources, Inc., serving as Executive Vice President and Chief Financial Officer until Evergreen Resources merged with Pioneer Natural Resources Co. in September 2004.  He became a Certified Public Accountant in 1983 after receiving his Bachelor of Science degree in Business Administration and Accounting from the University of Arizona.  Mr. Collins has over 13 years of public accounting experience and has also served as Vice President and a board member of the Colorado Oil and Gas Association, President of the Denver Chapter of the Institute of Management Accountants, and a board member and Chairman of the Finance Committee of the Independent Petroleum Association of Mountain States.

**Jerrie F. Eckelberger (Director - September 1996 to Present)** is an investor, real estate developer and attorney who has practiced law in the State of Colorado since 1971.  He graduated from Northwestern University with a Bachelor of Arts degree in 1966 and received his Juris Doctor degree in 1971 from the University of Colorado School of Law.  From 1972 to 1975, Mr. Eckelberger was a staff attorney with the Eighteenth Judicial District Attorney's Office in Colorado.  From 1975 to the present, Mr. Eckelberger has been engaged in the private practice of law in the Denver area.  Mr. Eckelberger previously served as an officer, director and corporate counsel for Roxborough Development Corporation.  Since March, 1996, Mr. Eckelberger has engaged in the investment and development of Colorado real estate through several private companies in which he is a principal.

**Jean-Michel Fonck (Director - May 27, 2009 to February 12, 2012)** is President of Geopartners SAS, a service company for petroleum studies located in France, and is consulting with the firm of JMF-Conseil SARL to various oil companies since 2001.  Mr. Fonck was previously employed by TOTAL SA ("**TOTAL**"), serving in various capacities there from 1968 until 2000.  During his tenure at TOTAL, he worked in Paris in mathematical applications to geology and exploration venture appraisals, in Indonesia as chief geologist, in Argentina and Egypt as exploration manager and in Paris again as division manager for Exploration New

Ventures and International Exploration Coordination.  In 1991, Mr. Fonck became President and CEO of the TOTAL exploration and production branch in Houston, and then returned to Paris in 1994 to serve as Vice President of Exploration and Reservoir Evaluation for the TOTAL group. Mr. Fonck graduated from Ecole des Mines (Nancy) in 1963.  On February 12, 2012, Mr. Fonck submitted a letter to Delta resigning as a director.  Mr. Fonck did not indicate any disagreement with Delta or the Board of Directors in connection with his resignation.

**Anthony Mandekic (Director - May 27, 2009 to February 2, 2012)** currently serves as the Secretary and Treasurer of Tracinda and has held such positions since Tracinda's inception in 1976.  Mr. Mandekic also currently serves as Chairman of the Lincy Foundation, a charitable organization founded by Mr. Kerkorian, and has served as its Chief Financial Officer and a Director since 1989.  Since May of 2006 he has served as a member of the Board of Directors of MGM Resorts International and as a member of its Executive Committee, Diversity Committee and Compensation Committee.  In May of 2007 Mr. Mandekic became Chairman of the MGM Mirage Compensation Committee, and also became a member of the MGM Mirage Corporate Governance and Nominating Committee in 2009.  Mr. Mandekic is a graduate of the University of Southern California with a bachelor's degree in Science-Accounting and is a Certified Public Accountant.  On February 2, 2012, Mr. Mandekic submitted a letter to Delta resigning as a director.  Mr. Mandekic did not indicate any disagreement with Delta or the Board of Directors in connection with his resignation.

**Jordan R. Smith (Director - October 2004 to Present)** is President of Ramshorn Investments, Inc., a wholly owned subsidiary of Nabors Drilling USA LP that is located in Houston, Texas, where he is responsible for drilling and development projects in a number of producing basins in the United States.  He has served in such capacity for more than the past five years.  Mr. Smith has served on the Board of the University of Wyoming Foundation and the Board of the Domestic Petroleum Council, and is also Founder and Chairman of the American Junior Golf Association.  Mr. Smith received Bachelor and Master degrees in Geology from the University of Wyoming in 1956 and 1957, respectively.

All directors hold office until the next annual meeting of stockholders.  All executive officers hold office until the next annual meeting of the Board of Directors or their earlier resignation or removal by the Board of Directors.

In conjunction with the February 2008 equity issuance to Tracinda, and in accordance with the related Company Stock Purchase Agreement, Tracinda designated Messrs. Mandekic and Taylor to serve on Delta's Board of Directors.  There are no other arrangements or understandings pursuant to which any other person was selected to serve on Delta's Board of Directors.

### D.    Capital Structure

As of the Petition Date, the Debtors owed approximately $306.2 million on account of debt financing.  The Debtors' obligations include (i) amounts owing under the MBL Credit Facility (as defined below), (ii) amounts owing with respect to the 7% Notes (as defined below); and (iii) amounts owing with respect to the Senior Convertible Notes (as defined below).  The following is a brief summary of the Debtors' obligations.

1.      **The Senior Credit Facility**

On November 5, 2004, Delta executed a Credit Agreement establishing a $200 million revolving and term loan facility (the "**Secured Credit Facility**"), for which JPMorgan Chase Bank, N.A. (as successor-in-interest to Bank One, N.A., "**JPMorgan**") served as the agent bank. The Secured Credit Facility replaced Delta's previous $100 million credit facility with Bank of Oklahoma, N.A., U.S. Bank National Association and Hibernia National Bank, each of which also participated in the Secured Credit Facility. In order to obtain this facility, Delta granted first and prior liens to the lending banks on most of its natural gas and crude oil properties and the related equipment, inventory, accounts and proceeds.

Through subsequent amendments and increases to Delta's borrowing base, the maximum available size of the Secured Credit Facility increased, peaking at $590.0 million on November 3, 2008 when Delta entered into a Second Amended and Restated Credit Agreement with JPMorgan and certain other financial institutions.

Over time, the Debtors' borrowing base materially decreased and their availability to borrow additional monies under the Secured Credit Facility became severely constricted as a result. Delta defaulted on certain covenants and obligations under the Secured Credit Facility and entered workout with the lenders in March 2010. Consequently, as senior lenders became fatigued with Delta's efforts, JPMorgan and the lenders under the Secured Credit Facility opted to assign all of their rights and obligations under the Secured Credit Facility to Macquarie Bank Limited ("**MBL**") on December 29, 2010 (the "**JPMorgan Assignment**"). In connection with the JPMorgan Assignment, Delta, as borrower, and certain of its affiliated Debtors, as guarantors (the "**Guarantors**"),[15] entered into the Third Amended and Restated Credit Agreement with MBL, as administrative agent and issuing bank, and the lenders party thereto from time to time (together with all amendments, related agreements and documents, the "**MBL Credit Facility**"),[16] which amended and restated the terms of the Secured Credit Facility.

Through several asset sales, the Debtors were diligent in reducing the amounts owed to secured lenders by hundreds of millions of dollars prior to the Petition Date. However, such asset sales also reduced the Debtors' availability under the MBL Credit Facility as the borrowing base was recalculated. Consequently, the MBL Credit Facility, after giving effect to a series of amendments in March 14, 2011 and June 28, 2011, provided for only a revolving loan with a maximum borrowing base of up to $18 million and a term loan commitment in the amount of $15 million, each with a maturity date of January 31, 2012. Needing additional capital and not having any availability under the MBL Credit Facility, the Debtors and MBL agreed on December 12, 2011 to amend the MBL Credit Facility to provide for an additional $7 million commitment under the term loan, of which $5.5 million was advanced to the Debtors prior to the Petition Date. The revolving loan accrues interest at an annual rate equal to the prime rate plus 6.0% for prime rate advances and LIBOR plus 7.0% per annum for LIBOR advances, while the

---

15      The existing Debtor guarantors under the MBL Credit Facility were Delta Exploration Company, Inc., DPCA LLC, Delta Pipeline, LLC, DLC, Inc. and CEC, Inc.

16 As of the Petition Date, MBL was the only lender under the MBL Credit Facility.

term loan currently bears interest at the prime rate plus 11.0% per annum for prime rate advances and LIBOR plus 12.0% for LIBOR advances. As of the Petition Date, approximately $38,500,000 in principal was outstanding under the MBL Credit Facility, all of which was repaid under the DIP Credit Facility.

> 2.    **The 7% Senior Unsecured Notes**

On March 15, 2005, Delta issued $150 million of 7% senior unsecured notes (the "**7% Notes**") with U.S. Bank National Association as indenture trustee. The 7% Notes accrue interest semi-annually on April 1 and October 1 of each year and mature in 2015. The 7% Notes are guaranteed by Delta Exploration Company, Inc., DPCA LLC, and Delta Pipeline, LLC. Certain other additional guarantors were dissolved prior to the Petition Date. As of the Petition Date, the Debtors owed approximately $152,187,500 in outstanding obligations on account of the 7% Notes. Certain other additional guarantors were dissolved prior to the Petition Date. The Indenture Trustee takes the position that the other Debtors are also guarantors of the 7% Notes by virtue of their status as subsidiaries of Delta and the terms of the Notes, and has filed Claims on account of the Notes against each Debtor. The Debtors disagree with the Indenture Trustee's position since certain subsidiaries never executed guaranties in favor of the Indenture Trustee, but for purposes of voting on the Plan, all such asserted Claims on account of the Notes will be classified as Noteholder Claims, and the Debtors reserve the right to object to such guarantor claims at any time.

> 3.    **The 3 ¾% Senior Convertible Notes**

On April 25, 2007, Delta issued 3 ¾% Senior Convertible Notes due 2037 in the aggregate principal amount of $115 million (the "**Senior Convertible Notes**" and together with the 7% Notes, the "**Notes**") for net proceeds of $111.6 million after underwriters' discounts and commissions of approximately $3.4 million. The Senior Convertible Notes bear interest at a rate of 3 ¾% per annum, payable semi-monthly in arrears, on May 1 and November 1 of each year. The Senior Convertible Notes will mature on May 1, 2037 unless earlier converted, redeemed or repurchased, but each holder of the Senior Convertible Notes has the option to require Delta to purchase any outstanding note on each of May 1, 2012, May 1, 2017, May 1, 2022, May 1, 2027 and May 1, 2032 at a price equal to 100% of the principal amount of the Senior Convertible Notes to be purchased, payable in Cash. The Senior Convertible Notes are guaranteed by Delta Exploration Company, Inc., DPCA, LLC, Delta Pipeline, LLC, and DLC, Inc. Certain other additional guarantors were dissolved prior to the Petition Date. The Indenture Trustee takes the position that the other Debtors are also guarantors of the Senior Convertible Notes by virtue of their status as subsidiaries of Delta and the terms of the Notes, and has filed Claims on account of the Notes against each Debtor. The Debtors disagree with the Indenture Trustee's position since certain subsidiaries never executed guaranties in favor of the Indenture Trustee, but for purposes of voting on the Plan, all such asserted Claims on account of the Notes will be classified as Noteholder Claims, and the Debtors reserve the right to object to such guarantor claims at any time.

Prior to the Petition Date, the Debtors anticipated that some, if not all, of the holders of Senior Convertible Notes would elect to require Delta to repurchase such notes on May 1, 2012. As of the Petition Date, the Debtors owed approximately $115,527,083.30 in outstanding obligations on account of the Senior Convertible Notes.

4.       **Impending Maturity**

As of the Petition Date, Delta was current with all of its payables and debt obligations, including its semiannual interest payments on the Notes.  However, Delta had no availability under the MBL Credit Facility Date, and the MBL Credit Facility was set to mature on January 31, 2012.  Additionally, the holders of the Senior Convertible Notes could (and likely would) have required the Company to repurchase the notes at par on or after May 1, 2012.  Even if the Debtors had been able to find a lender willing to refinance the MBL Credit Facility and work out a restructuring of the Senior Convertible Notes, the 7% Notes were set to mature just three years later, and there was no clear path on how to repay the 7% Notes, which even in the most optimistic of circumstances would have required a perfect business plan with flawless execution over the next three years, and with meaningful increases in the price of natural gas or in the Debtors' exploration activities.

### III.       EVENTS LEADING TO RESTRUCTURING

A series of unforeseen events placed significant strain on the Debtors' ability to comply with certain of the financial covenants contained in the agreements governing the MBL Credit Facility and the Notes.  Those events included: (i) the Debtors' efforts to refinance and expand their operations during an unprecedented downturn in the United States natural gas industry and the onset of the global financial crisis; (ii) past mismanagement; and (iii) the expense and lost opportunity of numerous unsuccessful exploration ventures.

### A.       Natural Gas Industry Downturn and the Global Financial Crisis

Since June 2008, the United States natural gas industry has experienced an unprecedented decline.  Natural gas prices plummeted nearly 75% between June 2008 and August 2009.  With almost 70% of domestic drilling rigs aimed at natural gas reserves, the impact was substantial in the United States.  Indeed, total average domestic rig count decreased over 55% during the period from nearly 1,950 in September 2008 to less than 850 in June 2009.

Despite the reduced rig count, technological advances in natural gas drilling practices caused domestic natural gas supplies to increase, further reducing natural gas prices and compounding the problem.  Because over 91% of the Debtors' reserves at April 30, 2012 were natural gas reserves, the Debtors have been more affected than most companies by movements in natural gas prices.

The Debtors' revenues, operating results, profitability and future rate of growth depend primarily upon the prices they receive for natural gas.  Prices also affect the amount of cash flow available for capital expenditures and the Debtors' ability to borrow money or raise additional capital.  The amount of funds available under the MBL Credit Facility were subject to periodic redetermination based on such prices.

The substantial deterioration in the natural gas markets was followed by the rapid softening of the economy and tightening of the U.S. financial markets in the second half of 2008, which resulted in the effective collapse of the U.S. credit markets.  As has been widely reported, the U.S. financial markets have been slow to recover and are still not nearly as robust as in years past.

### B.    Management Turnover

Under past management, the Debtors pursued several business strategies that in hindsight have contributed to their decline.  The Debtors ramped up drilling and exploration activities at a time when prices were falling and incurred substantial indebtedness to do so.  With the decline in business outlook came changes in management.  On May 27, 2009, Roger Parker, Delta's Chief Executive Officer and Chairman of the Board, resigned from the company.  John Wallace continued in his role as President and functioned as the senior executive officer of Delta during the interregnum.  The overall condition of Delta continued to decline under Wallace's leadership.  Additional efforts by the Debtors to market themselves for joint ventures and equity infusions were also attempted during Wallace's tenure, but failed.

On July 7, 2010, Delta announced that Carl Lakey had been named Chief Executive Officer, effective as of July 6, 2010.  Mr. Lakey had previously served as Senior Vice President of Operations for Delta and has been with Delta since 2007.  Under Lakey, the Debtors stabilized operations and focused on improving their core businesses and maximizing the value of their assets for the benefits of stakeholders.  New drilling techniques were implemented on certain assets to enhance natural gas and crude oil production with some success, though such methods took more time to implement than the Debtors had available given their lack of liquidity and impending maturity dates.

### C.    The Debtors' Unsuccessful Exploration Efforts

In the course of Delta's exploratory efforts, some of its drilling activities failed to bear fruit.  In 2008, Delta drilled 18 wells that turned out to be "dry holes" (i.e., after incurring significant exploratory and drilling costs, the well did not yield commercial quantities of natural gas or crude oil).  For 2008 alone, dry hole costs totaled $111.9 million.  In 2009, dry hole costs totaled $33.6 million.  As a result of these increasing dry hole costs whereby the Debtors incurred significant expenses without generating revenue, Delta scaled back its drilling activities, and in 2010, incurred only $86,000 in dry hole costs.

The Debtors incurred dry hole and impairment costs of $420.9 million for the nine months ended September 30, 2011, compared to $29.8 million for the comparable period a year earlier.  During the three months ended September 30, 2011, proved and unproved property impairments to the Vega Area of $420.1 million were recognized.  During the nine months ended September 30, 2010, dry hole and impairment costs primarily related to unproved property impairments of $25.7 million for the Columbia River Basin, Hingeline, Howard Ranch, Bull Canyon, Garden Gulch, Delores River and Haynesville shale prospects and a $4.8 million impairment of the Paradox pipeline.

### D.    The Debtors' Prepetition Restructuring Initiatives

As early as late 2008, Delta tried to monetize its assets through a variety of strategic alternatives to reduce its debt and improve liquidity.  The Debtors hired an investment banker to consider joint venture opportunities, as well as equity and asset sales.  Conversations evolved with certain potential buyers, but ultimately the financial markets in late 2008 and early 2009 were not receptive to entering into transactions with Delta due to the global financial crisis.

Additionally, certain potential partners had concerns as to whether Delta would be able to fulfill its financial commitments in a joint venture due to Delta's weak balance sheet.

On December 1, 2009, Delta announced that it would consider strategic alternatives to enhance shareholder value, including, but not limited to, exploring the sale of some or all of its assets, partnerships and joint venture opportunities, and the sale of the entire company, including the Debtors or their assets. The Debtors retained a new set of investment bankers and undertook a second marketing process, but ultimately could not close a transaction with any potential buyer.

As a result of Delta's failure to close a transaction in late 2009 or early 2010, Delta's liquidity concerns became more acute, and the Debtors defaulted on certain covenants in March 2010 under the Secured Credit Facility and entered workout with the senior lenders. The default accelerated Delta's need for cash, which could be done most quickly through a divesture of certain assets. Due in part to the strategic alternatives process, Delta was aware of several potential transactions, though most were toward the lower end of the anticipated value of the assets. However, due to the need to repay indebtedness, on July 30, 2010, the Debtors completed the $130.0 million sale (the "**First Wapiti Transaction**") of certain non-core properties to Wapiti Oil & Gas, L.L.C. ("**Wapiti**"). ZCOF Oil and Gas LLC, an affiliate of ZCOF, one of the Debtors' DIP Lenders, owns 40.9% of Wapiti. In conjunction with the completion of this transaction, the Debtors repaid $108.5 million of amounts borrowed under the MBL Credit Facility, and Delta's borrowing base under the credit facility was reduced to $35.0 million.

On March 14, 2011, Delta and certain of its affiliates entered into an amendment to the agreement governing the MBL Credit Facility that increased the availability under the term loan at the time from $6.2 million to $25.0 million and did not require repayment of the term loan until the January 2012 maturity date. Specifically, among other changes, the amendment provided for an increase in the term loan commitment from $20.0 million to $25.0 million and removed the requirement that advances under the term loan be subject to approval of a development plan. In addition, so long as Delta was not in default under the MBL Credit Facility, Delta was not required to comply with certain cash management provisions, including the previous requirement to repay any term loan advances outstanding on a monthly basis with 100% of net operating cash flows.

Proceeds from the First Wapiti Transaction and the MBL Credit Facility were used to substantially reduce amounts outstanding under Delta's prior credit facility, as well as to extend the maturity date thereunder from January 15, 2011 to January 31, 2012 and to fund capital expenditures.

The Debtors continued to review various alternatives to maximize the value of the Debtors' businesses. The alternatives included, but were not limited to, reorganization, sale of separate operating units, sale of each of the Debtors as a whole, and liquidation. The Debtors began informally discussing with other oil and gas industry participants a new equity investment in spring 2011, but found that no one was interested in making such an investment given that the Debtors had substantial debt maturities looming less than a year away that would likely, in the opinion of such participants, cause such equity investments to be diluted, and that natural gas prices had continued to decline, decreasing the value of the Debtors' assets.

With the need for cash still paramount, the Debtors entered into a second asset sale with Wapiti.  On June 28, 2011, the Debtors closed on a second transaction with Wapiti to sell Delta's remaining interests in various non-core assets primarily located in Texas and Wyoming for gross cash proceeds of approximately $43.2 million (the "**Second Wapiti Transaction**", and together with the First Wapiti Transaction, the "**Wapiti Transactions**").  Proceeds from this transaction were used to further reduce amounts outstanding under the MBL Credit Agreement, as well as to fund capital expenditures.  After the Second Wapiti Transaction, the Debtors had divested themselves of all of their material non-core assets.

The Debtors ultimately determined that an asset sale, either as one aggregate sale or as multiple sales, would yield the greatest return, in part because there did not appear to be an entity either willing to make an equity investment of a substantial enough size to allow the Debtors to fund ongoing drilling operations for the next few years, nor a realistic option to incur debt that would allow for existing indebtedness to be refinanced and provide enough liquidity to allow the Debtors to continue to operate.

In July 2011, the board of directors of Delta announced that it had engaged Macquarie Capital (USA) Inc. ("**Macquarie**") and Evercore Group, L.L.C. ("**Evercore**") to act as advisors to Delta in conducting a strategic alternatives process in order to maximize shareholder value and address the 2012 debt maturities.  In the strategic alternatives process, Delta's board of directors considered a wide variety of possible transactions, including the sale of the company, issuances of equity or debt securities, sales of assets, joint ventures and volumetric production payment financing, as well as other potential corporate transactions.  Additionally, in November 2011, the board of directors of Delta appointed John T. Young Jr. to serve as Chief Restructuring Officer of Delta.

Specifically, as of the Petition Date, the Debtors' advisors sent initial marketing materials to approximately seventy-six (76) financial and strategic parties known to be interested in the oil and gas exploration and production sector in the Rockies, or who recently completed transactions involving oil and gas companies in the area.  Twenty (20) of those entities signed confidentiality agreements and received offering memoranda, leading to due diligence and in-person data room presentations with eight (8) potential buyers.  The Debtors, with the assistance of its attorneys and other representatives, assembled data and documents to facilitate the diligence process and prepared business presentations to provide for an organized and efficient transmission of a large amount of data related to the Debtors' assets and businesses.  The Debtors were unable to consummate an out-of-court transaction that would allow the Debtors to receive enough debt or equity to fund ongoing drilling and exploration activities, and several prospective bidders noted the existence of unfavorable contracts with certain first purchasers that were economically unfavorable to Delta, that could best be dealt with through a bankruptcy filing.

Notwithstanding an extensive and thorough marketing process lasting several months, which culminated in several prospective offers, the Debtors ultimately concluded that they would achieve more value for their stakeholders by seeking chapter 11 protection and taking advantage of the powers available to debtors under the Bankruptcy Code.  Specifically, the Debtors believed that they would be able to achieve more value for substantially all of their assets through chapter 11.

### IV.    EVENTS DURING THE CHAPTER 11 CASES

#### A.    Commencement of the Chapter 11 Cases

On December 16, 2011 (the "**Initial Petition Date**"), the Debtors, except for Castle Exploration Company, Inc. ("**CECI**"), commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On January 6, 2012 (the "**CECI Petition Date**," and with the Initial Petition Date, the "**Petition Date**"), CECI commenced its bankruptcy case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

#### B.    Significant Developments Since the Petition Date

On the Petition Date, the Debtors sought approval from the Bankruptcy Court of certain motions and applications (collectively, the "**First Day Motions**"), which the Debtors filed simultaneously with, or around the same time as, their voluntary petitions. The Debtors sought this relief to minimize disruption of the Debtors' business operations as a result of the filing of the Chapter 11 Cases, to establish procedures in the Chapter 11 Cases regarding the administration of the Chapter 11 Cases and to facilitate the Debtors' reorganization efforts. Specifically, the First Day Motions and other critical motions during the Chapter 11 Cases addressed the following issues, among others:

1.    **First Day Motions**

a.    **Joint Administration**

The Debtors are affiliated entities and, therefore, on the Petition Date, filed the *Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(A), Fed. R. Bankr. P. 1015(B), and Local Rule 1015-1 Directing Joint Administration of the Debtors' Related Chapter 11 Cases* [D.I. 2] (the "**Joint Administration Motion**").  The Joint Administration Motion sought authority from the Court for the joint administration of the Chapter 11 Cases, for procedural purposes only, under a single docket to create a centralized location for all documents filed and served in these cases and for all notices and orders entered by the Court.  On December 19, 2011, the Bankruptcy Court entered an order directing joint administration of the Chapter 11 Cases [D.I. 60].  Further, on January 22, 2012, the Bankruptcy Court entered orders directing the consolidation of the Debtors' cases with the chapter 11 case of CECI [D.I. 181] and applying all previously-entered orders as supplemented and currently pending orders to CECI prospectively [D.I. 182].

b.    **Cash Management**

On the Petition Date, the Debtors filed the *Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(A), 345(B) And 363(C) (I) Authorizing the Debtors to (A) Continue Their Existing Cash Management System and (B) Maintain Existing Bank Accounts and Business Forms, and (II) Granting an Extension of Time to Comply With Section 345(B) of the Bankruptcy Code* (the "**Cash Management Motion**") [D.I. 5].  The cash management system utilized by the Debtors is a centralized system to collect and transfer the funds generated by their operations and to disburse funds to satisfy their financial obligations.  The Debtors rely on the system to manage

their businesses efficiently and seamlessly.  The Bankruptcy Court entered an order granting the relief requested in the Cash Management Motion on December 19, 2012 [D.I. 62].

### c.    Utilities

On the Petition Date, the Debtors filed the *Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(A) And 366 (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Pre-Petition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment* (the "**Utilities Motion**") [D.I. 6].  In the ordinary course of business, the Debtors regularly incur utility expenses for telephone, electric, gas, sewer, waste management, internet access, and other services provided by approximately fifteen (15) utility providers.  On December 19, 2011, the Bankruptcy Court entered the interim order approving the procedures requested and setting the Utility Motion for a final hearing [D.I. 63]. There being no objections to the Utilities Motion, the Bankruptcy Court, on January 9, 2012, entered the final order [D.I. 168] implementing the procedures proposed by the Debtors in the Utilities Motion to ensure adequate assurance of future payment to utility service providers.

### d.    Prepetition Taxes and Fees

On the Petition Date, the Debtors filed the *Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Pre-Petition Taxes and Regulatory Fees in the Ordinary Course of Business and (II) Authorizing Banks and Financial Institutions to Honor And Process Checks and Transfers Related Thereto* (the "**Taxes Motion**") [D.I. 7]. The Bankruptcy Court entered an order granting the relief requested in the Taxes Motion on December 19, 2011 [D.I. 64].

### e.    Critical Vendors

On the Petition Date, the Debtors filed the *Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(A), 363, 364, 503(B), 1107(A) and 1108, Fed. R. Bankr. P. 6003 and 6004 and Del. Bankr. L. R. 9013-1(M) Authorizing the Debtors to (I) Honor Pre- Petition Obligations to and (II) Continue Pre-Petition Practices with Certain Critical Vendors* (the "**Critical Vendors Motion**") [D.I. 8].  The Critical Vendors Motion sought authority for the Debtors to pay, in their sole discretion, up to $2,000,000 to vendors of goods or services necessary to the Debtors' ordinary course production services for sale of natural gas from wells in which the Debtors own an interest.  In the event the vendors cease providing goods or services, the Debtors' efforts to maintain their operations would be irreparably harmed.  The Bankruptcy Court entered an order granting the relief requested in the Critical Vendors Motion on December 19, 2011 [D.I. 65].  The Bankruptcy Court subsequently entered a clarifying order on February 14, 2012 as to Enterprise Gas Processing, LLC, to permit the Debtors' to exceed the cap in the Critical Vendors Motion as to that particular vendor [D.I. 304].

### f.    Royalties

On the Petition Date, the Debtors filed the *Motion for Entry of an Order Pursuant to 11 U.S.C. 11 U.S.C. §§ 105(A) And 363(B) Authorizing the Debtors to Pay or Honor Pre-Petition and Post-Petition Obligations to Holders of Royalty Interests* (the "**Royalties Motion**") [D.I. 9].  The Debtors, as operators of certain oil and gas properties, are responsible for the

payment of royalties related to their leasehold interests in such properties. The Royalties Motion sought authority to deliver royalty owners the pre-petition amounts due to them and to honor post-petition royalty obligations and pay such obligations as they become due. On December 19, 2011, the Bankruptcy Court entered an order granting the relief requested in the Royalties Motion, but setting a "Royalty Cap" of $1.1 million [D.I. 66]. Since the Debtors pay royalties two months in arrears, the Royalty Cap did not account for royalties owed for the month of November 2011 and the portion of December 2011 that lapsed prior to the Petition Date. Therefore, the Court entered an amended order on February 13, 2012 removing the Royalty Cap and enabling the Debtors to pay all royalties as they become due [D.I. 296].

### g.    Employee Wages and Benefits

On the Petition Date, the Debtors filed the *Motion For Entry of an Order Pursuant to 11 U.S.C. §§ 105(A), 363(B) and 507(A), Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing the Debtors to pay Certain Pre-Petition (A) Wages, Salaries and Other Compensation; (B) Reimbursable Employee Expenses; and (C) Employee Benefits; (II) Authorizing and Directing Banks and Other Financial Institutions to Honor all Related Checks and Electronic Payment Requests; and (III) Granting Related Relief* (the "**Employee Wages and Benefits Motion**") [D.I. 9] and the *Declaration Of Carl E. Lakey in Support of Debtors' Employee Wages and Benefits Motion* [D.I. 11]. Delta, the only Debtor with employees, had approximately 32 full-time employees as of the Petition Date in addition to certain independent contractors and temporary employees. The Bankruptcy Court entered an order granting the relief requested in the Employee Wages and Benefits Motion on December 19, 2011 [D.I. 67], and issued a supplemental order authorizing, but not directing, the Debtors to pay pre-petition director compensation and director compensation for services performed in 2012 in the ordinary course of business on January 11, 2012 [D.I. 179].

In conjunction with the Employee Wages and Benefits Motion, the Debtors filed the *Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing Debtor Delta Petroleum Corporation to Pay 2011 Bonus Amounts to Certain Employees in the Ordinary Course of Business* [D.I. 317] (the "**Bonus Motion**") on February 15, 2012. The Bonus Motion requested the entry of an order authorizing, but not requiring, Delta, in its discretion, to pay bonuses to certain employees in accordance with Delta's long-standing employee bonus plan. On March 5, 2012, the United States Trustee filed an objection to the Bonus Motion [D.I. 358] and on March 6, 2012, the Debtors and the U.S. Trustee reached an agreement regarding the Bonus Motion, which was presented to the Bankruptcy Court at a hearing on March 6, 2012. The Bankruptcy Court then entered an order granting the relief requested in the Bonus Motion on March 7, 2012 with certain modifications to address the issues raised in the U.S. Trustee's objection [D.I. 382].

### h.    Notification and Hearing Procedures for Trading in Equity and Debt Securities

On the Petition Date, the Debtors filed the *Motion For Entry of an Order Pursuant to 11 U.S.C. §§ 105(A) and 362 Establishing Notification and Hearing Procedures for Trading in Equity Securities* (the "**Equity Trading Motion**") [D.I. 12]. As of the Petition Date, the Debtors had substantial net operating loss carryforwards ("**NOLs**"). In order to protect the value of the NOLs, the Equity Trading Motion sought to establish court-ordered procedures that must be

satisfied before certain transfers of common stock of Delta and Amber or any beneficial interest therein is deemed effective.  On December 19, 2011, the Bankruptcy Court entered the interim order approving the procedures requested and setting the Equity Trading Motion for a final hearing [D.I. 68].  There being no objections to the Equity Trading Motion, the Bankruptcy Court, on January 11, 2012, entered the final order [D.I. 187] implementing the procedures proposed by the Debtors.  The Bankruptcy Court subsequently entered an order on March 7, 2012 Order (A) Establishing Notice and Sell-Down Procedures for Trading in Claims Against the Debtors' Estates and (B) Granting Related Relief *Nunc Pro Tunc* to the Petition Date [D.I. 383] establishing restrictions on trading in the Debtors' debt securities.

### i.    Insurance

On the Petition Date, the Debtors filed the *Motion Pursuant to 11 U.S.C. §§ 105(A), 362(D), 363(B) and 503(B) and Fed. R. Bankr. P. 6003 (I) Authorizing the Debtors to (A) Continue Their Workers' Compensation Programs and their Liability, Property and other Insurance Programs and (B) Pay Certain Obligations in Respect Thereof and (II) Authorizing and Directing the Debtors' Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations* (the "**Insurance Motion**") [D.I. 13].  In connection with the operation of their businesses, the Debtors maintain insurance programs for liabilities relating to, among other things, general liability, workers' compensation, directors' and officers' liability (including excess liability), fiduciary liability, employment practices liability, commercial property liability, control of well, gas and oil lease property liability, auto liability, crime and various other property-related and general liabilities.  The continuation of the insurance programs is essential to the operation of the Debtors' businesses and is necessary to protect the Debtors from catastrophic liability.  The Bankruptcy Court entered an order granting the relief requested in the Insurance Motion on December 19, 2011 [D.I. 69].

### j.    Cash Collateral

On the Petition Date, the Debtors filed the *Motion to Approve Use of Cash Collateral Debtors Motion For Entry Of Interim And Final Orders Authorizing Debtors To Use Cash Collateral And Grant Adequate Protection Filed By Delta Petroleum Corporation* (the "**Cash Collateral Motion**") [D.I. 27].  However, since MBL assigned the Secured Credit Facility to the DIP Lenders pursuant to the DIP Credit Agreement, the Cash Collateral Motion was no longer necessary.  Accordingly, the Debtors filed a notice of withdrawal of the Cash Collateral Motion on February 6, 2012 [D.I. 268].

### k.    DIP Financing

On the Petition Date, the Debtors filed the *Motion For Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 362, 364, 503(b) and 507(a), Fed. R. Bankr. P. 2002, 4001 and 9014 and Del. Bankr. L.R. 4001-2 (A) to Obtain Post-Petition Secured DIP Financing and (B) to Refinance Certain Pre-Petition Indebtedness; (II) Granting Liens and Providing for Superiority Administrative Expense Status; (III) Modifying The Automatic Stay; and (IV) Granting Related Relief* (the "**DIP Motion**") [D.I. 28].  The DIP motion sought authority to enter into a $57,500,000 million first lien new money superpriority priming revolving credit facility (the "**DIP Facility**" as governed by the "**DIP Credit Agreement**") to provide working capital for, and for other general corporate purposes of, the Debtors, including the payment of certain costs

and expenses associated with the Chapter 11 Cases. In connection with their entry into the DIP Facility, the Debtors granted to the DIP Agent, for the benefit of itself and the other DIP Lenders, senior liens on substantially all of the Debtors' assets and superpriority administrative claims to the DIP Lenders. Zell Credit Opportunities Master Fund, L.P. filed an objection to the DIP Motion on the Petition Date [D.I. 42], which was resolved consensually, and the Bankruptcy Court entered an interim order authorizing the borrowing of up to $44,022,749 on December 21, 2011 [D.I. 85]. The Bankruptcy Court entered a final order approving the DIP Motion on January 11, 2012 [D.I. 186]. The Bankruptcy Court subsequently entered an order on March 28, 2012 [D.I. 458] approving the Debtors' motion to amend the DIP Credit Agreement, which increased the maximum availability thereunder to $58,900,000 and provided for the payment of PIK fees to the DIP Agent. It is possible that the Debtors will seek to increase the size of the DIP Credit Facility prior to the Confirmation Hearing.

The DIP Credit Facility matured pursuant to its terms on June 30, 2012, and consequently, the DIP Lenders' outstanding commitments under the DIP Credit Facility will terminate on July 30, 2012. To facilitate further progress in these Chapter 11 Cases, Debtors entered into a forbearance agreement with the DIP Lenders, whereby the DIP Lenders agreed – subject to satisfaction of certain conditions of the forbearance agreement and provided there are no additional defaults – to forbear from exercising their rights and remedies under the DIP Credit Facility until July 16, 2012, or such later date as will be agreed upon between the DIP Lenders and the Debtors. Moreover, because the DIP Lenders understand that the Debtors may need additional funds to progress from June 30, 2012 until emergence from chapter 11, a provision was included in the forbearance agreement, which permits further advances by any of the DIP Lenders in such lender's sole discretion. The advances would be made pursuant to the DIP Credit Facility, as modified by the forbearance agreement. While there are certain obligations and milestones included in the forbearance agreement with which the Debtors must comply, it is the reasonable expectation of all parties that the Debtors will be in compliance and that this expected arrangement will be extended from time to time and will facilitate an emergence from chapter 11 on or prior to August 30, 2012. The DIP Lenders are charging a default rate of interest pursuant to the terms of the DIP Credit Agreement and forbearance agreement after June 30, 2012, which in light of the short duration of these Chapter 11 Cases, will modestly increase the amount of the DIP Facility Claims. A motion to authorize the Debtors' entry into the forbearance agreement was filed on July 3, 2012 [D.I. 668] and entered by the Bankruptcy Court on July 5, 2012 [D.I. 685].

2.      **Filing of Schedules and Statements of Financial Affairs**

On January 6, 2012, each of the Debtors filed their statements of financial affairs and schedules of assets and liabilities (collectively, the "**Schedules and Statements**"). The Schedules and Statements represent a diligent effort by the Debtors and their professionals to comprehensively and accurately disclose all manner of information including all known creditors and claims against the Debtors (both secured and unsecured), the nature and value of the Debtors' assets, the identities of board members and other insiders and distributions made thereto, all executory contracts to which the Debtors are a party, any known pending litigation, the identities of individuals with access to the Debtors' financial information and existing bank accounts and related balances. Delta filed amended Schedules and Statements on February 9, 2012 [D.I. 285], March 26, 2012 [D.I. 416, 417] and April 18, 2012 [D.I. 491, 492].

3.        **Applications to Retain Professionals**

To assist the Debtors in carrying out their duties as debtors in possession and to represent the Debtors' interests in the Chapter 11 Cases, the Debtors retained the following professionals: Hughes Hubbard and Reed LLP ("**Hughes Hubbard**") as their bankruptcy counsel [D.I. 169]; Morris, Nichols, Arsht & Tunnell LLP ("**Morris Nichols**") as their Delaware bankruptcy co-counsel [D.I. 170]; Evercore Group L.L.C. ("**Evercore**") as their financial advisor and investment banker [D.I. 185]; Conway MacKenzie, Inc. ("**Conway**") as their restructuring advisor [D.I. 180]; Davis Graham & Stubbs LLP ("**Davis Graham**") as their special corporate counsel [D.I. 190]; Epiq Bankruptcy Solutions, LLC ("**Epiq**") as their claims, noticing and balloting agent [D.I. 70]; and KPMG LLC ("**KPMG**") as their service provider for audit, tax compliance and tax consulting matters [D.I. 308].

On January 11, 2012, the Bankruptcy Court entered a final order approving procedures for the payment of compensation for professional services rendered and reimbursement of expenses incurred by attorneys and other professionals who are required to file retention applications pursuant to sections 330 and 331 of the Bankruptcy Code [D.I. 188].  In addition, on January 11, 2012, the Bankruptcy Court entered a final order approving procedures to retain and compensate certain professionals and professional service providers of the Debtors utilized in the ordinary course of business [D.I. 189].

4.        **Claims Process**

a.        **Bar Date for Filing Proofs of Claim and Administrative Expense Requests**

On January 24, 2012, the Debtors filed a motion requesting that the Bankruptcy Court set a deadline by which parties, including governmental units, must file proofs of claim (the "**Bar Date Motion**") [D.I. 227].  The Bankruptcy Court, on February 14, 2012, entered an order [D.I. 303] establishing March 23, 2012, as the deadline for filing against the Debtors claims that arose prior to the Petition Date (the "**General Bar Date**"), and June 13, 2012, as the bar date for governmental units (except for claims against CECI, which is July 5, 2012).  A schedule of filed proofs of claim is maintained by Epiq.

b.        **Claims Reconciliation**

As of the filing of the Disclosure Statement, approximately 347 proofs of claims had been filed.  The Debtors are in the process of reviewing and objecting to certain proofs of claim. The Debtors expect that the claims pool will be reduced based on their review and reconciliation.

5.        **Contract and Lease Rejections**

The Debtors filed two motions seeking to reject specified contracts and leases.  The first such motion, filed on December 23, 2011, sought approval of the Debtors' rejection of a gas gathering agreement between Delta and Encana Oil and Gas (USA) Inc. ("**Encana**") [D.I. 94]. The gas gathering agreement contained burdensome terms that prospective purchasers of the Debtors' assets had expressed unwillingness to assume as part of any sale.  On January 11, 2012, the Bankruptcy Court entered an order authorizing the Debtors to reject the gas gathering

agreement, and, on March 2, 2012, the Debtors filed a notice of intent to reject the gas gathering agreement effective March 15, 2012 [D.I. 355]. The second such motion, filed on January 24, 2012, sought approval of the Debtors' rejection of the unexpired lease of the Debtors' headquarters in Denver [D.I. 222]. Due to reductions in the number of the Debtors' employees, half of the leased property was vacant as of the Petition Date. Although the Debtors sought to renegotiate the lease with the lessor, they were unable to reduce the lease rate, which was above the current market rate, or reduce the amount of leased space. The Bankruptcy Court entered an order authorizing the Debtors' rejection of the unexpired lease on March 7, 2012 [D.I. 376], and the Debtors subsequently entered into a modified lease with the landlord to lower the Debtors' headquarters lease costs.

Further, on March 5, 2012, the Debtors filed the *Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. 365(d)(4) of the Bankruptcy Code to Extend the Deadline by Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property* (the "**Lease Extension Motion**") [D.I. 360]. As of the Petition Date, the Debtors were party to approximately 670 unexpired leases of non-residential real property (the "**Leases**"). The Debtors have not yet made any assumption or rejection decisions, as those decisions depend on, among other things, whether the Plan Sponsor wishes for such leases to be assumed and assigned to the Joint Venture Company. On March 26, 2012, the Bankruptcy Court entered an order extending the assumption/rejection deadline to July 12, 2012 [D.I. 450].

6.    **Exclusivity Extensions**

On March 2, 2012, the Debtors filed requests for extensions of the Debtors' exclusive periods in which to file a plan of reorganization and solicit acceptances thereof to June 12, 2012 and August 12, 2012, respectively [D.I. 354]. The Bankruptcy Court entered an order granting the extensions on March 26, 2012 [D.I. 449]. The Debtors have filed the Plan within their exclusive period to propose a plan.

7.    **Adversary Proceedings**

On March 5, 2012, Delta filed complaints against Knight Oil Tools, LLC, d/b/a Knight Fishing Services (Adversary Case No. 12-50407) and Baker Hughes Oilfield Operations, Inc., d/b/a Baker Oil Tools (Adversary Case No. 12-50408) (together, the "**Adversary Proceeding Defendants**") for violations of the automatic stay provisions of the Bankruptcy Code. The Adversary Proceeding Defendants had filed numerous post-petition liens to secure the payment of amounts they had been paid by Delta within the 90-day period prior to the petition date (the "**Contingent Preference Liens**"). Delta sought to declare the Contingent Preference Liens null and void and filed motions against each of the Adversary Proceeding Defendants seeking temporary restraining orders and preliminary injunctions enjoining the Adversary Proceeding Defendants from filing additional Contingent Preference Liens, directing the Adversary Proceeding Defendants to remove and terminate the Contingent Preference Liens and declaring that the Contingent Preference Liens violated the automatic stay and were therefore void. The Bankruptcy Court granted the temporary restraining orders on March 9, 2012 and entered an injunction stating the Adversary Proceeding Defendants' actions violated the automatic stay on March 23, 2012.

Further, a number of transactions occurred prior to the Petition Date that may give rise to Claims, including preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims, or causes of action under sections 510, 544, 547, 548, 549, 550, and/or 553 of the Bankruptcy Code, and other applicable bankruptcy or non-bankruptcy law (collectively, the "**Avoidance Actions**").  Pursuant to section 546(a) of the Bankruptcy Code, the statute of limitations with respect to the commencement of avoidance or recovery actions under sections 544, 545, 547, 548, and 553 of the Bankruptcy Code will expire on the second anniversary of the Petition Date.

The Plan preserves all Causes of Action and Wapiti Causes of Action, unless expressly otherwise released, and provides for them to be transferred to, respectively, the General Trust and the Wapiti Trust on the Effective Date.  The Causes of Action include the Avoidance Actions and other claims and potential claims that the Debtors hold against third parties.  The Wapiti Causes of Action include Avoidance Actions and other claims and potential claims that the Debtors hold against Wapiti and the ZCOF Parties.  For the avoidance of doubt, other than those actions expressly preserved against Wapiti and the ZCOF Parties under Section 10.7 of the Plan, no Estate cause of action shall be preserved against ZCOF and its affiliates, directors, and employees.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Plan further provides that the Recovery Trustee will have standing, on and after the Effective Date, to pursue the Causes of Action and the Wapiti Causes of Action and will be deemed appointed the representative of the Estates for the purpose of enforcing, prosecuting and settling them.

8.    **Bid Procedures and Sale Process**

Immediately after filing the Chapter 11 Cases and after consulting their advisors and parties in interest, the Debtors, in their business judgment, decided that a sale of substantially all of their assets would be the best way to maximize the value of their estates.  The Debtors concluded that a sale process was the proper path forward for several reasons, including that several of the Debtors' constituencies voiced their support for a sale process, many different parties were interested in acquiring some or all of the Debtors' assets even though no acceptable stalking horse bid had been finalized, and a full and open process, widely marketed with sufficient opportunity for all parties to conduct diligence would achieve the fairest result and allow for the highest and best bids for the assets to emerge.

Accordingly, on December 27, 2011, the Debtors filed the *Motion for Orders (I) (A) Approving (i) Bid Procedures; (ii) Bid Protections; (iii) Auction Procedures; and (iv) Assumption and Assignment Procedures; (B) Approving Notice Procedures for (i) the Solicitation of Bids and (ii) an Auction; (C) Scheduling Hearings on Approval of a Sale or Sales of Substantially all of the Debtors Assets; and (D) Granting Related Relief; and (II) (A) Approving the Sale or Sales of Substantially all of the Debtors' Assets; and (B) Approving the Assumption and Assignment of Contracts and Leases* (the "**Bid Procedures and Sale Motion**") [D.I. 107] requesting the entry of two orders: (a) an order approving, *inter alia*, the Bid Procedures (as defined herein) and setting certain deadlines and dates and (b) an order approving, *inter alia*, the sale or sales of some or all of the Debtors' assets free and clear of all liens, claims, interests, and encumbrances to any successful bidder(s) at an auction.

On January 11, 2012, the Bankruptcy Court entered an order approving the process set forth in the Bid Procedures Order (the "**Bid Procedures Order**") [D.I. 184] and the *Bid*

*Procedures and Related Bankruptcy Provisions* (the "**Bid Procedures**") attached as Exhibit "1" to the Bid Procedures Order.  The Bid Procedures Order set the Bid Deadline for March 21, 2012 at 5:00 p.m. (ET), the Auction for March 26, 2012 at 9:00 a.m. (ET) and the Sale Hearing for March 28, 2012 at 1:30 p.m. (ET).

As the sale process for the Debtors' assets progressed, it became apparent that the Debtors' NOLs and certain other tax attributes (together with the NOLs, the "**Tax Attributes**") may have value.  To facilitate the Debtors' ability to maximize the value of their estates and the recoveries for creditors by accounting for the latent value of the Tax Attributes, the Debtors determined that it would be in the best interests of all constituencies to amend the bid procedures to provide potential interested parties an opportunity to submit plan funding proposals as well as bids for a sale of assets.

Consequently, on March 15, 2012, the Debtors filed the *Emergency Motion to Approve an Order (A) Amending (i) Order (A) Approving (I) Bid Procedures; (II) Bid Protections; (III) Auction Procedures; and (IV) Assumption and Assignment Procedures; (B) Approving Notice Procedures for (I) the Solicitation of Bids, (II) an Auction; (C) Scheduling Hearings on Approval of a Sale or Sales of Substantially all of the Debtors' Assets [D.I. 184]; and (ii) the Bid Procedures and Related Bankruptcy Provisions; and (B) Granting Related Relief* (the "**Amended Bid Procedures Motion**") [D.I. 413] seeking certain corresponding amendments to the Bid Procedures (the "**Amended Bid Procedures**").

The Amended Bid Procedures Motion additionally requested that certain of the Sale Process Deadlines, including the Bid Deadline and the procedures for and date of the Auction, be amended to allow potential bidders additional time.  The Court entered an order approving the Amended Bid Procedures on March 22, 2012 (the "**Amended Bid Procedures Order**") [D.I. 435].  The Amended Bid Procedures Order set the Bid Deadline for April 18, 2012 at 4:00 p.m. (ET), the deadline to notify potential bidders whether an Auction would occur for April 20, 2012, the Auction for April 24, 2012 at 9:00 a.m. (ET) and the Sale Hearing for May 1, 2012 at 11:00 a.m. (ET).

On April 20, 2012, the Debtors filed a notice [D.I. 497] stating that the Debtors planned to conduct a competitive process to consider bids for plan sponsorship as well as bids for the Debtors' assets.  On April 24 and 25, the Debtors and their advisors, along with counsel for the DIP Agent and counsel for ZCOF, met with prospective bidders at the offices of Hughes Hubbard.  Over the course of two days, a competitive process was conducted, and ultimately the Debtors, in consultation with their creditors, chose the Plan Sponsor.  Subsequently, after a hearing on May 8, 2012, the Bankruptcy Court entered an order approving the Debtors' selection of the Plan Sponsor [D.I. 541].

The Debtors filed a motion on May 18, 2012 [D.I. 564] authorizing the payment of a break-up fee to the Plan Sponsor in the amount of $1.5 million.  The break-up fee would only be payable to the Plan Sponsor under certain circumstances, such as (i) Delta has terminated the Contribution Agreement to enter into an alternative transaction (including a plan with a plan sponsor other than the Plan Sponsor), or indicates in a court filing or any other publicly available or disseminated document that it wishes to pursue, or seek the Court's approval of, an alternative transaction, (ii) the Plan Sponsor has terminated the Contribution Agreement because Delta has breached a covenant, representation or warranty that is not cured by the earlier of five days after

notice of such breach or the closing of the transaction; (iii) Delta has terminated the Contribution Agreement and agreed that the reason for such termination gives rise to payment of the break-up Fee to the Plan Sponsor, (iv) the Plan is not confirmed within the timeframe set forth in the Contribution Agreement, (v) the Plan is amended in a public filing and such amendment is materially adverse to the Plan Sponsor, (vi) Delta fails to deliver executed counterparts of the Contribution Agreement, any document contemplated by the Laramie Term Sheet, or any other operative document referenced therein, (vii) Delta's bankruptcy case is converted to a case under chapter 7 of the Bankruptcy Code prior to the closing of the transaction, (viii) the transaction fails to close within 20 business days after the Confirmation Order has become a Final Order, or (ix) an order granting relief from the automatic stay is entered with respect to any of the Delta Assets (as defined in the Contribution Agreement) prior to the closing of the transaction.  In the event that the break-up fee was payable to the Plan Sponsor, such fee would constitute an administrative expense of the Debtors' estates.  Failure to obtain approval of the break-up fee would have allowed the Plan Sponsor to terminate the Contribution Agreement without having to pay a reverse break-up fee in the amount of $5 million to the Debtors.  Additionally, the Debtors argued that the approval of the break-up fee was appropriate since it limited the liability of the Debtors' estates to the Plan Sponsor to a finite amount, rather than risking a scenario where the transaction failed to close and the Plan Sponsor sought unliquidated damages from the Debtors. The Court entered an order on June 4, 2012 [D.I. 588] authorizing the Debtors to pay a break-up fee to the Plan Sponsor in the event one of the conditions set forth above occurred.

### 9.    **Relevant Milestones in DIP Credit Agreement**

Schedule M to the DIP Credit Agreement set forth two milestones in the Chapter 11 Cases (the "**Milestones**").  The failure to achieve the Milestones by the dates specified therein is an event of default under the DIP Credit Agreement.  The Milestones are:

- **By April 30, 2012**: A letter of intent or similar agreement with respect to the sale of (i) substantially all of the assets of the Debtors or (ii) sponsorship of a plan of reorganization for the Debtors, in each case, to be delivered to the DIP Agent and, in each case, in form and substance satisfactory to the DIP Agent and the Debtors.

- **By May 31, 2012**: An Asset Purchase Agreement to be executed and delivered to the DIP Agent or a disclosure statement with respect to a Plan to be filed with the Court, in each case, in a form and substance reasonably satisfactory to the DIP Agent.

The Debtors satisfied both of these Milestones.  The DIP Credit Facility matured on June 30, 2012, and the Debtors entered into a forbearance agreement with the DIP Lenders that extends the DIP Credit Facility until July 16, 2012 provided that no additional events of default occur under the DIP Credit Agreement.  The DIP Lenders are charging a default rate of interest pursuant to the terms of the DIP Credit Agreement and forbearance agreement after June 30, 2012, which would increase the amount of the DIP Facility Claims.  The Debtors and DIP Lenders anticipate that there will be additional extensions of the forbearance agreement.

### 10.    **Overview of the Debtors' Marketing Efforts in Connection with the Plan Sponsor**

The Plan is the product of a marketing process that started well before the Petition Date. As explained above, the Debtors commenced their marketing process in July 2011. By the Petition Date, the Debtors' advisors sent initial marketing materials to approximately seventy-six (76) financial and strategic parties known to be interested in the oil and gas exploration and production sector in the Rockies, or who recently completed transactions involving oil and gas companies in the area. Twenty (20) of those entities signed confidentiality agreements and received offering memoranda, leading to due diligence and in-person data room presentations with eight (8) potential buyers.

The Debtors, with the assistance of their advisors, assembled data and documents to facilitate the diligence process and prepared business presentations to provide for an organized and efficient transmission of a large amount of data related to the Debtors' assets and businesses. However, the Debtors were unable to consummate an out-of-court transaction that would allow the Debtors to receive enough debt or equity to fund ongoing drilling and exploration activities, and several prospective bidders noted the existence of unfavorable contracts with certain first purchasers that were economically unfavorable to Delta, that could best be dealt with through a bankruptcy filing.

Consequently, the Debtors concluded that they would achieve more value for their stakeholders by seeking chapter 11 protection and taking advantage of the powers available to debtors under the Bankruptcy Code.

After the Petition Date, the Debtors' advisors continued their efforts to market the Debtors' businesses. To that end, following the filing of the Chapter 11 Cases, the Debtors' advisors distributed teaser information to 317 prospective bidders. The teaser document was also filed by Delta as an 8-K. 130 prospective bidders expressed preliminary interest in the Debtors' assets after receiving the aforementioned information. 62 of those 130 entities requested form confidentiality agreements to pursue further discussions and review additional information, and 46 of those entities actually entered into confidentiality agreements with the Debtors. Pursuant to the Initial Bid Procedures, interested parties were required to submit non-binding expressions of interest to purchase the Debtors' assets and confidentiality agreements on or prior to Feb. 13, 2012 at 5:00 p.m. (ET) (the "**Initial Bid Deadline**"). Of the potential bidders that the Debtors' advisors contacted, 28 submitted expressions of interest meeting the participation requirements by the Initial Bid Deadline. These parties received confidential information packages that included company overview materials, the Debtors' financial projections, and access to an electronic data room containing extensive information about the Debtors' operations and finances. Potential bidders were provided equal opportunities to conduct due diligence.

Over the course of negotiations with interested parties, a number of potential purchasers expressed a desire to have an opportunity to submit plan funding proposals as well as bids for the Debtors' assets. Accordingly, the Amended Bid Procedures Order extended the Bid Deadline to April 18, 2012 at 4:00 p.m. (ET) to accommodate plan sponsor proposals (the "**Amended Bid Deadline**"). Of the 28 potential buyers that submitted expressions of interest meeting the participation requirements by the Initial Bid Deadline, nine submitted plan sponsor proposals or bids for the Debtors' assets by the Amended Bid Deadline.

The Debtors carefully considered each of the nine proposals to determine whether they were "qualified" under the Amended Bid Procedures Order, and if so, whether they were

acceptable to the Debtors. The Debtors thereafter decided that the best way to maximize value would be to conduct an informal competitive process rather, to hold a pure 363 auction. As a result, on April 20, 2012, the Debtors filed the *Notice Regarding Auction Status* [D.I. 497] explaining that a 363 sale auction would not be held, but that the Debtors would instead conduct an informal competitive process to consider bids for plan sponsorship as well as bids for the Debtors' assets, commencing on April 24, 2012.

Six prospective bidders, along with the Debtors and the Noteholders, participated in a competitive negotiation process on April 24, 2012 and April 25, 2012. This informal competitive process resulted in a robust negotiation process among the Debtors, the bidders and the Noteholders.

As a result of this process, the Debtors received both 363 sale bids and plan sponsorship bids of varying values and structures. The Debtors, together with their advisors, considered each of the bids received by the Debtors to determine which bid presented the best overall value to stakeholders. In addition, the Noteholders and their representatives were consulted in this process and provided input on the bids and the process.

Ultimately, based on the value of the bid and the negotiated terms and conditions, the Debtors, with the assistance of their advisors, and after consultation with the Noteholders, determined that in their business judgment, Laramie's plan sponsorship proposal, which is outlined in the *Summary of Company Formation Documents* (the "**Laramie Term Sheet**") attached as **Exhibit "1"** to the *Notice of Debtors' Selection of Proposed Plan Sponsor* filed on May 7, 2012 [D.I. 530], was the offer that would achieve the best recovery for the Debtors' creditors.

Specifically, in consideration for the Vega Area and other assets, the Plan Sponsor has offered the highest overall economic value as compared to the other bids received to date because of the combined value offered as a result of (i) the significant value of the assets that the Plan Sponsor has agreed to contribute in the Contribution Agreement to the Joint Venture Company in which Delta will be provided a 33.34% interest and (ii) the cash component of the offer. The other bids received by the Debtors presented a substantially lower overall economic value than the Plan Sponsor's offer.

A summary of the relative value of the assets contributed by each of Delta and the Plan Sponsor to the Joint Venture is attached hereto as <u>Exhibit 6</u>. The summary contained in Exhibit 6 was prepared by the Plan Sponsor. Based upon the foregoing, the Debtors' selection of Laramie as Plan Sponsor and consummation of the transactions contemplated by the Laramie Term Sheet are in the best interests of the Debtors, their creditors, their estates and other parties in interest. Considering all of the circumstances of the Chapter 11 Cases, previous pre-petition sale and restructuring efforts and the value provided by Laramie's offer, accepting the Laramie offer constitutes a reasonable and sound exercise of the Debtors' business judgment. Accordingly, Laramie's offer has been incorporated in the Plan filed with the Bankruptcy Court.

11.    **Information Regarding The Plan Sponsor**

Laramie Energy II, LLC ("**Laramie**") is a Denver-based company primarily focused on finding and developing natural gas reserves from unconventional gas reservoirs within the U.S.

Rockies.  Its predecessor company, Laramie Energy, LLC (now referred to as "**Laramie I**"), sold all of its oil and gas assets in May 2007 to Plains Exploration & Production Company, Inc.

Laramie was formed in June 2007 by Laramie I executives and former employees and by affiliates of the same private equity investors that helped Laramie I succeed.  Laramie is backed by over $300 million of equity capital commitments funded by Laramie's management team, EnCap Investments, Avista Capital, and DLJ Merchant Banking Partners (an affiliate of Credit Suisse Securities).  In addition, Laramie is debt financed by JPMorgan Chase Bank and Wells Fargo Bank.

With its seasoned executive leadership, an operations team with a reputation for excellence, and its solid financial foundation, Laramie continues as a leading operator in the Rockies.  Laramie is currently conducting an active acquisition and development program within the Piceance Basin of Western Colorado.

12.    **Plan Support Agreement**

As of the date hereof, Delta owes the approximate aggregate principal amount of $267.7 million in Noteholder Claims.  The Supporting Noteholders own, beneficially own, or are the nominees of, approximately 79.7% of such Noteholder Claims.  The Supporting Noteholders, the DIP Agent, the Debtors and the Plan Sponsor agreed in form and substance on the terms of a Plan Support Agreement on June 4, 2012.  Pursuant to the Plan Support Agreement, the Supporting Noteholders and DIP Agent have agreed, subject to certain conditions, to vote in favor of confirmation of the Plan on the terms and conditions substantially consistent with those set forth in the Plan.  As of the date of this Disclosure Statement, the Plan Support Agreement has not been executed.  If the Plan Support Agreement is ultimately executed, the Debtors will file a Plan Supplement with an executed version of the Plan Support Agreement.

13.    **Sheep Creek**

On February 7, 2011, Delta and the United States Department of the Interior, Bureau of Land Management (the "Government") entered into a Unit Agreement for the Development of the Sheep Creek Unit Area, County of Mesa, State of Colorado, No. COC74793X (the "**Sheep Creek Agreement**"), under which Delta acquired certain oil and gas interests in the NV Fed 12B-6-14D unit obligation well (the "**Well**").  Under the Sheep Creek Agreement, Delta is obligated to commence drilling and completion of the Well by August 15, 2012.  Because the Plan Sponsor places great value on the Sheep Creek Agreement, Delta and the Plan Sponsor agreed in the Contribution Agreement that the Plan Sponsor would work to complete the work required on the Well.  Delta filed a motion on June 14, 2012 [D.I. 612] authorizing Delta to enter into a services agreement with the Plan Sponsor whereby Delta would pay the Plan Sponsor to oversee the required work on the Well, which would otherwise be performed by a third party. Delta subsequently reconsidered whether the Plan Sponsor would be obligated to do such work in the event that the Debtors selected another entity to sponsor its plan of reorganization, and thus, Delta withdrew the motion on June 21, 2012 [D.I. 628].

Delta has requested and received oral confirmation from the Government that a further extension past August 15, 2012 will be granted, and Delta expects to receive written confirmation of this extension prior to July 16, 2012. The forbearance agreement dated as of July

3, 2012 requires Delta to enter into the services agreement with the Plan Sponsor prior to July 16, and consequently Delta re-executed the services agreement on July 5, 2012 and filed a motion to approve the services agreement on July 6, 2012 [D.I. 689], which will be heard by the Bankruptcy Court on July 10, 2012.

14.    **The Creditors' Committee**

On June 15, 2012, the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed the Creditors' Committee, consisting of Delta employee Paul M. Joeckel, R.W. Jones Trucking Co., and U.S. Bank National Association, as Indenture Trustee [D.I. 614]. The Creditors' Committee hired Akin Gump Strauss Hauer & Feld LLP on June 27, 2012, but has not yet filed a retention application.  On July 2, 2012, Paul M. Joeckel resigned from the Creditors' Committee.

C.    **Currently Pending Litigation; Causes of Action of the Estates**

1.    **Pre-Petition Litigation Being Pursued by the Debtors**

a.    **Delta Petroleum Corporation vs. Richard B. Evans, Case No. CIV25819, District Court of Polk County, Texas, 411 Judicial District**.  On May 28, 2010, Delta commenced an action against Richard B. Evans to recover $158,000 in revenues from the Best Kenesson-Willsource 2H Well that was overpaid by Delta as operator to Mr. Evans as a working interest owner.  Mr. Evans filed a general denial answer and on December 16, 2010.  Settlement negotiations have been finalized and the Debtors filed a motion on June 28, 2012 [D.I. 643] to approve a settlement between the parties in the amount of $124,125.00.

b.    **Delta Petroleum Corporation vs. Caprock Pipe & Supply, Inc. and Enquest Energy Services Corp., Case Number 2010CV8475, District Court, Denver County, Colorado**.  On October 25, 2010, Delta commenced an action against Caprock Pipe & Supply, Inc. and Enquest Energy Services Corp. to recover $130,000 for an unpaid invoice related to a purchase from Delta of tubing and casing.  Delta obtained a Summary Judgment Order on August 15, 2011, but has yet to collect on the judgment.

c.    **The Long Trusts v. Castle Texas Limited Partnership, et al., Case No. 11-0161, Texas Supreme Court**.  In 1996, the Long Trusts claimed that Castle Texas Production Limited Partnership ("**Castle**") failed to market the Long Trusts' gas when Castle was operating wells in Rusk County, Texas, in which the Long Trusts owned an interest.  Castle filed a counterclaim against the Long Trusts for the Long Trusts' failure to pay joint operating expenses.  Both parties recovered judgments in 2001 - Castle in the amount of $770,000 (plus prejudgment interest of $73,998.90) and the Long Trusts in the amount of $3,232,893.97; both parties appealed from those judgments.  The judgment for Castle was affirmed (after a reduction in the attorney's fees awarded by the jury, the

total judgment was $599,407) and remanded on appeal for recalculation of prejudgment interest. The judgment of the Long Trusts was reversed and remanded for a new trial. That new trial has not been held. Since the case was remanded in 2004, the Long Trusts have not requested a trial date. After years of disputes over the calculation of prejudgment interest, prejudgment interest was waived by Castle and judgment was entered in favor of Castle for the amounts (after remittitur) affirmed by the court of appeals. The issue now pending is whether to calculate post-judgment interest from the date of the original judgment entered in Castle's favor (September 5, 2001) or the date of the final judgment signed after remand (March 25, 2009). This judgment was affirmed by the Court of Appeals, but the Long Trusts have filed a petition for review in the Texas Supreme Court. In 2011, the Texas Supreme Court requested briefing on the merits, which briefing has been completed by the parties, but has not yet granted the Long Trusts' petition for appellate review. If Castle prevails on appeal, it believes that the judgment in its favor should, as of June 27, 2012, total approximately $1.5 million, with interest continuing to accrue after such date until a favorable decision is issued. The Long Trusts dispute Castle's position and contend that the judgment in Castle's favor should total approximately $968,700. If the Long Trusts prevail on their appeal, they will presumably seek the amount of their prior judgment plus post-judgment interest. Castle disputes the Long Trusts' Claims.

2.    **Causes of Action Belonging to the Debtors' Estates**

While the Debtors have not completed an investigation of possible Causes of Action or Wapiti Causes of Action, the Debtors may have Causes of Action or Wapiti Causes of Action under state or federal law against Persons that are and/or were, without limitation, the Debtors' creditors, contract counterparties, former officers, directors and employees, recipients of transfers and other third parties, each of which will be expressly preserved by the Debtors and transferred and assigned to the General Trust, or solely in the cases of the Wapiti Causes of Action, to the Wapiti Trust, in either case unless otherwise released by the Plan including Section 10.7 thereof. In particular, the Bankruptcy Code creates certain causes of action that allow the Debtors to recover certain transfers (i.e., those determined to be "preferences" or "fraudulent conveyances") they made prior to the Petition Date, as described below. The Wapiti Causes of Action include, but are not limited to, Avoidance Actions and other causes of action relating to and/or arising from the Wapiti Transactions.

a.    **Preferences**

A debtor may recover a transfer of property it made prior to its bankruptcy filing if that transfer: (i) was in payment of a pre-existing debt; (ii) allowed the transferee to receive more than it would have received had the transfer not been made and the debtor had been liquidated under chapter 7 of the Bankruptcy Code; and (iii) was made during the ninety (90) days immediately prior to its bankruptcy filing (or, if the transferee was an insider, during the one (1) year immediately prior to the bankruptcy filing).

There are certain statutory defenses to preference actions.  A transfer made in the ordinary course of the debtor's and transferee's business and according to ordinary business terms may not be recoverable.  Furthermore, if the transferee gave, subsequent to the transfer, new value to the debtor, the new value may constitute an offset against the amount of any recovery.  If a transfer is recovered by the debtor, the transferee has a general unsecured claim against the debtor to the extent of the recovery.

### b.    Fraudulent Transfers

Under the Bankruptcy Code and under various state laws, a debtor may recover a transfer of property it made or an obligation it incurred while insolvent or that rendered it insolvent, or at a time when it either was unable to meet its debts as they matured or was left with unreasonably small capital, if and to the extent the debtor received less than reasonably equivalent value for such property.  Transfers made up to six (6) years prior to the bankruptcy filing may be recovered under some state statutes.

### c.    Transfers by the Debtors

The Debtors' statements of financial affairs, which are incorporated by reference herein, include listings of payments the Debtors made in the ninety (90) days immediately preceding the Petition Date as well as listings of payments the Debtors made to insiders made in the year immediately preceding the Petition Date (each with respect to preferences) and payments the Debtors made in the two years immediately preceding the Petition Date (with respect to fraudulent transfer claims arising solely under the Bankruptcy Code (as opposed to claims under applicable non-bankruptcy law that may be asserted under the Bankruptcy Code).  The Debtors' statements of financial affairs therefore identify recipients of transfers that may sought to be avoided by the Debtors and/or the Recovery Trustee as preferences and/or fraudulent transfers.  The Debtors are in the process of conducting an analysis of potential preferences paid to their vendors, insiders and other creditors and of potential fraudulent transfers paid to transfer recipients.

Other than these analyses, no analysis of the merits of Causes of Action or Wapiti Causes of Action has been made at this time.  While the Debtors' attempted to list all recipients of the foregoing transfers in their statements of financial affairs, it is possible that through further investigation the Debtors or the Recovery Trustee may identify additional recipients of potential preferences and/or fraudulent transfers.  Accordingly, the Debtors cannot estimate potential recoveries, if any, from possible litigation surrounding such transfers or obligations.

### V.    SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN.  THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS <u>EXHIBIT 1</u> TO THE DISCLOSURE STATEMENT.

THE PLAN AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS.

UPON THE EFFECTIVE DATE, THE PLAN WILL BE BINDING UPON HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

The Plan accomplishes a significant deleveraging of the Debtors' balance sheets through Reorganized Delta's membership in the Joint Venture Company, which was formed earlier by the Plan Sponsor, and through the cash payment drawn from the JV Company Credit Facility. As a result of these transactions, the Debtors will have a significantly reduced amount of debt following consummation of the Plan, and Reorganized Delta will become the owner of 33.34% of the membership interests in the Joint Venture Company.

The Holders of Noteholder Claims and the Holders of General Unsecured Claims against Delta will receive their Pro Rata share of the New Common Stock of Reorganized Delta.  The aggregate amount of New Common Stock distributable to such Holders of General Unsecured Claims and Noteholder Claims is subject to dilution to the extent that a grant of New Common Stock to lenders is necessary to obtain financing under the Exit Loan.

All Existing Equity Interests in Delta will be canceled and the Holders thereof will receive no value under the Plan (except as provided in Section 4.13 of the Plan).

A Holder of an Allowed General Unsecured Claim or an Allowed Noteholder Claim against a Debtor other than Delta shall receive its Pro Rata Share of any Cash (including any proceeds from the wind down or liquidation of any remaining assets) that may exist in such Debtor's Estate after all Claims senior to the General Unsecured Claims and Noteholder Claims against such Debtor (including any DIP Facility Claims) are paid in full, in full satisfaction, settlement, release, and discharge of and in exchange for such General Unsecured Claim and Noteholder Claim.

A Holder of an Existing Equity Interest against a Debtor other than Delta shall be extinguished, canceled and discharged and such Holders of Existing Equity Interests shall not receive any distribution or consideration in connection with such Existing Equity Interests, provided, however, that if Holders of Allowed General Unsecured Claims and Noteholder Claims against such Debtor's Estate have been paid in full on account of such Allowed Claim, such Existing Equity Interests will not be extinguished, canceled or discharged, and any remaining Assets owned by such Debtor will be held by the Recovery Trustee on behalf of such Debtor's Estate pending a decision by such Debtor's board of directors on if and when to distribute the proceeds of such Assets.

The Debtors maintain that commencement of the Plan maximizes value for the benefit of their stakeholders.  The Debtors believe that through the Plan, Holders of Allowed Claims will obtain a substantially greater recovery from the Estates of the Debtors than the recovery they would receive if the Debtors filed petitions under chapter 7 of the Bankruptcy Code.

So long as either the Classes of General Unsecured Claims or of Noteholder Claims votes in favor of the Plan, the Debtors intend to seek consummation of the Plan as quickly as possible.

If one of the aforementioned Classes does not accept the Plan, the Debtors intend to seek confirmation under the "cram down" provisions of section 1129 of the Bankruptcy Code.

The Debtors have not substantively consolidated their estates. Delta's subsidiaries are non-operational and own few, if any, assets. To the extent a Claim exists against a Debtor-subsidiary of Delta, such Claim if Allowed will be paid solely from the assets (if any) of such Debtor-subsidiary, and any such assets owned by a Debtor-subsidiary will be distributed solely to the creditors and shareholders of such Debtor-subsidiary.

## A.    Overview of Chapter 11 and the Plan Process

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders. Upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the reorganization case. The commencement of a reorganization case creates an estate that comprises all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that a debtor may continue to operate its business as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in, the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

## B.    Classification and Treatment of Claims and Equity Interests; Cram Down

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, a plan divides claims and equity interests into classes and sets forth the treatment for each class (other than administrative expense claims and priority tax claims (each as defined in the Bankruptcy Code) which, under section 1123(a)(1) of the Bankruptcy Code, need to be classified). A debtor is required, under section 1122 of the Bankruptcy Code, to classify claims against and equity interests in the debtor into classes, each of which contains claims and equity interests that are substantially similar to the other claims and equity interests in such class.

Although the Debtors believe that the Plan has classified all Claims and Equity Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case

law, it is possible that a Holder of a Claim or Equity Interest may challenge the Debtors' classification of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Debtors would, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, make such reasonable modifications of the classifications in the Plan to permit confirmation and to use the acceptances of the Plan that are marked on the ballots received in this Solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately would be deemed to be a member.  Any such reclassification could adversely affect the Class of which such Holder initially was a member, or any other Class in the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.  Furthermore, a reclassification of a Claim or Equity Interest after approval of the Plan could necessitate a resolicitation of acceptances of the Plan.

The amount of any impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims ultimately Allowed by the Bankruptcy Court with respect to each impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any impaired Class.  Thus, the value of the property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely (or favorably) affected by the aggregate amount of Claims ultimately Allowed in the applicable Class.

The classification of Claims and Equity Interests and the nature of distributions to members of each Class are summarized below.  The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and the fair value of the Debtors' assets.  In view of the deemed rejection by Classes A6, A8, and Existing Equity Interests, however, as set forth below, the Debtors will seek confirmation of the Plan pursuant to the "cram down" provisions of the Bankruptcy Code.   Specifically, section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if all impaired classes of claims and equity interests have not accepted the plan.  In order to confirm a plan under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court is required to find that a number of statutory tests are met.  Although the Debtors believe that the Plan can be confirmed under section 1129(b) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

1.      **Treatment of Unclassified Claims Under the Plan**

a.      **Administrative Expense Claims Generally**

Each Holder of an Allowed Administrative Expense Claim will receive payment in full in Cash of the unpaid portion of such Allowed Administrative Expense Claim (a) in the case of professional fees and expenses for professionals and advisors retained by the Debtors or the Creditors' Committee, as soon as practicable after Bankruptcy Court approval thereof, or, in the case of professionals retained by the Debtors in the ordinary course of their business, if any, on such terms as are customary between the Debtors and such professionals; (b) with respect to all other Holders of Allowed Administrative Expense Claims, on the later of (i) the Effective Date and (ii) the date on which such payment would be made in the ordinary course of the Debtors'

businesses, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents relating to such transactions, or (c) with respect to any Claim described in clauses (a) through (b) of Section 2.1 of the Plan, as otherwise agreed by the Holder of such Claim and the Debtors.  Disputed but not yet Allowed Administrative Expense Claims will receive payment on the later of (i) the date such disputed Allowed Administrative Expense Claim becomes Allowed and (ii) the date on which such payment would be made in the ordinary course of the Debtors' businesses, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents relating to such transactions; provided, however, that Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto; provided further, however, that prior to the Effective Date any Administrative Claim asserted by an employee, officer or director of the Debtors other than ordinary course wage payments earned but unpaid as of the Effective Date shall not be Allowed or paid until approval of such Claim by the Bankruptcy Court, a majority (by total amount of Claims held) of the Supporting Noteholders and the Creditors' Committee.  Administrative Claims that are estimated in connection with confirmation of the Plan will be deemed Allowed in the amount so estimated.  All Administrative Claims against the Debtors or the Creditors' Committee (except for professional fees and expenses for professionals and advisors retained by the Debtors as provided in Section 2.2 of the Plan and DIP Facility Claims) must be filed with the Bankruptcy Court and served upon the Debtors and their counsel on or before the date that is sixty (60) days after the Effective Date.

**b.      Professional Compensation and Reimbursement Claims; Other Administrative Claims**

Except as provided in Section 2.1 of the Plan, all Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code and any other Persons seeking administrative priority status for their Claims shall (a) file, on or before the date that is sixty (60) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim.  The Recovery Trustee is authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

**c.      Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim against the Debtors agrees with the Debtors to a different treatment or has been paid by the Debtors prior to the Effective Date, each Holder of an Allowed Priority Tax Claim shall, at the Recovery Trustee's election where applicable, in full satisfaction, release, and discharge of such Allowed Priority Tax Claim: (a) be paid in full, in Cash on (i) the Effective Date, (ii) the date such Claim becomes an Allowed Priority Tax Claim, (iii) such other date as may be agreed upon by the Recovery

Trustee and the Holder of such Allowed Priority Tax Claim, or (iv) such other date as the Bankruptcy Court may order; or (b) be paid in Cash in regular installment payments over the period ending on the fifth anniversary of the Petition Date in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that any such Priority Tax Claim, if Allowed, will be paid solely from the assets (if any) of the Debtor against whom such Priority Tax Claim was asserted.

      2.      **Treatment of Classified Claims Against and Equity Interests In Delta**

      a.      **DIP Facility Claims (Class A1)**

On the Effective Date, each Holder of an Allowed DIP Facility Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed DIP Facility Claim, Cash equal to the full amount of such Allowed DIP Facility Claim.

      b.      **Priority Non-Tax Claims (Class A2)**

Each Holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim, Cash equal to the unpaid portion of such Allowed Priority Non-Tax Claim (i) at the Recovery Trustee's election, either (A) in accordance with the reinstated terms of such indebtedness; (B) in accordance with section 1129(a)(9) of the Bankruptcy Code; or (C) on the latest to occur of (1) the Effective Date, (2) the date such Claim becomes an Allowed Priority Non-Tax Claim, and (3) such other date as may be agreed upon by the Recovery Trustee and the Holder of such Allowed Priority Non-Tax Claim; or (ii) on such other date as the Bankruptcy Court may order.

      c.      **Other Secured Claims (Class A3)**

Each Holder of an Allowed Other Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, Cash equal to the unpaid portion of such Allowed Other Secured Claim (i) at the Recovery Trustee's election, either (A) in accordance with the reinstated terms of such indebtedness; (B) in accordance with section 1129(a)(9) of the Bankruptcy Code; or (C) on the latest to occur of (1) the Effective Date, (2) the date such Claim becomes an Allowed Other Secured Claim, and (3) such other date as may be agreed upon by the Recovery Trustee and the Holder of such Allowed Other Secured Claim; or (ii) on such other date as the Bankruptcy Court may order.

Delta's failure to object to any Other Secured Claim shall be without prejudice to Delta's or Reorganized Delta's right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the Other Secured Claim Holder. Nothing in the Plan shall preclude Delta or Reorganized Delta from challenging the validity of any alleged Lien on any asset of Delta or the value of the property that secures any alleged Lien.

      d.      **General Unsecured Claims (Class A4)**

On the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed General Unsecured Claim against Delta shall receive, in full satisfaction, settlement,

release, and discharge of and in exchange for such General Unsecured Claim, such Holder's Pro Rata share of the New Common Stock of Reorganized Delta.

### e.    Noteholder Claims (Class A5)

On the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Noteholder Claim shall receive (along with any distribution that such Holder is entitled to receive from Debtors other than Delta), in full satisfaction, settlement, release, and discharge of and in exchange for such Noteholder Claim, such Holder's Pro Rata share of the New Common Stock of Reorganized Delta.  The A5 Noteholder Claims shall be Allowed in the full principal amount thereof ($265,000,000) plus interest as of the Petition Date ($2,685,416.66).

### f.    Intercompany Claims (Class A6)

On the Effective Date the legal, equitable and contractual rights of each Holder of an Intercompany Claim against Delta shall be extinguished and such Holders of Intercompany Claims shall not receive any distribution or consideration in connection with such Intercompany Claims.

### g.    Existing Equity Interests (Class A7)

On the Effective Date the legal, equitable and contractual rights of each Holder of an Existing Equity Interest in Delta shall be extinguished, canceled and discharged and such Holders of Existing Equity Interests shall not receive any distribution or consideration in connection with such Existing Equity Interests.

### h.    Securities Litigation Claims (Class A8)

On the Effective Date the legal, equitable and contractual rights of each Holder of a Securities Litigation Claim against the Debtors shall be extinguished and such Holders of Securities Litigation Claims shall not receive any distribution or consideration in connection with such Securities Litigation Claims.

### 3.    Treatment of Classified Claims Against and Equity Interests In Debtors Other Than Delta

### a.    Priority Non-Tax Claims Against Amber (Class H1)

Each Holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim, Cash equal to the unpaid portion of such Allowed Priority Non-Tax Claim (i) at the Recovery Trustee's election, either (A) in accordance with the reinstated terms of such indebtedness; (B) in accordance with section 1129(a)(9) of the Bankruptcy Code; or (C) on the latest to occur of (1) the Effective Date, (2) the date such Claim becomes an Allowed Priority Non-Tax Claim, and (3) such other date as may be agreed upon by the Recovery Trustee and the Holder of such Allowed Priority Non-Tax Claim; or (ii) on such other date as the Bankruptcy Court may order.

      **b.**      **Other Secured Claims Against Debtors Other Than Delta (Classes B2, C2, D2, E2, F2, G2, H2, and I2)**

Each Holder of an Allowed Other Secured Claim in one of the above respective Classes shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, Cash equal to the unpaid portion of such Allowed Other Secured Claim (i) at the Recovery Trustee's election, either (a) in accordance with the reinstated terms of such indebtedness; (b) in accordance with section 1129(a)(9) of the Bankruptcy Code; or (c) on the latest to occur of (x) the Effective Date, (y) the date such Claim becomes an Allowed Other Secured Claim, and (z) such other date as may be agreed upon by the Recovery Trustee and the Holder of such Allowed Other Secured Claim; or (ii) on such other date as the Bankruptcy Court may order. A Debtor's failure to object to any Other Secured Claim shall be without prejudice to the such Debtor's or the Recovery Trustee's right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the Other Secured Claim Holder. Nothing in Section 4.3 of the Plan or elsewhere in the Plan shall preclude Delta or Reorganized Delta from challenging the validity of any alleged Lien on any asset of Delta or the value of the property that secures any alleged Lien.

      **c.**      **General Unsecured Claims Against Debtors Other Than Delta (Classes B3, C3, D3, E3, F3, G3, H3, and I3)**

On the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed General Unsecured Claim against a Debtor other than Delta shall receive its Pro Rata Share of any Cash (including any proceeds from the wind down or liquidation of any remaining assets) that may exist in such Debtor's Estate after all Allowed Claims senior to the General Unsecured Claims and Allowed Noteholder Claims against such Debtor (including any DIP Facility Claims) are paid in full, or reserved in accordance with Article VII of the Plan, in full satisfaction, settlement, release, and discharge of and in exchange for such General Unsecured Claim.

      **d.**      **Noteholder Claims Against Debtors Other Than Delta (Classes B4, C4, D4, E4, F4, G4, H4, and I4)**

On the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Noteholder Claim shall receive (along with any distribution that such Holder is entitled to receive from Delta) , in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Noteholder Claim, its Pro Rata Share of Cash (including proceeds from the wind down or liquidation of any remaining assets) that may exist in such Debtor's Estate after all Claims senior to the General Unsecured Claims and Allowed Noteholder Claims against such Debtor (including DIP Facility Claims) are paid in full or reserved in accordance with Article VII of the Plan.

      **e.**      **Existing Equity Interests in Debtors Other Than Delta (Classes B5, C5, D5, E5, F5, G5, H5, and I5)**

On the Effective Date the legal, equitable and contractual rights of each Holder of an Existing Equity Interest against a Debtor other than Delta shall be extinguished, canceled and discharged and such Holders of Existing Equity Interests shall not receive any distribution or

consideration in connection with such Existing Equity Interests and such Debtor shall be liquidated, provided, however, that if Holders of Allowed General Unsecured Claims and Noteholder Claims against such Debtor's Estate have been paid in full on account of such Allowed Claim, such Existing Equity Interests will not be extinguished, canceled or discharged, and any remaining Assets owned by such Debtor will be held by the Recovery Trustee on behalf of such Debtor's Estate pending a decision by such Debtor's board of directors on if and when to distribute the proceeds of such Assets.

### C.    Summary of the Capital Structure of Reorganized Delta

Pursuant to the Plan, Reorganized Delta expects to have the capital structure described below upon its emergence from chapter 11.   The summary of Reorganized Delta's capital structure is qualified in its entirety by reference to the Plan and the documents contained in the Plan Supplements.

### 1.    Description of New Common Stock

On the Effective Date, Reorganized Delta will issue the New Common Stock.   Each share of the New Common Stock shall entitle its Holder to one vote.   On the Effective Date, or as soon as reasonably practicable thereafter, Reorganized Delta shall take all steps necessary to facilitate the public trading of the New Common Stock, provided, however, that Reorganized Delta's Tax Attributes shall be protected through provisions in Reorganized Delta's Restated Certificate of Incorporation and/or the New Stockholders' Agreement limiting transactions that might result in adverse consequences to Reorganized Delta's Tax Attributes.   The Debtors do not know at this time what exchange, if any, on which the New Common Stock will be traded, though it is likely to be traded on the over-the-counter market.

### a.    New Stockholders' Agreement

As is described in more detail in Article X of this Disclosure Statement, the Debtors will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the New Common Stock issued pursuant to the Plan from the registration requirements of the Securities Act and any state securities laws.   Transfers of securities issued under the Plan to the Supporting Noteholders will be subject to the terms and conditions of the New Stockholders' Agreement.

### b.    Restrictions on Resale of Securities to Protect Net Operating Losses

The Restated Certificates of Incorporation, at the Supporting Noteholders' discretion and with the Supporting Noteholders' unanimous consent, shall contain restrictions on the transfer of the New Common Stock to minimize the likelihood of any potential adverse federal income tax consequences resulting from an ownership change (as defined in section 382 of the Tax Code) in Reorganized Delta, consistent with those described in Section VII.C.5 of this Disclosure Statement.

### 2.    JV Company Credit Facility

On the Effective Date, the Plan Sponsor shall obtain on behalf of the Joint Venture Company a $400 million secured revolving credit facility secured by a lien on the Joint Venture

Company's oil and gas properties and related assets and the LLC membership interests in the Joint Venture Company owned by the JV Company Credit Facility Guarantors (the "**JV Company Credit Facility**").  Availability will be limited to the lesser of (a) $400 million, or (b) the borrowing base in effect from time to time.  The initial borrowing base shall be not less than $140 million.  To the extent required by the JV Company Credit Facility Lenders (defined below), the Plan Sponsor and Reorganized Delta (the "**JV Company Credit Facility Guarantors**") shall pledge their respective LLC membership interests in the Joint Venture Company and grant the JV Credit Facility Lenders a non-recourse lien against such interests. The JV Company Credit Facility Lenders shall be J.P. Morgan Securities and Wells Fargo Bank, N.A. and/or such other lenders, if any, approved by the Joint Venture Company (the "**JV Company Credit Facility Lenders**"). The JV Company Credit Facility will mature on the fourth anniversary of the Effective Date (the "**JV Maturity Date**").

On the Effective Date, the Joint Venture Company shall draw on the JV Company Credit Facility and wire to Reorganized Delta Cash consideration equal to $75 million, subject to certain adjustments, which shall be used to pay the administrative expenses and other creditors of the Debtors' estates, including, without limitation, the DIP Credit Facility, pursuant to the terms of the Plan.  Precise sources and uses of the approximately $75 million in Cash will depend on the amount of Allowed Administrative Expense Claims.

An executed copy of the JV Company Credit Facility Term Sheet is attached to the Plan as <u>Plan Exhibit 6</u>.

3.    **Exit Loan**

Reorganized Delta shall obtain an exit term loan on reasonable terms in an amount sufficient to refinance all unpaid Allowed DIP Facility Claims (the "**Exit Loan**").  The amount of the Exit Loan will depend on the amount of Allowed Administrative Expense Claims, but is anticipated to be less than $20,000,000, if an Exit Loan is needed at all.  The Exit Loan shall be secured by all of the assets of the Reorganized Debtors, including a pledge of Reorganized Delta's LLC membership interest in the Joint Venture Company, subordinated to the security interest granted in favor of the JV Company Credit Facility Lenders.  The Debtors anticipate that financing for the Exit Loan will be available at a financing rate of approximately 5% annually.  If such financing is unavailable, however, the Exit Loan may be obtained from an alternative funding source, in which case the interest rate could be up to 15%, including payment-in-kind interest.   In addition, alternative financing sources may negotiate to receive a portion of Reorganized Delta's New Common Stock, likely within the range of 1-10%, which would reduce the amount of New Common Stock available for Pro Rata distribution to Holders of General Unsecured Claims against Delta and Noteholder Claims.

A term sheet setting forth the material terms of the Exit Loan shall be filed as a Plan Supplement.

### D.    Means for Implementation and Execution of the Plan

1.    **Corporate Action**

Upon the occurrence of the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) selection of the directors and officers for the Reorganized Debtors, (ii) the issuance and distribution of the New Common Stock, (iii) entry into the Joint Venture Company LLC Agreement, (iv) entry into the Contribution Agreement, (v) entry into the Management Services Agreement, (vi) entry into the JV Company Credit Facility, (vii) entry into the Exit Loan, (viii) the adoption of the Restated Certificates of Incorporation and Restated Bylaws, (ix) entry into the New Stockholders' Agreement, if any, (x) entry into the Recovery Trust Agreements and (xi) all other actions contemplated by the Plan (whether to occur before or on the Effective Date).    All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Equity Interest Holders, directors or officers of the Debtors or the Reorganized Debtors.    On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the JV Company Credit Facility Documents and any and all other agreements, documents, securities and instruments relating to the foregoing.

2.    **Restated Certificate of Incorporation and Restated Bylaws**

The Restated Bylaws and the Restated Certificates of Incorporation shall be consistent with the provisions of the Plan and the Bankruptcy Code, and satisfactory to the Supporting Noteholders.    On or immediately before the Effective Date, the Reorganized Debtors will file their respective Restated Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces or countries of incorporation in accordance with the corporate laws of the respective states, provinces or countries of incorporation.    Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Restated Certificates of Incorporation will prohibit the issuance of non-voting equity securities.    After the Effective Date, the Reorganized Debtors may amend and restate their respective Restated Certificates of Incorporation and Restated Bylaws and other constituent documents as permitted by the laws of their respective states, provinces or countries of incorporation and their respective Restated Certificates of Incorporation and Restated Bylaws.    The Restated Certificate of Incorporation of Reorganized Delta will, among other things authorize the New Common Stock and, at the Supporting Noteholders' discretion and with the Supporting Noteholders' unanimous consent, contain restrictions on the transfer of the New Common Stock to minimize the likelihood of any potential adverse federal income tax consequences resulting from an ownership change (as defined in section 382 of the Tax Code) in Reorganized Delta, consistent with those described in Section VII.C.5 of this Disclosure Statement.    Any modification to the originally filed Restated Certificate of Incorporation or Restated Bylaws of Reorganized Delta after the Confirmation Date but prior to the Effective Date may become effective; provided, however that, any such modification must be approved by the Supporting Noteholders.

Drafts of the Restated Certificates of Incorporation and the Restated Bylaws shall be filed as Plan Exhibits 8 and 9, respectively.

3.    **Plan Exhibits**

The Plan Exhibits include drafts and execution versions or executed copies, where applicable, of the following documents:

1.    Contribution Agreement

2.    Joint Venture Company LLC Agreement

3.    Management Services Agreement

4.    Recovery Trust Agreements

5.    New Stockholders' Agreement for Reorganized Delta

6.    Restated Certificate of Incorporation of Reorganized Delta

7.    Restated Bylaws of Reorganized Delta

8.    JV Company Credit Facility Term Sheet and JV Company Credit Facility Documents

The Plan Exhibits include term sheets for the Exit Loan Documents.

4.    **Plan Supplements**

The Plan Supplements, which will include a listing of directors and officers for the Reorganized Debtors, and Plan Exhibits will be filed with the clerk of the Bankruptcy Court no later than seven (7) days prior to the Voting Deadline, underlined provided that the Debtors may amend such Plan Supplements and Plan Exhibits at any time prior to the Confirmation Hearing. Upon such filing, all documents included in the Plan Supplements may be inspected in the office of the clerk of the Bankruptcy Court during normal business hours or may be accessed online at www.deb.uscourts.gov (cm/ecf) or http://chapter11.epiqsystems.com/DPC

5.    **Directors and Officers of the Reorganized Debtors and Reorganized Delta**

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the New Boards, including the New Delta Board and the New Subsidiary Boards, as well as the officers of each of the Reorganized Debtors shall be appointed in accordance with the Restated Certificates of Incorporation and Restated Bylaws of each Reorganized Debtor. On the Effective Date, the New Delta Board shall consist of five directors. The initial New Delta Board shall be selected as follows: two Directors shall be selected by Whitebox Advisors, LLC ("**Whitebox**"), two Directors shall be selected by Zell Credit Opportunities Master Fund, L.P. ("**ZCOF**"), and one Director shall be an independent Director jointly selected by unanimous consent of Whitebox, ZCOF and Waterstone Capital Management, L.P., provided that if non-Noteholder shareholders own 20% or more of the New Common Stock of Reorganized Delta, then a sixth Director shall be selected by the non-Noteholder shareholders. Reorganized Delta's formation documents shall contain provisions for tie-breaking in the event there are an even number of board members. Pursuant to section 1129(a)(5) of the Bankruptcy

Code, the Debtors will disclose in a Plan Supplement the identity and affiliations of any Person proposed to serve on the initial New Delta Board and the New Subsidiary Boards, as well as those Persons that serve as an officer of any of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the Restated Certificates of Incorporation, Restated Bylaws and other constituent documents of the Reorganized Debtors.

6.    **The Joint Venture Company**

On the Effective Date, Reorganized Delta and the Plan Sponsor shall amend the limited liability company organizational documents of Piceance Energy, LLC (the "**Joint Venture Company**"), in accordance with the terms of the Limited Liability Company Agreement of the Joint Venture Company (the "**Joint Venture Company LLC Agreement**"), the Contribution Agreement between the Plan Sponsor, the Debtors and the Joint Venture Company (the "**Contribution Agreement**"), and the Management Services Agreement between the Plan Sponsor and the Joint Venture Company (the "**Management Services Agreement**").

Drafts of the term sheets for the Limited Liability Company Agreement, Contribution Agreement, and the Management Services Agreement were filed with the Bankruptcy Court as the *Summary of Company Formation Documents* attached as **Exhibit "1"** to the *Notice of Debtors' Selection of Proposed Plan Sponsor* on May 7, 2012 [D.I. 530]. The final executed Contribution Agreement, and final execution forms of the Limited Liability Company Agreement and the Management Services Agreement are also attached to the Plan as Plan Exhibits 1, 2, and 3, respectively.[17]

a.    **The Joint Venture Company LLC Agreement**

Pursuant to the Joint Venture Company LLC Agreement, the Joint Venture Company will serve as an operating company owning the oil and gas, surface real estate and related assets (the "**JV Company Assets**") formerly owned by each of Delta and the Plan Sponsor in Garfield and Mesa Counties, Colorado. Upon the execution of the Joint Venture Company LLC Agreement, there shall be 1 million authorized membership units and 500,000 issued units. The Plan Sponsor shall own 333,333 (66.66%) and Reorganized Delta shall own 166,667 (33.34%) of the issued units. Each member shall have one vote for each unit that it holds in all matters subject to a vote, and the affirmative act of the members shall require the vote of at least 51% of the outstanding units.

The Joint Venture Company LLC Agreement provides for corporate governance of the Joint Venture Company through a manager (the "**Manager**") and board of members (the "**Board**

---

17    The Contribution Agreement is attached as an Exhibit to the Plan without certain schedules and exhibits thereto that contain confidential information about leases, property holdings and agreements. A party-in-interest may view copies of those schedules and exhibits upon entry into a confidentiality agreement with the Debtors, in form and substance satisfactory to the Debtors and the Plan Sponsor in their sole discretion.

**of Managers**").  The initial Manager shall be the Plan Sponsor.  The Manager's duties are set forth in the Management Services Agreement.

The Manager shall serve at the pleasure of the Board of Managers, composed of six representatives: four appointed by the Plan Sponsor and two appointed by the board of Reorganized Delta (one of which shall be selected by members of the Reorganized Delta board appointed by Whitebox and one of which shall be selected by members of the Reorganized Delta board appointed by ZCOF).  For all actions taken by members, such members must act through the Board of Managers.  Board of Managers decisions shall be binding on the Manager and the Joint Venture Company.  The Board of Managers shall have a duty of good faith to the Joint Venture Company but shall owe no other fiduciary duties to the Joint Venture Company.

Lastly, the Joint Venture Company LLC Agreement contains a number of minority protections that require the unanimous approval of the Board of Managers, including, without limitation the following:[18] (a) incurring any borrowings or the issuance or restructuring of any debt of the Joint Venture Company other than  the Joint Venture Company Credit Facility, purchase money indebtedness up to $5,000,000 and unsecured trade indebtedness in an aggregate not to exceed $15,000,000; (b) assuming or guaranteeing the performance of any obligation outside the ordinary course of business greater than $1,000,000; (c) adding a new class of securities or increasing or decreasing the outstanding ownership of the Joint Venture Company, except certain permitted capital contributions of up to $60,000,000 in the aggregate, or otherwise requiring additional capital contributions in excess of $60,000,000 in the aggregate; (d) admitting additional members to the Joint Venture Company except pursuant to a permitted capital contribution; (e) acquiring new assets with a value in excess of $25,000,000; and (f) forming or joining a joint venture (except pursuant to customary oil and gas industry exploration and development agreements) or subsidiary, or merging or consolidating with another entity.

### b.    The Contribution Agreement

Pursuant to the Contribution Agreement, both the Plan Sponsor and Delta will contribute assets to the Joint Venture Company in exchange for their respective membership interests.  A description of the assets is set forth in Section 1.1 to the Contribution Agreement, and a summary of such assets is attached hereto as <u>Exhibit 6</u>.  Such assets include, among other things, all of the Plan Sponsor's and Delta's oil and gas assets, fee lands, and surface rights in Garfield and Mesa Counties, Colorado, with certain exceptions.

Excluded assets are set forth in Section 1.3 of the Contribution Agreement and, among other things, comprise both the Plan Sponsor's or Delta's oil and gas assets located outside of Mesa and Garfield Counties, Colorado, records relating to their businesses generally or excluded assets and their respective office leases.  Delta's excluded assets additionally include, among other things, Delta's Point Arguello interests, certain compressors owned by Delta that were located in the State of Wyoming as of September 30, 2011, all Cash on hand, and all of the Causes of Action and Wapiti Causes of Action (including the Avoidance Actions).

---

18.    Readers should refer to the Joint Venture Company LLC Agreement, attached to the Plan as Plan Exhibit 2 for a complete list of minority protections.

The Contribution Agreement further provides for the assumption and assignment of various contracts of both the Plan Sponsor and Delta to the Joint Venture Company. Such contracts and leases are listed on **Exhibits C1, C-6, D-1 and D-6** to the Contribution Agreement. Cure amounts owed pursuant to section 365 of the Bankruptcy Code shall be paid in accordance with the Contribution Agreement; provided, however, that if cure amounts exceed $2,000,000, such cure amounts will be paid by the Plan Sponsor in its sole discretion, or the applicable executory contract or unexpired lease shall be rejected unless otherwise agreed by the Debtors and the Supporting Noteholders prior to the Effective Date or by Reorganized Delta after the Effective Date. The transfer to the Joint Venture Company of any of the Debtors' rights and interests in or to property, including the assumption of the contracts and leases shall be free and clear of all Liens, Claims and interests to the fullest extent permitted under § 365 and 1141(c) of the Bankruptcy Code, with the exception of certain existing mortgage liens on certain Laramie assets to be assigned to the JV Credit Facility Lenders. Notwithstanding the foregoing, the Contribution Agreement shall be subject to amendment according to the terms thereof.

### c.    The Management Services Agreement

Pursuant to the Management Services Agreement, the Joint Venture Company will retain the Manager as an independent contractor to manage the Joint Venture Company's assets and perform activities not performed by the Joint Venture Company's own employees. In particular, the services to be rendered by the Manager shall include: (i) executive level services, (ii) administrative and operating level management responsibilities, and (iii) supervision of oil and gas field development services.

In compensation for such services, the Joint Venture Company will pay the Manager an amount equal to $650,000 per month (the "**Management Fee**"). The Management Fee shall reimburse the Manager for its general and administrative overhead expenses.

### 7.    JV Company Credit Agreement

The JV Company Credit Agreement was executed and delivered on June 4, 2012. On the Effective Date, the Reorganized Debtors and the JV Company Credit Facility Guarantors shall be authorized to execute and deliver the JV Company Credit Facility Documents, including Reorganized Delta's guaranty of the JV Company Credit Facility, without the need for any further corporate action and without further action by the Holders of Claims or Equity Interests.

### 8.    Issuance of New Common Stock

On the Effective Date, the New Common Stock shall be issued and distributed on behalf of Reorganized Delta to the Holders of Allowed General Unsecured Claims who have elected to receive New Common Stock, and Noteholder Claims, as applicable.

### 9.    Recovery Trusts

On the Effective Date, two trusts shall be formed pursuant to the Plan, the Recovery Trust Agreements shall be executed, and the Recovery Trusts shall be established and become effective and, except as otherwise set forth in the Plan or the Confirmation Order, the Debtors

shall transfer and assign to the Recovery Trusts all of their legal and equitable interests in the Recovery Trust Assets as set forth below. Each Reorganized Debtor shall be a beneficiary of the Recovery Trusts, but only to the extent of the Recovery Trust Assets contributed to the Recovery Trusts by such Debtor. The Recovery Trustee shall maintain separate accounts for each Reorganized Debtor's Estate to segregate funds received on account of assets, Causes of Action or Wapiti Causes of Action contributed by such Debtor.

The first trust shall be called the Wapiti Recovery Trust (the "**Wapiti Trust**"). On the Effective Date, all Estate causes of action against Wapiti Oil & Gas Energy, LLC and affiliated persons and entities including, subject to the terms of the releases to be granted under the Plan, ZCOF and the ZCOF affiliate that directly invested in Wapiti (the "**ZCOF Parties**") shall be vested in the Wapiti Trust. Other than those actions preserved against Wapiti and the ZCOF Parties under section 10.7 of the Plan, no Estate cause of action shall be preserved against ZCOF, and any ZCOF affiliate, director, officer, or employee, and each such person shall be released to the fullest extent permitted by law. The Wapiti Trust shall be overseen by a three person Wapiti Trust Oversight Board selected as follows: one Director shall be selected by Whitebox; one Director shall be selected by Waterstone Advisors, LLC; and one Director shall be the Recovery Trustee. The non-Trustee Directors on the Wapiti Trust Oversight Board shall determine the terms of compensation for the Recovery Trustee. Directors on the Wapiti Trust Oversight Board shall serve without compensation. The Wapiti Trust Agreement shall establish additional governance procedures for the Wapiti Trust and the Wapiti Trust Oversight Board. The maximum amount of funding available to the Wapiti Trust shall be $5,000,000, plus any value generated by the Recovery Trusts through the prosecution of the Causes of Action, the Wapiti Causes of Action and objections to Claims.

The second trust shall be called the Delta Petroleum General Recovery Trust (the "**General Trust**"). On the Effective Date, all Estate causes of action not otherwise vested in the Wapiti Trust, all Estate responsibilities for Claim objections and resolutions, and all other responsibilities for winding-up the Chapter 11 Cases shall be vested in the General Trust. In addition, the $75 million (subject to adjustment) to be received from the Joint Venture Company shall be disbursed in accordance with a flow of funds memorandum to be agreed upon by the Debtors and the Supporting Noteholders, a form of which shall be filed as a Plan Supplement. The General Trust shall be overseen by a three person General Trust Oversight Board selected as follows: one Director shall be selected by Whitebox; one Director shall be selected by ZCOF; and one Director shall be the Recovery Trustee. The non-Trustee Directors on the General Trust Oversight Board shall determine the terms of compensation for the Creditor Trustee. Directors on the General Trust Oversight Board shall serve without compensation. The General Trust Agreement shall establish additional governance procedures for the General Trust and the General Trust Oversight Board.

The Recovery Trusts shall be funded in the initial amounts as set forth in their respective Recovery Trust Agreements. Subject to the provisions of the Recovery Trust Agreements, and in the discretion of Reorganized Delta, all costs, expenses and obligations incurred by the Recovery Trustee in administering the Plan, the Recovery Trusts, or in any manner connected, incidental or related thereto, in effecting distributions from, as applicable, the General Trust or the Wapiti Trust thereunder (including the reimbursement of reasonable expenses) shall be a charge against the applicable Recovery Trust Assets remaining from time to time in the hands of the Recovery Trustee. Such expenses shall be paid as they are incurred without the need for Bankruptcy Court

approval.  To conduct its operations and fulfill its responsibilities under the Plan and the Recovery Trust Agreements, the Recovery Trustee may request additional funding from Reorganized Delta; provided, however, that all Directors nominated by ZCOF shall recuse themselves from all discussions and decision-making by the Reorganized Delta Board of Directors regarding funding requests for the benefit of the Wapiti Trust.

Subject to governance by the applicable Oversight Board, the initial trustee of both Recovery Trusts shall be John T. Young, Jr., the Chief Restructuring Officer of Delta.  The Recovery Trustee shall retain and have all the rights, powers and duties necessary to carry out his or her responsibilities under the Plan and the Recovery Trust Agreements, and as otherwise provided in the Confirmation Order.  The Recovery Trustee shall be the exclusive trustee of the Recovery Trust Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code § 1123(b)(3)(B).  Matters relating to the appointment, compensation, removal and resignation of the Recovery Trustee and the appointment of any successor Recovery Trustee shall be set forth in the Recovery Trust Agreements.  The compensation of the Recovery Trustee shall be disclosed in the Plan Supplements.  The Debtors, the Recovery Trustee or the Reorganized Debtors, as the case may be, shall file post-confirmation quarterly reports or any pre-confirmation monthly operating reports not filed as of the Confirmation Hearing in conformity with the U.S. Trustee guidelines, until entry of an order closing or converting the Chapter 11 Cases.

The Recovery Trustee shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Recovery Trustee, are necessary to assist the Recovery Trustee in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the General Trust or the Wapiti Trust, as applicable, upon the monthly submission of statements to the Recovery Trustee. The payment of the reasonable fees and expenses of the Recovery Trustee's retained professionals shall be made in the ordinary course of business from the Recovery Trust Assets, and shall not be subject to the approval of the Bankruptcy Court.

Subject to the provisions of the Recovery Trust Agreements, and, as applicable, Oversight Board Approval, all costs, expenses and obligations incurred by the Recovery Trustee in administering the Plan, the Recovery Trusts, or in any manner connected, incidental or related thereto, in effecting distributions from the Recovery Trusts thereunder (including the reimbursement of reasonable expenses) shall be a charge against the Recovery Trust Assets remaining from time to time in the hands of the Recovery Trustee.  Such expenses shall be paid as they are incurred without the need for Bankruptcy Court approval.

The Recovery Trustee shall not be liable for any act or omission taken or omitted to be taken in his or her capacity as the Recovery Trustee, other than acts or omissions resulting from the Recovery Trustee's willful misconduct, gross negligence or fraud.  The General Trust and the Wapiti Trust, as applicable, shall, subject to the terms approved by the Oversight Board, indemnify and hold harmless the Recovery Trustee and his or her agents, representatives, professionals, and employees from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to such trust or the implementation or administration of the Plan; provided,

however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

If a litigation recovery on behalf of a Cause of Action or a Wapiti Cause of Action arising from a defendant Person's bad faith, willful misconduct, or gross negligence is obtained by the Recovery Trustee against a Person, such Person shall not be entitled to share directly or indirectly in the proceeds from such litigation recovery.

The duties, responsibilities and powers of the Recovery Trustee shall terminate after all Recovery Trust Assets, including the Causes of Action and Wapiti Causes of Action, transferred and assigned to the Recovery Trusts, or involving the Recovery Trustee on behalf of the Recovery Trusts, are fully resolved, abandoned or liquidated and been distributed in accordance with the Plan and the Recovery Trust Agreements and the administration of the Recovery Trusts has otherwise been completed. The Recovery Trusts shall terminate no later than five (5) years after the Effective Date unless extended by order of the Bankruptcy Court. Upon the occurrence of the termination of the Recovery Trusts, the Recovery Trustee shall file with the Bankruptcy Court a report thereof, seeking an order discharging the Recovery Trustee. In the event of any inconsistencies or conflict between the Recovery Trust Agreements and the Plan, the terms and provisions of the Plan shall control.

10.    **Cancellation of Agreements**

On the Effective Date, the Indentures shall be canceled and shall be of no further force and effect except as to obligations between parties other than the Debtors and their Affiliates and Subsidiaries.

11.    **Surrender of Existing Securities**

Each Holder of a Noteholder Claim shall surrender its note(s) to the Indenture Trustee or in the event such note(s) are held in the name of, or by a nominee of, The Depository Trust Company, the Reorganized Debtors shall seek the cooperation of The Depository Trust Company to provide appropriate instructions to the Indenture Trustee. Each Holder of Noteholder Claim shall send its note(s) to the Indenture Trustee or The Depository Trust Company shall provide appropriate instructions to the Indenture Trustee or the loss, theft or destruction of such note shall be established to the reasonable satisfaction of the Indenture Trustee as applicable, which satisfaction may require such Holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, the Reorganized Debtors, and the Indenture Trustee harmless in respect of such note and any distributions made on account thereof. Upon compliance with Section 6.8 of the Plan by a Holder of any Note, such Holder shall, for all purposes under the Plan, be deemed to have surrendered such note. All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Reorganized Debtors by the Indenture Trustee and any such security shall be canceled.

12.    **Cancellation of the Notes and Equity Interests**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates and other documents evidencing (a) the 3 3/4% Notes, (b) the 7% Notes and (c) the Equity Interests shall be canceled (except as set forth in Section 4.13 of the Plan), and

the obligations of the Debtors thereunder and in any way related thereto shall be fully satisfied, released and discharged; provided, however, that such cancellation shall not itself alter the obligations or rights of any third parties (apart from the Debtors, their Affiliates and Subsidiaries and the Holders of Noteholder Claims) under such notes, instruments, certificates or other documents, including, but not limited to, any applicable rights to indemnification or to seek contribution from any party other than the Debtors or their Affiliates and Subsidiaries with respect to such notes, instruments, certificates or other documents.  With respect to the Notes, on the Effective Date, except to the extent otherwise provided in the Plan, the Indentures and any similar agreements, including, without limitation, any related note, guaranty or similar instrument of the Debtors shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and discharged (i) with respect to all obligations owed by the Debtors under any such agreement and (ii) except to the extent provided herein below, with respect to the respective rights and obligations of the Indenture Trustee under the Indentures against the Holders of Noteholder Claims.  Solely for the purpose of clause (ii) in the immediately preceding sentence, only the following rights of the Indenture Trustee shall remain in effect after the Effective Date: (A) rights as trustee, paying agent and registrar, including but not limited to any rights to payment of fees, expenses and indemnification obligations and liens securing such rights to payment including, but not limited to, from or on property distributed under the Plan to the Indenture Trustee (but excluding any other property of the Debtors, the Reorganized Debtors or their Estates), (B) rights relating to distributions to be made to the Holders of the 3 3/4% Notes or the 7% Notes by the Indenture Trustee from any source, including, but not limited to, distributions under the Plan including, without limitation, any Liens on distributions to the Holders that may be provided to the Indenture Trustee pursuant to the Indentures (but excluding any other property of the Debtors, the Reorganized Debtors or their Estates), (C) rights relating to representation of the interests of the Holders of the 3 3/4% Notes or the 7% Notes by the Indenture Trustee in the Chapter 11 Cases to the extent not discharged or released by the Plan or any order of the Bankruptcy Court and (D) rights relating to participation by the Indenture Trustee in proceedings and appeals related to the Plan.  Notwithstanding the continued effectiveness of such rights after the Effective Date, such Indenture Trustee shall have no obligation to object to Claims against the Debtors and the Indenture Trustee shall have no obligation to locate certificated Holders of the 3 3/4% Notes or the 7% Notes who fail to surrender the 3 3/4% Notes and/or the 7% Notes in accordance with Section 6.8 of the Plan.  For the avoidance of doubt, after the performance by the Indenture Trustee and its representative of any duties that are required under the Plan, the Confirmation Order and the Indentures, the Indenture Trustee and its representative shall be relieved of and released from all obligations arising under the Indentures.

13.    **Preservation of Documents.**

From and after the Effective Date, the Debtors, the Reorganized Debtors, the Recovery Trusts, the Recovery Trustee and any transferee of the Debtors' Documents (defined infra), as the case may be, shall preserve and maintain all of the Debtors' documents, files, books, records, electronic data (including, but not limited to, emails and email server back-up tapes) (collectively, the "**Documents**"), whether retained by the Debtors, Reorganized Debtors or any successors to or transferees of the Debtors, or transferred to the Recovery Trusts or the Recovery Trustee, pursuant to the applicable Recovery Trust Agreement, or such other transferee pursuant to the Plan, and the Debtors, Reorganized Debtors, any successors to or transferees of the

Debtors, the Recovery Trusts, the Recovery Trustee and/or such other transferee shall not destroy or otherwise abandon any such Documents absent further order of this Court or other court of competent jurisdiction after a hearing upon notice to counsel for lead plaintiffs in the Class Action, counsel to defendants of pending adversary proceedings, and all parties on the Debtors' Rule 2002 service list subject to a contested matter or claim objection in an adversary proceeding or state court action with an opportunity to be heard, or the later to occur of the conclusion of the Class Action by entry of a Final Order or the liquidation and distribution of the Recovery Trust Assets upon written notice to the parties listed in Section 6.7 of the Plan with an opportunity to be heard.

### E.    Existing Liens

All property rights and interests to be transferred to the Joint Venture Company by the Debtors shall be free and clear of all Liens, Claims and liabilities to the fullest extent permitted by sections 365 and 1141(c) of the Bankruptcy Code.

### F.    Compromise of Controversies

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under Bankruptcy Rule 9019.

### G.    Effectuating Documents; Further Transactions

The chief executive officer, the president, the chief financial officer, the general counsel or any other appropriate officer of the Debtors of the Reorganized Debtors or the Recovery Trustee, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The secretary or assistant secretary of the Debtors, the Reorganized Debtors, or the Recovery Trustee, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

## VI.    PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Date of Distributions on Account of Allowed Claims

Unless otherwise provided herein or in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon as practicable thereafter.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### B.    Sources of Cash for Plan Distribution

Except as otherwise provided in the Plan or Confirmation Order, all Cash required for the payments to be made pursuant to the Plan to Delta's prepetition and administrative creditors shall

be obtained from the Cash proceeds drawn from the JV Company Credit Facility, the Exit Facility Loan and Delta's and Reorganized Delta's operations and Cash on hand, and all Cash required for the payments to be made hereunder to the prepetition and administrative creditors of all Debtors other than Delta shall be obtained from the Cash proceeds available in such Debtor's Estate after all senior Allowed Claims against such Debtor have been paid in full, all as set forth in the flow of funds memorandum agreed upon by the Debtors and Supporting Noteholders, a form of which shall be filed as a Plan Supplement.

### C.    Time Bar to Cash Payments

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Disbursement Agent by the Holder of the Allowed Claim to whom such check was originally issued. Any Claim in respect of such a voided check shall be made on or before the first anniversary of the date on which such distribution or payment was made. If no Claim is made as provided in the preceding sentence, all Claims in respect of void checks shall be discharged and forever barred and such unclaimed distributions shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat laws to the contrary.

### D.    Disbursement Agent

The Disbursement Agent, or such other Person designated by the Recovery Trustee as a Disbursement Agent, shall make all distributions under the Plan on the Effective Date. A Disbursement Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### E.    Record Date for Distributions

Except as otherwise required to comply with the provisions of the Claims Trading Order, distributions shall only be made to the record Holders of Allowed Claims as of the Confirmation Date. On the Confirmation Date, at the close of business for the relevant register, all registers maintained by the Debtors and the Reorganized Debtors, and each of their respective agents, successors and assigns, shall be deemed closed for purposes of determining whether a Holder of such a Claim is a record Holder entitled to distributions under this Plan. The Debtors and the Reorganized Debtors, and all of their respective agents, successors and assigns shall have no obligation to recognize, for purposes of distributions pursuant to or in any way arising from this Plan (or for any other purpose), any Claims that are transferred after the Confirmation Date. Instead, they shall be entitled to recognize only those record Holders set forth in the registers as of the Confirmation Date, irrespective of the number of distributions made under this Plan or the date of such distributions. Furthermore, if a Claim is transferred twenty (20) or fewer calendar days before the Confirmation Date, the Disbursement Agent shall make distributions to the transferee only if the transfer form or other appropriate writing contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. Notwithstanding anything in the Plan to the contrary, (i) distributions to Holders of Allowed Claims under section 502(h) of the Bankruptcy Code shall be made to the Holder of such Claim after a Final Order has been entered by the Court that deems such Claim as Allowed and (ii) distributions may be made to Holders of Allowed Claims who acquired their Claims after the

Confirmation Date pursuant to the "Sell-Down Procedures" set forth in the Claims Trading Order.

If any dispute arises as to the identity of a Holder of an Allowed Claim that is entitled to receive a distribution pursuant to the Plan, the Disbursement Agent or the servicers, as applicable, may, in lieu of making such distribution to such Person, make the distribution into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute.

### F.    Objections to and Estimation of Claims; Resolution of Disputed Claims

### 1.    Right to Object to Claims

On and after the Effective Date, the Recovery Trustee, the Reorganized Debtors and any creditor, may continue to attempt to consensually resolve any disputes regarding the amount of any Claim and shall have the right, but not the obligations, to object to the allowance of any Claim and may file with the Court any other appropriate motion or adversary proceeding with respect thereto.  All such objections may be litigated to Final Order. The Recovery Trustee shall retain the rights and defenses the Debtors or their Estates had with respect to any Claim or Equity Interest immediately prior to the Effective Date, subject to the provisions of the Plan.

### 2.    Deadline for Objecting to Claims

All objections to Claims shall be filed with the Bankruptcy Court by the Claims Objection Deadline in accordance with its local rules, and a copy of the objection must be served on the Holder of the subject Claim before the expiration of the Claims Objection Deadline; otherwise such Claims shall be deemed Allowed in accordance with section 502 of the Bankruptcy Code.  The objection shall notify the Holder of the subject Claim of the deadline for responding to such objection.  The Claims Objection Deadline can be extended up to an additional ninety (90) days by the Recovery Trustee filing a notice with the Court and thereafter as permitted by order of the Bankruptcy Court, upon notice and a hearing.

### 3.    Deadline for Responding to Claims Objections

Within thirty (30) days after service of an objection, the Holder whose Claim was objected to must, in accordance with the local rules of the Bankruptcy Court, serve and file a written response to the objection with the Bankruptcy Court and serve a copy on the Disbursement Agent, the Recovery Trustee, the Reorganized Debtors, any objecting creditor and the notice parties for the Debtors and the Supporting Noteholders identified in section 12.18 of the Plan.  Failure to serve and file a written response within the thirty (30) day time period may result in the Bankruptcy Court granting the relief demanded in the Claim objection without further notice or hearing.

### 4.    Right to Request Estimation of Claims

Before the Effective Date, the Debtors or any objecting creditors may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant

to § 502(c) of the Bankruptcy Code, that is contingent or unliquidated or any Disputed Claim arising from a right to an equitable remedy or breach of performance for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. From and after the Effective Date, the Recovery Trustee, the Reorganized Debtors or any objecting creditor may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to § 502(c) of the Bankruptcy Code, that is contingent or unliquidated or any Disputed Claim arising from a right to an equitable remedy or breach of performance for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. With respect to any request for estimation, the Bankruptcy Court shall retain jurisdiction to estimate any such Claim at any time, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision otherwise in the Plan,  a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated for distribution purposes at zero ($0) dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant party may elect to pursue any supplemental proceedings to object to any distribution under the Plan on such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, recharacterized or resolved by any mechanism approved by the Bankruptcy Court.

5.    **Setoff Against Claims**

The Debtors, the Disbursement Agent and the Recovery Trustee, as applicable, may set off against any Claim, and the payments made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever that any of the Debtors or the Recovery Trustee (as assignee of such claims) may have against the Holder of the Claim, but neither the failure to do so nor the allowance of such Claim shall constitute a waiver or release by the Debtors or the Recovery Trustee of any claims or rights against the Holder of the Claim. Any payment in respect of a disputed, unliquidated, or contingent Claim shall be returned promptly to the Disbursement Agent in the event and to the extent such Claims are determined by the Bankruptcy Court or any other court of competent jurisdiction not to be Allowed Claims.

6.    **Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any other provision of the Plan and except as otherwise agreed by the relevant parties, the Disbursement Agent shall not be required to make any partial payments or partial distributions to a Person, estate or trust with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. To the extent that there is any Holder of a Claim that is the subject of a Cause of Action, the Disbursement Agent shall have the authority to withhold any distribution to such Holder of a Claim until such Cause of Action is subject to final nonappealable order or otherwise is settled or adjudicated in the Bankruptcy Court.

7.      **Limited Recourse for Disputed Claims**

The holder of a Disputed Claim is not entitled to recover unless a Disputed Claim becomes an Allowed Claim and in such event any Holder of a Disputed Claim may only be entitled to receive a distribution on its Allowed Claim from the Disputed Claim Reserve.

8.      **Disputed Claim Reserve**

The Disbursement Agent shall establish and maintain the Disputed Claim Reserve as a separate reserve in order to satisfy Disputed Claims upon the resolution of such claims. Property of the Estate deposited into the Disputed Claim Reserve shall be distributed to the holders of Disputed Claims when such Disputed Claims become Allowed Claims. Any funds remaining in the Disputed Claim Reserve after all Disputed Claims are resolved shall be transferred to Reorganized Delta.

## G.      Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to Holders of Allowed Claims shall be made at the address of such Holder as set forth in the books and records of the Debtors as of the Record Date.  In the event that any distribution to any Holder is returned as undeliverable, the Disbursement Agent shall use reasonable efforts to determine the current address of such Holder, but no distribution to such Holder shall be made unless and until the Disbursement Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors and the Claim of any other Holder to such property or interest in property shall be discharged and forever barred notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary.

## H.      Noteholder Claims and DIP Facility Claims

The Indenture Trustee shall be deemed to be the Holder of all Noteholder Claims, for purposes of distributions to be made pursuant to the Plan, and all distributions on account of such notes shall be made to or on behalf of the Indenture Trustee.  The Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Noteholder Claims.  As soon as practicable following compliance with the requirements set forth in Section 6.9 of the Plan, the Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Noteholders.  Notwithstanding any other provision of the Plan, the distribution to the Indenture Trustee on account of Allowed Noteholder Claims shall be made in full on the Effective Date or as soon as reasonably practicable thereafter, and the Indenture Trustee shall disburse or direct such distribution promptly upon receipt to each beneficial Holder of an Allowed Noteholder Claim in all respects consistent with the Indentures.

For purposes of distributions to be made under the Plan, all distributions on account of the DIP Facility Claims shall be made at the direction of the DIP Agent in accordance with the provisions of the DIP Credit Agreement and shall be distributed to the DIP Agent.

### I.        Recovery Trust Distributions

The Recovery Trust Agreements shall govern distributions from the Recovery Trusts and shall include the terms of the other sections of Article VII of the Plan and other relevant provisions of the Plan.

### J.        Manner of Cash Payments Under Plan

At the Reorganized Debtors' option, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements, or as agreed by the Recovery Trustee and the claimant subject to the terms of the Recovery Trust Agreements.

### K.        Fractional Shares

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional shares.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

### L.        Setoffs and Recoupment

Except as provided in the Plan, the Debtors may, but shall not be required to, set off against or recoup from any Claim or Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim they may have against such claimant; provided, however, that any claimant shall have the right to object to any such setoff made by the Debtors.

### M.        Exemption from Securities Law

The issuance of the New Common Stock and any other securities issued pursuant to the Plan and any subsequent sales, resales or transfers, or other distributions of any such securities shall be exempt from any federal or state securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code.  Transfers of securities issued under the Plan will be subject to (a) the terms of the Restated Certificate of Incorporation and (b) as to holders of New Common Stock of Reorganized Delta that are party to the New Stockholders' Agreement, the terms and conditions of the New Stockholders' Agreement.

### N.        Allocation of Payments

In the case of distributions with respect to Claims pursuant to the Plan, the amount of any Cash and the fair market value of any other consideration received by the Holder of such Claim

will be allocable first to the principal amount of such Claim (as determined for federal income tax purposes), and then, to the extent of any excess, the remainder of the Claim.

### O.    No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

### P.    Treatment of Executory Contracts and Unexpired Leases

On the Effective Date, all executory contracts and unexpired leases to which the Debtors are a party that have not been expressly assumed and/or assumed and assigned by the Debtors on or before the Effective Date shall be deemed rejected in accordance with sections 365 and 1123 of the Bankruptcy Code, unless such contract or lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or was terminated pursuant to its own terms, (iii) is the subject of a separate assumption or rejection motion filed by the Debtors on or before the Confirmation Date or is required under the Plan to be included in such a motion, (iv) is set forth in a schedule as an executory contract or unexpired lease to be assumed on or after the Effective Date, if any, filed by the Debtors as part of the Plan Supplement, which schedule shall separately set forth those executory contracts or unexpired leases which will be assigned to the Joint Venture Company or (v) if there is a dispute as to the amount of cure that cannot be resolved consensually among the parties, the Debtors or Reorganized Delta shall have the right to assume or reject the contract or lease, by written notice to the counterparty, for a period of five (5) Business Days after entry of a Final Order establishing a cure amount in excess of that provided by the Debtors.  The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123 of the Bankruptcy Code approving the contract and lease assumptions, assignments or rejections described above, subject to the occurrence of the Effective Date. Without limitation of the foregoing, upon the Effective Date, and in accordance with the Contribution Agreement, all rights of Delta in, to and under the Carry Agreement, and all right, title and interest of Delta in and to (i) the Delta Properties, the Existing Agreement Wells, the EnCana Wells, the Carry Wells (as all of the foregoing terms are defined in the Carry Agreement), (ii) all other contract rights and interests of Delta under any contracts provided for in the Carry Agreement and (iii) all other oil and gas rights and interests of every kind and nature owned by Delta, or which Delta may in the future have the right to own or receive, under or pursuant to the Carry Agreement, shall be assigned to, and shall be vested in, the Joint Venture Company, which shall acquire and own such rights, free and clear of any transfer or assignment restrictions in the Carry Agreement, and the Confirmation Order shall provide as such. Cure amounts owed pursuant to section 365 of the Bankruptcy Code shall be paid in accordance with the Contribution Agreement; provided, however, that in the event that cure amounts exceed $2,000,000, such cure amounts shall be paid by the Plan Sponsor, in its sole discretion, or such executory contracts or unexpired leases shall be rejected by written notice to the counterparty unless otherwise agreed by the Debtors and the Supporting Noteholders prior to the Effective Date or by Reorganized Delta after the Effective Date.

To the extent applicable, all executory contracts of the Reorganized Debtors assumed or assigned pursuant to the Plan shall be deemed modified such that the transactions contemplated

by the Plan shall not be a "change of control," however such term may be defined in the relevant executory contract, and any required consent under any such contract or lease shall be deemed satisfied by the confirmation of the Plan, and all executory contracts assumed pursuant to the Plan shall be assumed notwithstanding any provisions therein that purport to modify Delta's rights, or the rights of any Affiliate or Subsidiary of the Debtors, thereunder as a result of the Debtors' commencement of the Chapter 11 Cases, which rights shall not be modified by such assumption.

Each executory contract assumed pursuant to the Plan (or pursuant to other Bankruptcy Court order) shall remain in full force and effect and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

Any monetary amounts required as Cure payments on each executory contract and unexpired lease to be assumed or assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date or upon such other terms and dates as the parties to such executory contracts or unexpired leases otherwise may agree.  If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (iii) any other matter pertaining to assumption or assignment, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute.

**Through the Plan and this Disclosure Statement, the Debtors are giving notice that the Cure amounts for each such contract and lease shall be zero dollars unless otherwise noticed on a schedule filed by the Debtors thereafter.**

All Claims arising out of the rejection of executory contracts and unexpired leases under the Plan must be served upon the Debtors and their counsel within thirty (30) days after the later of (i) the date of entry of an order of the Bankruptcy Court approving such rejection, (ii) service of notice of the occurrence of the Effective Date or (iii) service of notice of rejection as provided in this Article VIII.  Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their Estates, the Reorganized Debtors, the Joint Venture Company and their respective property.

### Q.    Conditions Precedent to Effective Date

The occurrence of the Effective Date of the Plan is subject to satisfaction of the following conditions precedent and the filing by the Debtors of a notice of the occurrence of the Effective Date in the Chapter 11 Cases:

### 1.    Confirmation Order

The clerk of the Bankruptcy Court shall have entered the Confirmation Order in the Debtors' Chapter 11 Cases, which shall be in form and substance reasonably acceptable to the Plan Sponsor (with respect only to those provisions that have a material effect on the Plan Sponsor's or the Joint Venture Company's commercial, economic or management (with respect to the Joint Venture Company) rights or interests) and reasonably acceptable in all respects to the

Supporting Noteholders, fourteen (14) calendar days shall have elapsed following the entry of the Confirmation Order on the docket, and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

2.      **Exit Loan**

Reorganized Delta shall have entered into agreements or binding term sheets for the Exit Loan in form and substance reasonably satisfactory to the Supporting Noteholders, and, to the extent applicable, the Plan Sponsor (with respect only to those provisions that have a material effect on the Plan Sponsor's or the Joint Venture Company's commercial, economic or management (with respect to the Joint Venture Company) rights or interests), and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, the proceeds of which shall be disbursed in accordance with a flow of funds memorandum agreed upon by the Debtors and the Supporting Noteholders, a form of which shall be filed as a Plan Supplement.

3.      **Contracts and Leases**

The Bankruptcy Court shall have entered one or more orders, which may include the Confirmation Order, authorizing the assumption, assignment, or rejection of unexpired leases and executory contracts by the Debtors as contemplated by Article 8 of the Plan.

4.      **Execution and Delivery of Other Documents**

All other actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan, including, without limitation, the Plan Documents, the Plan Exhibits, and the Plan Supplements shall be in form and substance reasonably satisfactory to the Supporting Noteholders, and, to the extent applicable, the Plan Sponsor (with respect only to those provisions that have a material effect on the Plan Sponsor's or the Joint Venture Company's commercial, economic or management (with respect to the Joint Venture Company) rights or interests).  The Recovery Trust Agreements, the Joint Venture Company LLC Agreement, the Contribution Agreement, the Management Services Agreement, the JV Company Credit Facility Documents and the Exit Loan, shall be in form and substance reasonably acceptable to the Supporting Noteholders and the Plan Sponsor (with respect only to those provisions that have a material effect on the Plan Sponsor's or the Joint Venture Company's commercial, economic or management (with respect to the Joint Venture Company) rights or interests) and shall have been effected, duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived in accordance with their respective terms.

5.      **Corporate Formalities**

The Restated Certificates of Incorporation shall be filed with the applicable Secretaries of State and/or other applicable authorities in the Debtors' respective states contemporaneously with the Effective Date.

6.      **SEC Filings**

Delta shall be in compliance with all applicable SEC reporting obligations required of a public reporting company.

7.      **Other Acts**

Any other actions the Debtors, in consultation with the Plan Sponsor, determines are necessary to implement the terms of the Plan shall have been taken.

8.      **Debtors' Waiver of Conditions Precedent**

Each of the conditions precedent in Section 9.1 of the Plan (except for Section 9.1(a)) may be waived, in whole or in part, by the Debtors, with approval of the Plan Sponsor (with respect only to those provisions that have a material effect on the Plan Sponsor's or the Joint Venture Company's commercial, economic or management (with respect to the Joint Venture Company) rights or interests) and the Supporting Noteholders, without notice or an order of the Bankruptcy Court.

9.      **Substantial Consummation**

Substantial consummation of the Plan under section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

R.      **Effect of Confirmation**

1.      **Vesting of Assets**

Except as otherwise provided in the Plan, on the Effective Date all property comprising the Estates not otherwise vested in the Joint Venture Company or the Recovery Trusts shall revest in the Reorganized Debtors, free and clear of all Liens, Claims and Equity Interests (other than as expressly provided herein), including, without limitation: (i) the 33.34% membership interest in the Joint Venture Company; (ii) the Delta oil and gas assets not located in Mesa and Garfield Counties, Colorado; (iii) the certain compressors owned by the Debtors that were located in the State of Wyoming as of September 30, 2011; (iv) the Plan Documents; (v) Cash, any accounts receivables or other cash equivalent forms of value (vi) the oil and gas lease in Mesa County, CO, between Delta and Buzzard Creek Elk Ranch and its Amendment effective August 15, 2011 and all rights and obligations thereunder,  (vii) all frac water tanks, (viii) the gathering agreement between Delta and Encana dated September 24, 2008, (ix) Delta's Denver and Grand Junction office leases, office fixtures, and personal property located in such offices not pertaining to the Delta Records (as defined in the Contribution Agreement), except for the HP T-1100 Map Plotter Scanner referenced in Section 1.1(d)(5) of the Contribution Agreement, and (x) all other assets not specifically described in Exhibits D-1, D-2, D-3, D-4, D-5 and D-6 to the Contribution Agreement.  On and after the Effective Date, the Reorganized Debtors shall be authorized to operate its businesses, and to use, acquire or dispose of assets without supervision or approval by the Bankruptcy Court, and free from any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

2.      **Corporate Existence**

Except as otherwise provided in the Plan, each Debtor, as a Reorganized Debtor, shall continue to exist on and after the Effective Date as a separate corporation, limited liability company, partnership or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law.

3.      **Binding Effect**

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Equity Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Equity Interest of such Holder is impaired under the Plan and whether or not such Holder has accepted the Plan.  The provisions of the Plan shall bind the respective Estates of the Debtors and any chapter 7 Trustee that might be appointed upon a subsequent conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

4.      **Settlements, Releases and Discharges**

The settlements, releases and discharges of Claims and Causes of Action described in the Plan, including releases by the Debtors and by Holders of Claims, constitute good faith compromises and settlements of the matters covered thereby and are consensual.   Such compromises and settlements recognize the substantial contributions by parties in these Chapter 11 Cases, are made in exchange for consideration, including the release of certain Claims, and are in the best interest of Holders of Claims, are fair, equitable and reasonable and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan.  Each of the discharge, release, indemnification and exculpation provisions set forth in the Plan (a) is within the jurisdiction of the Bankruptcy Court under sections 1334(a), 1334(b) and 1334(d) of title 28 of the United States Code, (b) is an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code, (c) is an integral element of the transactions incorporated into the Plan, (d) confers material benefit on, and is in the best interests of, the Debtors, their Estates and their creditors, (e) is important to the overall objective of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors and (f) is consistent with sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

5.      **Discharge of the Debtors**

Except to the extent otherwise provided in the Plan or the Confirmation Order, the treatment of all Claims against or Equity Interests in the Debtors under the Plan shall be in exchange for and in complete satisfaction, discharge and release of, all Claims against or Equity

Interests in the Debtors of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon from and after the Petition Date, or against their Estates or properties or interests in property. Except as otherwise provided in the Plan or the Confirmation Order, upon the Effective Date, all Claims against and Equity Interests in the Debtors shall be satisfied, discharged and released in full exchange for the consideration provided under the Plan. Except as otherwise provided in the Plan or the Confirmation Order or under the terms of the documents evidencing the Exit Loan, all Persons shall be precluded from asserting, against the Debtors, the Reorganized Debtors, or their respective properties or interests in property, any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims and other debts and liabilities of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent such judgment is related to a discharged Claim.

6.    **Exculpation**

To the extent permitted by applicable law and approved by the Bankruptcy Court, the Released Parties and the Creditors' Committee shall not have any liability to any Holder of a Claim or Equity Interest for any act or omission in connection with, or arising out of, the negotiation and the pursuit of approval of the Disclosure Statement, the Plan or the solicitation of votes for, or confirmation of, the Plan, the funding of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan (except for any liability that results from bad faith, willful misconduct or gross negligence as determined by a Final Order), and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

7.    **Releases By the Debtors and their Estates**

Except for the right to enforce the Plan, the Debtors shall, on their own behalf and on behalf of their Estates, effective upon the occurrence of the Effective Date, be deemed to forever release, waive and discharge the Released Parties of and from any and all Claims, demands, causes of action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise (except for any liability that results from bad faith, willful misconduct or gross negligence as determined by a Final Order); provided, however, that to the extent the Wapiti Trust prevails in a fraudulent conveyance action under section 548 or section 544 against Wapiti Oil & Gas, L.L.C. or any affiliated person or entity (excluding the Zell Credit Opportunities Master Fund, L.P., the affiliate thereof that has directly invested in Wapiti (collectively, the "**ZCOF Parties**") and each of its directors and employees) (collectively, other than the ZCOF Parties and each of their directors and employees, "**Wapiti**") pursuant to a final, non-appealable order (the "**Judgment**"), and Wapiti is unable to pay on the Judgment after the Wapiti Trust has used reasonable efforts to collect from Wapiti, then, subject to the ZCOF Parties' reservation of rights below, the Wapiti Trust may take action against the ZCOF Parties in connection with such fraudulent conveyance action pursuant to 11 U.S.C. § 550(a)(2), but only to the extent (a) of the

deficiency between the amount of the Judgment and the amount paid, (b) of the value of the assets distributed, dividended or otherwise paid from Wapiti to ZCOF, if any and (c) the commencement of such litigation against the ZCOF Parties has been approved in advance by a majority of the Wapiti Trust Oversight Board, which majority shall include the vote of Whitebox, provided that to the extent Whitebox votes against the commencement of such litigation against the ZCOF Parties and the Recovery Trustee disagrees with such determination, then the Recovery Trustee is hereby authorized to file a motion with the Bankruptcy Court seeking a finding that such determination not to pursue the litigation against the ZCOF Parties was not reasonable and upon such a finding, the Bankruptcy Court shall order the Wapiti Trust to pursue such litigation against the ZCOF Parties; provided further, however, that the ZCOF Parties reserve all rights and defenses, at law and in equity, to defend against any and all actions and no release of any party provided for herein or under the Plan shall prejudice the ZCOF Parties' rights or defenses.

Such release, waiver and discharge shall not operate as a release, waiver or discharge of any Released Party in respect of any express contractual obligation of any such party effective from and after the Effective Date, provided that no Person who votes to reject the Plan will receive the benefit of a release.

8.     **Consensual Releases By Holders of Claims**

Except for the right to enforce the Plan, each Holder of a Claim who affirmatively votes to accept the Plan and does not indicate its preference to opt-out of the releases contained in Section 10.8 of the Plan on its ballot shall for good and adequate consideration, be deemed to forever release, waive and discharge the Released Parties, to the fullest extent permitted by applicable law, of and from any and all Claims, demands, causes of action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise that is based on, relates to, or in any manner arises from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party relating to the restructuring of Claims prior to or in the Chapter 11 Cases or the negotiation, formulation or preparation of the Plan, or any related agreements, instruments or other documents (except for any liability that results from bad faith, willful misconduct or gross negligence as determined by a Final Order). Holders of Claims not voting to accept the Plan are not granting the releases contained in Section 10.8 of the Plan. For the avoidance of doubt, to the extent the Holder of a Claim in a voting Class votes to accept the Plan with respect to that Claim and does not opt-out of the releases under Section 10.8 of the Plan, and such Holder also holds a Claim in a non-voting Class, any release granted as a result of such Holder's vote with respect to its voting Class Claim shall not be deemed a release of such Holder's non-voting Class Claim. Notwithstanding the foregoing, in the event that the Plan is not confirmed, no party shall be deemed to have released or shall release any claims or be released hereby. Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of any Released Party in respect of any express contractual obligation of any

such Released Party incurred in connection with the Plan or of any express contractual obligation of any non-Debtor party due to any other non-Debtor party.

9.     **Abrogation of Successor Liability.**

To the extent permitted pursuant to applicable law, the transfer of property of the Debtors to the Joint Venture Company, the Reorganized Debtors and the Recovery Trusts shall be free and clear of any claim, or resulting liability, that the Joint Venture Company, the Plan Sponsor, the Reorganized Debtors or the Recovery Trusts is to any extent a "successor" to any of the Debtors under any state or federal statutory or common law relating to "successor liability," or any claim that an entity is legally responsible for the debts or liabilities of another entity as a successor to, continuation of, or participant in a de facto or actual merger with, the other entity, under any theory or legal doctrine of any type or nature whatsoever.  To the extent permitted pursuant to applicable law, neither of the Joint Venture Company, the Plan Sponsor, any Reorganized Debtor or either Recovery Trust shall be, or shall be deemed to be, a successor to any of the Debtors for any purpose.

10.     **Term of Injunctions or Stays**

Except as otherwise expressly provided herein or in the Plan, and except with respect to enforcement of the Plan, all Persons who have held, hold or may hold any Claim against, or Equity Interest in, the Debtors as of the Effective Date will be permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind in any forum with respect to such Claim or Equity Interest against the Reorganized Debtors, the Joint Venture Company, the Recovery Trusts, or their property, (ii) the enforcement, attachment, collection or recovery in any manner or by any means any judgment, award, decree or order against the Reorganized Debtors, the Joint Venture Company, the Recovery Trusts, or their respective property with respect to such Claim or Equity Interest, (iii) creating, perfecting or enforcing any Lien or other encumbrance of any kind against the Reorganized Debtors, the Joint Venture Company, the Recovery Trusts, or against any property or interests in property of the Reorganized Debtors with respect to any such Claim or Equity Interest, (iv) asserting a right of setoff, subrogation or recoupment of any kind against any obligation due from the Reorganized Debtors, the Joint Venture Company, the Recovery Trusts, or against any property or interests in property of the Reorganized Debtors, the Joint Venture Company or the Recovery Trusts with respect to such Claim or Equity Interest, (v) commencing or continuing any action, in any forum, that does not comply or is inconsistent with the provisions of the Plan and (vi) pursuing any such Claim released pursuant to Section 10.5, 10.6, 10.7 or 10.8 of the Plan.  For the avoidance of doubt, nothing in this Section shall be deemed to affect or waive any potential defenses that any defendant to a Cause of Action or Wapiti Cause of Action has asserted or could assert against the Debtors or the Recovery Trustee, as the case may be, in any resulting litigation, or the rights of the Debtors to object to such potential defenses asserted by such defendants therein.  The right of any defendant to a Wapiti Cause of Action or Cause of Action (except as provided in Section 10.7 of the Plan with respect to the ZCOF Parties) to assert defenses, at law and in equity, and to defend against actions is preserved to the extent allowed under applicable law.  Unless otherwise provided or in the Plan, all injunctions or stays arising under or entered during the Debtors' Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

Wapiti asserts that the Plan or Confirmation Order should include the following sentence: "**The right of any defendant to a Wapiti Cause of Action or Cause of Action to assert all arguments and defenses, at law and in equity, and to defend against any and all actions is preserved and no release of any party provided herein shall prejudice the right of any such defendants' rights or defenses**." The Debtors and other parties in interest disagree. The resolution of this issue will be heard at the Confirmation Hearing if not resolved by agreement of the parties earlier.

## 11.    Termination of Subordination Rights and Settlement of Related Claims

The classification and manner of satisfying all Claims and Equity Interests under the Plan takes into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code, or otherwise. All subordination rights that a Holder of a Claim or Equity Interest may have with respect to any distribution to be made under the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be enjoined permanently. Accordingly, distributions under the Plan to Holders of Allowed Claims will not be subject to payment of a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

## 12.    Indemnification Obligations

As of the Effective Date, the Restated Certificates of Incorporation and/or Restated Bylaws shall provide for the indemnification, defense, reimbursement, exculpation and/or limitation of liability of, and advancement of fees and expenses to, directors and officers and employees of the Reorganized Debtors (including in the case of officers and employees serving as directors, managers, officers and employees of any Affiliate or Subsidiary of the Reorganized Debtors or as trustee (or similar position) of any employee benefit plan or trust (or similar Person) of the Reorganized Debtors and their Affiliates and Subsidiaries, in such capacities), to the fullest extent permitted by applicable state law.

The Debtors and the Reorganized Debtors shall indemnify and hold harmless (i) the DIP Agent and the DIP Lenders, (ii) the Plan Sponsor, (iii) the Joint Venture Company, (iv) the respective advisors, officers, directors and employees of the parties described in clauses (i) through (iii) hereof, and (v) each of their respective successors and assigns (collectively, the "**Indemnified Persons**"), to the full extent lawful, from and against all losses, claims, damages, and liabilities incurred by them that are related to or arise out of (a) the formulation, negotiation and pursuit of the confirmation or consummation of the Plan or (b) the Indemnified Persons' consideration of other proposals for the reorganization of the Debtors under chapter 11 of the Bankruptcy Code.

## 13.    Limitation on Indemnification

Notwithstanding anything to the contrary set forth in the Plan or elsewhere, neither the Reorganized Debtors nor the Joint Venture Company shall be obligated to indemnify and hold harmless any Person or entity for any claim, cause of action, liability, judgment, settlement, cost or expense that results from such Person's fraud, gross negligence, or willful misconduct as determined by a Final Order.

14.    **Preservation of Claims**

All Causes of Action, rights of setoff and other legal and equitable defenses of any Debtor or any Estate are preserved for the benefit of the General Trust, and all Wapiti Causes of Action are preserved for the benefit of the Wapiti Trust, in each case unless expressly released, waived, or relinquished under the Plan or Confirmation Order.  No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action or Wapiti Cause of Action against them as an indication that the Recovery Trusts will not pursue a Cause of Action or Wapiti Cause of Action against them.

The Recovery Trustee shall be appointed representative of the Estates pursuant to Bankruptcy Code § 1123(b)(3)(B) with respect to the Causes of Action and Wapiti Causes of Action and, except as otherwise ordered by the Bankruptcy Court and subject to any releases in the Plan, on the Effective Date, the General Trust and the Wapiti Trust shall be transferred, respectively, all Causes of Action and Wapiti Causes of Action, and may enforce, sue on, and, subject to Bankruptcy Court approval (except as otherwise provided herein) settle or compromise (or decline to do any of the foregoing) any or all of the Causes of Action and Wapiti Causes of Action.  Except as otherwise ordered by the Bankruptcy Court and subject to the provisions of the Recovery Trust Agreements and the oversight of the applicable Oversight Board, the Recovery Trustee shall be vested with authority and standing to prosecute any Causes of Action and Wapiti Causes of Action.  The Recovery Trustee and his or her attorneys and other professional advisors shall have no liability for pursuing or failing to pursue any such Causes of Action or Wapiti Causes of Action.

At any time after the Confirmation Date and before the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors, with the consent of the DIP Agent, may settle some or all of the Causes of Action, the Wapiti Causes of Action or the Disputed Claims subject to obtaining any necessary Bankruptcy Court approval. The proceeds from the settlement of a Cause of Action or Wapiti Cause of Action shall constitute, respectively, a General Trust Asset or a Wapiti Trust Asset that shall be transferred to, as applicable, the General Trust or the Wapiti Trust on the Effective Date, for distribution in accordance with the Plan and the Recovery Trust Agreements.  For the avoidance of doubt, proceeds of Causes of Action (including the Wapiti Causes of Action), to the extent not used to fund the Recovery Trusts, shall be for the benefit of Reorganized Delta.

15.    **No Acquisition of a Majority of Voting Interests**

The confirmation and consummation of the Plan, and the issuance of New Common Stock pursuant thereto, shall not, and shall not be deemed to, constitute or result in an acquisition of a majority of the voting interests of the Debtors or any of their Affiliates or Subsidiaries for purposes of any agreement to which the Debtors or any of their Affiliates or Subsidiaries are a party.

S.    **Retention of Jurisdiction**

Unless otherwise provided for in the Plan or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have jurisdiction over all matters arising out of, or related to, the

Debtors' Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

1. To hear and determine pending applications for the assumption, assignment or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

2. To determine any and all adversary proceedings, applications and contested matters in the Debtors' Chapter 11 Cases and grant or deny any application involving the Debtors that may be pending on the Effective Date;

3. To ensure that distributions to Holders of Allowed Claims are accomplished as provided in the Plan;

4. To hear and determine any timely objections to Administrative Expense Claims or to proofs of claim and Equity Interests, including any objections to the classification of any Claim or Equity Interest, and to allow or disallow any disputed Claim in whole or in part;

5. To determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action, and consider and act upon the compromise and settlement of any Claim against, or Causes of Action on behalf of, the Recovery Trusts;

6. To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

7. To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

8. To consider any amendments to or modifications of the Plan, or to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

9. To hear and determine all applications of retained professionals under sections 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

10. To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, the Plan Supplements, the Recovery Trusts, any transactions or payments contemplated by the Plan or any agreement, instrument or other document governing or relating to any of the foregoing;

11. To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

12. To hear any other matter not inconsistent with the Bankruptcy Code;

13. To hear and determine all disputes involving the existence, scope and nature of the discharges granted under Sections 10.4 and 10.5 of the Plan;

14. To hear and determine all disputes involving or in any manner implicating the exculpation provisions granted under Section 10.6 of the Plan;

15. To issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any Person with the consummation or implementation of the Plan;

16. To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Plan with respect to any Person;

17. To enter a final decree closing the Debtors' Chapter 11 Cases;

18. To hear and determine all disputes relating to whether the confirmation and consummation of the Plan, and the issuance of New Common Stock pursuant thereto, shall have, or shall be deemed to, constitute or result in an acquisition of a majority of the voting interests of the Debtors or any of their Affiliates or Subsidiaries for purposes of any agreement to which the Debtors or any of their Affiliates or Subsidiaries are a party;

19. To hear and determine all disputes relating to the effect of the Plan under any agreement to which the Debtors, the Reorganized Debtors or any Affiliate or Subsidiary of the Debtors or the Reorganized Debtors are a party; and

20. To hear and determine all disputes relating to whether any third party consent is required for the assumption or assignment under the Plan of any executory contract.

### T.    Miscellaneous

### 1.    Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid on the earlier of when due or the Effective Date by the Debtors.  From and after the Effective Date, the Reorganized Debtors shall be jointly liable for and shall pay the fees under 28 U.S.C. section 1930 assessed against the Debtors' estate under 28 U.S.C. section 1930 until entry of a final decree closing the Chapter 11 Cases.

### 2.    Payment of Noteholder Professional Fees

The Reorganized Debtors shall pay all reasonable and documented fees, costs and expenses incurred by the DIP Agent, ZCOF and the Indenture Trustee after the Petition Date. Notwithstanding the foregoing, the fees, costs and expenses discussed in this subsection in respect of ZCOF and the Indenture Trustee shall only be paid in the event that the Plan is confirmed and the Effective Date occurs.  Within 30 days after the Effective Date, the Indenture Trustee shall serve its invoice (with backup detail) on Reorganized Delta, the Creditors' Committee, the Recovery Trustee, the Office of the United States Trustee and the Supporting Noteholders.  Such parties shall have 20 days thereafter to indicate to the Indenture Trustee if

they object to any portion of the invoice.  At the end of the 20-day period, the Recovery Trustee may pay any portion of the invoice not subject to an objection; the Recovery Trustee shall thereafter have 30 days to ask for a hearing on that part of the invoice subject to an objection, and shall reserve the invoiced amount subject to objection pending the 30-day hearing request period and, if a hearing is requested, conclusion of that contested matter.

3.     **Further Assurances**

The Debtors or the Reorganized Debtors, as applicable, may file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

4.     **Exhibits, Appendices and Schedules Incorporated**

All exhibits, appendices and Schedules to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if fully set forth herein.

5.     **Intercompany Claims**

Notwithstanding anything to the contrary herein or in the Plan, on or after the Effective Date, any claims held by one Debtor against any other Debtor may be adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid, continued, or discharged to the extent reasonably determined appropriate by the Debtors and the Plan Sponsor.

6.     **Amendment or Modification of the Plan**

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, alterations, amendments or modifications of the Plan may be proposed in writing jointly by the Debtors, the Supporting Noteholders, and, with respect only to those provisions that have a material effect on the Plan Sponsor's or the Joint Venture Company's commercial, economic or management (with respect to the Joint Venture Company) rights or interests, the Plan Sponsor at any time prior to or after the Confirmation Date, but prior to the Effective Date.  Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder; provided, however, that any Holders of Claims who were deemed to accept the Plan because such Claims were unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modification, such Claims continue to be unimpaired.  If the Debtors make material changes to the terms of the Plan, the Debtors will disseminate additional solicitation materials and extend the solicitation period, in each case to the extent required by law or further order of the Court.

7.     **Inconsistency**

In the event of any inconsistency among the Plan, this Disclosure Statement and any exhibit to this Disclosure Statement, the provisions of the Plan shall govern.

8. **Section 1125(e) of the Bankruptcy Code**

As of the Confirmation Date, the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.   The Debtors (and each of their successors, predecessors, control persons, members, Affiliates, Subsidiaries, agents, directors, officers, employees, investment bankers, financial advisors, accountants, attorneys and other professionals and any officer or employee serving as a director, manager, officer or employee of any Affiliate or Subsidiary of the Debtors or trustee (or similar position) of any employee benefit plan or trust (or similar person) of the Debtors or its Affiliates or Subsidiaries) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities under the Plan. Accordingly, such entities and individuals shall not be liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of the securities under the Plan.

9. **Compliance with SEC Requirements**

The Debtors shall (i) take all steps necessary to remedy any past instances of SEC non-compliance with public-company reporting requirements prior to the Effective Date, and (ii) commence timely filing of all SEC reports, statements and other information required of a public reporting company.

10. **Compliance with Tax Requirements**

In connection with the Plan and all instruments issued in connection herewith and distributed thereunder, any party issuing any instruments or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any withholding or reporting requirements.   To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of the Plan as having been paid to the applicable Holder of an Allowed Claim in respect of which such withholding was made. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.   Any party issuing any instruments or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to such issuing or distributing party for payment of any such tax obligations.

11. **Determination of Tax Filings and Taxes**

The Reorganized Debtors shall have the right to request an expedited determination of their tax liability, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.   The Reorganized Debtors shall have the sole right, at their expense, to control, conduct, compromise and settle any tax contest, audit or administrative or court proceeding relating to any liability for taxes.

12.      **Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities (including issuance of warrants) under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

13.      **Dissolution of Any Statutory Committees and Cessation of Fee and Expense Payment**

On the Effective Date, the Creditors' Committee shall be dissolved except for the purposes of (i) any appeal or request for reconsideration, stay pending appeal, other disputes, or litigation regarding the Plan or the Confirmation Order, and (ii) prosecuting and/or objecting to applications described in section 2.2 of the Plan.

14.      **Severability of Provisions in the Plan**

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

15.      **Governing Law**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or the Plan Supplements provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflict of laws that would require application of the laws of another jurisdiction.

16.      **No Admissions**

If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors, (b) prejudice in any manner the rights of the Debtors or

any other party in interest or (c) constitute an admission of any sort by the Debtors or other party in interest.

17.    **Reservation of Rights**

The Plan shall have no force or effect unless and until the Effective Date occurs. Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan or action taken by the Debtors with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of the Debtors or any other party with respect to any Claims or Equity Interests or any other matter.

## VII.    CERTAIN RISK FACTORS AFFECTING THE DEBTORS

The Holders of Claims against the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.    Risk Factors Relating to the Chapter 11 Cases

1.    **Parties in Interest May Object to the Debtors' Classification of Claims**

Section 1122 of the Bankruptcy Code provides that a chapter 11 plan of reorganization may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements in the Bankruptcy Code. However, certain Holders of Claims may object to this.

In such event, the cost of the Plan and the time needed to confirm the Plan could increase and the Bankruptcy Court may not agree with the Debtors' classification of Claims and Equity Interests. If the Bankruptcy Court concludes that the classification of Claims and Equity Interests under the Plan does not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan. Such modification could require a resolicitation of votes on the Plan. If the Bankruptcy Court determines that the Debtors' classification of Claims and Equity Interests was not appropriate or if the Bankruptcy Court determines that different treatment provided to similarly situated Claim or Equity Interest Holders was unfair or inappropriate, the Plan may not be confirmed. If this occurs, the amended plan of reorganization that would ultimately be confirmed may be less attractive to certain Classes than the Plan.

2.    **The Debtors May Object to the Amount, Secured Status or Priority Status of a Claim**

The Debtors reserve the right to object to the amount, the secured status or the priority status of any Claim or Equity Interest under the Plan, except where indicated otherwise in the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by a Holder of any Claim or Equity Interest whose Claim or Equity Interest is or may be subject to an objection.

Any such Holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

3.    **In Certain Instances, Any Chapter 11 Case May Be Converted to a Case Under Chapter 7 of the Bankruptcy Code**

If no plan can be confirmed, or if the Bankruptcy Court finds that it would be in the best interest of creditors and/or the Debtors, the Bankruptcy Court may convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to the Debtors' creditors than those provided for in the Plan because of (i) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing the Debtors' businesses as a going concern; (ii) additional administrative expenses involved in the appointment of a chapter 7 trustee; and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the operations.

4.    **The Bankruptcy Court May Decline to Confirm the Plan**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes. In the event that the Bankruptcy Court refuses to confirm the Plan, the Debtors may be required to seek an alternative restructuring of its obligations. There can be no assurance that the terms of any such alternative restructuring would be similar to or as favorable to the Debtors' creditors and shareholders as the terms proposed in the Plan.

The confirmation of the Plan is subject to certain conditions and requirements of the Bankruptcy Code. If the Plan is filed, the Bankruptcy Court may determine that one or more of those requirements is not satisfied. For example, the Bankruptcy Court might determine that the Plan is not "feasible" under section 1129(a)(11) of the Bankruptcy Code. For the Plan to be feasible, the Debtors must establish that the confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor of the Debtors under the Plan unless such liquidation or reorganization is proposed in the Plan. While the feasibility requirement is not rigorous, it does require the Debtors to put forth concrete evidence indicating that it has a reasonable likelihood of meeting its obligations under the Plan and remaining a commercially viable entity.

With regard to the Solicitation, if the Bankruptcy Court concludes that the requirements of section 1126(b) of the Bankruptcy Code and/or Bankruptcy Rule 3018(b) have not been met, then the Bankruptcy Court could deem such votes invalid, and the Plan would not be confirmed without a resolicitation of votes to accept or reject the Plan. While the Debtors believe that the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018 will be met, the Bankruptcy Court may not reach the same conclusion.

If the Bankruptcy Court were to find any of these deficiencies, the Debtors could be required to restart the process of filing another plan and disclosure statement by (i) seeking Bankruptcy Court approval of a disclosure statement, (ii) soliciting votes from classes of claims and equity interests and (iii) seeking Bankruptcy Court confirmation of such newly proposed plan of reorganization.  If this situation occurs, confirmation of the Plan would be delayed and possibly jeopardized.   Additionally, should the Plan fail to be approved, confirmed, or consummated, other parties with an interest in the Debtors may be in a position to propose alternative plans of reorganization.  Therefore, any failure to confirm the Plan would likely entail significantly greater risk of delay, expense and uncertainty, which would likely have a material adverse effect upon the Debtors' businesses and financial condition.

### 5. The Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Plan

Although the Debtors believe that the Effective Date may occur very shortly after the Confirmation Date, there can be no assurance as to such timing.  Moreover, if the conditions precedent to the Effective Date, including (i) the entry of a Confirmation Order as a Final Order, (ii) execution and delivery of certain documents, and (iii) receipt of all necessary authorizations and regulatory approvals, have not occurred, the Plan may not be confirmed by the Bankruptcy Court.

### 6. The Supporting Noteholders May Withdraw Their Support of the Plan

In the event the Plan Support Agreement is ultimately executed, pursuant to the terms of Section 4 of the Plan Support Agreement, the Supporting Noteholders may terminate their obligations under the Plan Support Agreement under a variety of circumstances.  If the Plan Support Agreement is terminated, any vote by the Supporting Noteholders for the Plan would be immediately revoked and deemed void *ab initio*.

### 7. The Plan Sponsor May Withdraw Its Support of the Plan

Pursuant to the terms of the Contribution Agreement, the Plan Sponsor could choose to breach its obligations under the Contribution Agreement, and would only be liable to the Debtors for a reverse break-up fee of $5,000,000, and would not be required to close the transactions contemplated under the Contribution Agreement.

### 8. The Debtors May Seek to Amend, Waive, Modify or Withdraw the Plan at Any Time Prior to the Confirmation Date

The Debtors reserve the right, prior to confirmation or substantial consummation of the Plan, subject to the provisions of section 1127 of the Bankruptcy Code and Rule 3019 of the Bankruptcy Rules, to amend the terms of the Plan or waive any conditions thereto, if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on the Holders of Claims cannot presently be foreseen, but may include a change in the economic impact of the Plan on some or all of the Classes or a change in the relative rights of such Classes.  All Holders of Claims and Equity Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances but prior to confirmation of the Plan,

the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (i) all Classes of adversely affected creditors accept the modification in writing, or (ii) the Bankruptcy Court determines, after notice has been given to designated parties, that such modification was *de minimis*, purely technical or otherwise did not materially, adversely change the treatment of Holders of accepting Claims.

> 9.    **The Contribution Agreement May Not Achieve Its Intended Results and May Result in The Joint Venture Company Assuming Unanticipated Liabilities and Properties of Lower Value Than Originally Contemplated**

We have the opportunity to conduct customary environmental and title due diligence following the execution of the Contribution Agreement, but our diligence efforts to date with respect to the Plan Sponsor's assets and liabilities have been limited. As a result, we may discover title defects or adverse environmental or other conditions of which we are currently unaware. Environmental, title and other problems could reduce the value of the properties contributed to the Joint Venture Company, and, depending on the circumstances, we could have limited or no recourse to the Plan Sponsor with respect to those problems. The Joint Venture Company would assume substantially all of the liabilities associated with the acquired Plan Sponsor properties, and the Joint Venture Company would be entitled to indemnification in connection with those liabilities in only limited circumstances and in limited amounts. We cannot assure that such potential remedies will be adequate for any liabilities incurred by the Joint Venture Company, and such liabilities could be significant. In addition, certain of the assets to be contributed to the Joint Venture Company are subject to consents to assign and preference rights. If Delta and the Plan Sponsor cannot obtain all applicable consents or waivers, the Joint Venture Company may not be able to acquire certain properties as originally contemplated. Also, it is uncertain whether Delta and the Plan Sponsor's contributed properties and assets can be integrated in an efficient and effective manner.

> 10.    **Inherent Uncertainty of Projections**

The Projections cover the operations of the Reorganized Debtors through calendar year 2017.  The fundamental premise of the Plan is the implementation and realization of the Debtors' business plan.  The Projections reflect numerous assumptions concerning the anticipated post-bankruptcy performance of the Reorganized Debtors, some of which may not materialize.  Such assumptions include, among other items, assumptions concerning (i) the general economy, (ii) industry performance, (iii) the ability to make necessary capital expenditures, (iv) the ability to establish market strength, (v) the ability to stabilize and control the Debtors' future operating expenses, (vi) no material adverse changes in applicable legislation or regulations, or the administration thereof, (vii) no material adverse changes in generally accepted accounting principles, (viii) no material adverse changes in competition, (ix) the Reorganized Debtors' retention of key management and other key employees, (x) adequate financing, (xi) the absence of material contingent or unliquidated litigation, indemnity or other claims, (xii) certain income tax matters, (xiii) future commodity prices, (xiv) future drilling results and (xv) other matters, many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize.  The Debtors believe that the assumptions underlying the Projections are reasonable.  However, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may affect the Reorganized Debtors' ability to maximize the intended benefits of the Chapter 11 Cases and undermine the financial results of the Reorganized

Debtors. Therefore, the actual results achieved throughout the periods covered by the Projections necessarily will vary from the projected results, and such variations may be material and adverse. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections.

The Projections were not prepared with a view to compliance with published guidelines of the Securities and Exchange Commission regarding projections or forecasts. The Projections have not been audited, reviewed, or compiled by the Debtors' independent public accountants. The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors or any other Person that the Projections can or will be achieved.

## B.     Risk Factors Regarding the Debtors' Businesses

1.     **Leverage**

The Debtors believe that they will emerge from chapter 11 with a reasonable level of debt that can be effectively serviced in accordance with their business plan, and the size and terms of the Exit Facility will be disclosed as a Plan Supplement. Circumstances, however, may arise that might cause the Debtors to conclude that they are overleveraged, which could have significant negative consequences, including: (1) it may become more difficult for the Reorganized Debtors to satisfy their financial obligations; (2) the Reorganized Debtors may be vulnerable to a prolonged downturn in the market in which they operate or a prolonged downturn in the economy in general, and they will be subject to the risk of adverse changes in commodity prices as described below; (3) the Reorganized Debtors may be required to dedicate a substantial portion of their cash flow from operations to fund working capital, capital expenditures, and other general corporate requirements; (4) the Reorganized Debtors may be limited in their flexibility to plan for, or react to, changes in their businesses and the industry in which they operate or entry of new competitors into their markets; (5) the Reorganized Debtors may be placed at a competitive disadvantage compared with their competitors that have less debt; and (6) the Reorganized Debtors may be limited in borrowing additional funds as they have pledged all of their oil and natural gas properties and the related equipment, inventory, accounts and proceeds as collateral for the borrowings under the Exit Loan.

Additionally, there may be factors beyond the control of the Reorganized Debtors that could affect their ability to meet debt service requirements. Current economic fundamentals portray an uncertain outlook for natural gas commodity prices in particular. These economic conditions have resulted in a decline in the Debtors' revenues and available capital, and have caused the Debtors to significantly decrease their drilling activities and operations. Although the Debtors have entered into derivative contracts that reduce exposure to changes in commodity prices, the Reorganized Debtors' ability to maintain adequate liquidity will nevertheless depend significantly on adequate pipeline capacity, maintaining low operating expenses, focused capital spending, generation of additional working capital, and the availability of funding. There is no assurance that industry commodity price or capital markets conditions will improve in the near term. If the Reorganized Debtors are unable to make scheduled debt payments or comply with the other provisions of their debt instruments, their various lenders will be permitted under certain circumstances to accelerate the maturity of the indebtedness owing to them and exercise other remedies provided for in those instruments and under applicable law.

2.      **Dependence on the Performance of the Joint Venture Company**

One of Reorganized Delta's primary assets after the Effective Date will be its 33.34% ownership interest in the Joint Venture Company.  Reorganized Delta's revenues will depend heavily on the profitability of the Joint Venture Company and on the ability of the Joint Venture Company to make distributions to its owners.  The Joint Venture Company will likely face similar risk factors to those that face other natural gas exploration and production companies as described herein.  All disclosures herein about business risks facing Reorganized Delta will also be risk factors faced by the Joint Venture Company; thus, all such disclosures shall be deemed automatically to apply to the Joint Venture Company by this reference.

3.      **The JV Company Credit Agreement Contains Financial and Other Covenants That Impose Restrictions on the Debtors' Financial and Business Operations**

The JV Company Credit Agreement contains financial covenants that, among other things, will require the Joint Venture Company to maintain certain financial ratios and meet certain tests, and restrict its ability to make capital expenditures.  In addition, the JV Company Credit Agreement restricts the Joint Venture Company's ability to, among other things, incur or secure additional indebtedness, make investments, sell assets, pay dividends, repurchase stock, sell assets, engage in certain mergers and acquisitions or refinance existing indebtedness.  These covenants may have important consequences for the Joint Venture Company's operations.  In addition, if the Joint Venture Company fails to comply with the covenants in the JV Company Credit Agreement and is unable to obtain a waiver or amendment, an event of default would result under the JV Company Credit Agreement.  If the Joint Venture Company is unable to repay amounts outstanding under the JV Company Credit Agreement when due, the JV Company Credit Facility Lenders thereunder could, subject to the terms of the JV Company Credit Agreement, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such facility.

4.      **The JV Company LLC Agreement Contains Provisions that May Cause Dilution of Reorganized Delta's Interests in the Joint Venture Company**

Representatives of the Plan Sponsor on the Board of Managers, subject to their duties of good faith to the Joint Venture Company and the other terms of the Joint Venture Company LLC Agreement, may cause the Joint Venture Company to raise capital in an aggregate amount of up to $60,000,000 without the consent of the representatives of Reorganized Delta on the Board of Managers.  Such a capital raise may be necessary or advantageous to the Joint Venture Company in terms of its pursuit of its exploration or development activities, but would also be dilutive of the ownership interest of Reorganized Delta (and the Plan Sponsor) in the Joint Venture Company.

5.      **The Board of Managers of the Joint Venture Company Do Not Have a Duty of Loyalty to the Joint Venture Company**

The Board of Managers shall have a duty of good faith to the Joint Venture Company but shall owe no other fiduciary duties to the Joint Venture Company, including a duty of loyalty or any other fiduciary duties.  Consequently, a manager of the Joint Venture Company could

hypothetically be able to take advantage of business opportunities for himself even if the Joint Venture Company was financially capable of undertaking such opportunity or if the Joint Venture Company had an interest in such opportunity without breaching his duties to the Joint Venture Company or its members.

6. **The Government May Not Grant an Extension of the Sheep Creek Agreement**

Delta has requested and received oral confirmation from the Government that a further extension past August 15, 2012 will be granted for the completion of the Well that is the subject of the Sheep Creek Agreement. If Delta does not receive written confirmation of this extension and if the work is not completed by Delta or the Plan Sponsor under a services agreement, Delta risks losing its rights under the Sheep Creek Agreement and the additional value that Delta believes would be contributed to its estate through the continued existence of the Sheep Creek Agreement.

7. **Natural Gas and Oil Prices are Volatile**

The Debtors' revenues, operating results, profitability and future rate of growth depend primarily upon the prices they receive for the natural gas and oil they sell. Prices also affect the amount of cash flow available for capital expenditures and the Debtors' ability to borrow money or raise additional capital. The amount the Joint Venture Company can borrow under the JV Company Credit Facility is subject to periodic redeterminations based on prices specified by the JV Company Credit Facility Lenders at the time of redetermination.

Historically, the markets for natural gas and oil have been volatile and they are likely to continue to be volatile. Wide fluctuations in natural gas and oil prices may result from relatively minor changes in the supply of and demand for natural gas and oil, market uncertainty and other factors that are beyond the Debtors' control, including: (i) worldwide and domestic supplies of natural gas and oil; (ii) weather conditions; (iii) the level of consumer demand; (iv) the price and availability of alternative fuels; (v) the proximity and capacity of natural gas pipelines and other transportation facilities; (vi) the price and level of foreign imports; (vii) domestic and foreign governmental regulations and taxes; (viii) the nature and extent of regulation relating to carbon and other greenhouse gas emissions; (ix) the ability of members of the Organization of Petroleum Exporting Countries to agree to and maintain oil price and production controls; (x) political instability or armed conflict in oil-producing regions; and (xi) overall domestic and global economic conditions.

These factors and the volatility of the energy markets make it extremely difficult to predict future natural gas and oil price movements with any certainty. Declines in natural gas and oil prices not only reduce revenue, but also reduce the amount of natural gas and oil that the Debtors can produce economically and, as a result, have had, and could in the future have a material adverse effect on the Reorganized Debtors' financial condition, results of operations, cash flows and reserves. Further, natural gas and oil prices do not move in tandem. Because over 91% of the Debtors' reserves at April 30, 2012 were natural gas reserves, the Reorganized Debtors' will be more affected by movements in natural gas prices. Natural gas prices have been very volatile in 2012, and may fall further or remain at low levels for an extended period of time.

8.    **The Current Financial Environment**

The continued instability in the global financial system and related limitation on availability of credit may continue to have an impact on the Debtors' businesses and financial condition, and the Reorganized Debtors may continue to face challenges if conditions in the financial markets do not improve.  Once adopted, the Reorganized Debtors' operating and capital budget will most likely be funded with anticipated internally generated cash flow and other available sources of liquidity.  Such sources historically have not been sufficient to fund all of the Debtors' expenditures, and they have relied on the capital markets and asset monetization transactions to provide additional capital.  The Debtors' ability to access the capital markets has been restricted as a result of the economic downturn and related financial market conditions and may be restricted in the future when the Reorganized Debtors would like, or need, to raise capital.  The economic situation could also adversely affect the collectability of the Reorganized Debtors' or the Joint Venture Company's trade receivables and cause their respective commodity hedging arrangements, if any, to be ineffective if their counterparties are unable to perform their obligations. Additionally, the current economic situation could lead to further reduced demand for natural gas and oil, or lower prices for natural gas and oil, or both, which would have a negative impact on the Reorganized Debtors' revenues.

9.    **Information Concerning Reserves is Uncertain**

There are numerous uncertainties inherent in estimating quantities of proved reserves and cash flows from such reserves, including factors beyond the Debtors' control. Reserve engineering is a subjective process of estimating underground accumulations of oil and natural gas that cannot be measured in an exact manner.  The accuracy of an estimate of quantities of oil and natural gas reserves, or of cash flows attributable to such reserves, is a function of the available data, assumptions regarding future oil and natural gas prices, availability and terms of financing, expenditures for future development and exploitation activities, and engineering and geological interpretation and judgment.  Reserves and future cash flows may also be subject to material downward or upward revisions based upon production history, development and exploitation activities, oil and natural gas prices and regulatory changes.  Actual future production, revenue, taxes, development expenditures, operating expenses, quantities of recoverable reserves and value of cash flows from those reserves may vary significantly from their assumptions and estimates.  In addition, reserve engineers may make different estimates of reserves and cash flows based on the same data.  Further, the difficult financing environment may inhibit the Reorganized Debtors' ability to finance development of their reserves in the future.

10.    **Replacing Production with New Reserves**

The Reorganized Debtors' reserves will decline significantly as they are produced unless the Reorganized Debtors acquire properties with proved reserves or conduct successful development and exploration drilling activities.  The Reorganized Debtors' future oil and natural gas production is highly dependent upon their level of success in finding or acquiring additional reserves that are economically feasible and developing existing proved reserves, which is in turn dependent on the availability of capital to fund such acquisition and development activity.

11.    **Commercially Productive Reserves**

The Debtors do not always encounter commercially productive reservoirs through their drilling operations. The new wells the Reorganized Debtors drill or participate in may not be productive and they may not recover all or any portion of their investment in wells they drill or participate in. The seismic data and other technologies the Debtors use do not allow them to know conclusively prior to drilling a well that oil or natural gas is present or may be produced economically. The cost of drilling, completing and operating a well is often uncertain, and cost factors can adversely affect the economics of a project. The Reorganized Debtors' efforts will be unprofitable if they drill dry wells or wells that are productive but do not produce enough reserves to return a profit after drilling, operating and other costs. Further, the Reorganized Debtors' drilling operations may be curtailed, delayed or canceled as a result of a variety of factors, including: (i) increases in the cost of, or shortages or delays in the availability of, drilling rigs and equipment; (ii) unexpected drilling conditions; (iii) title problems; (iv) pressure or irregularities in formations; (v) equipment failures or accidents; (vi) adverse weather conditions; and (vii) compliance with environmental and other governmental requirements.

12.    **Writedowns**

In the past, the Debtors have been required to write down the carrying value of their oil and gas properties and other assets. There is a risk that the Reorganized Debtors will be required to take additional writedowns in the future, which would reduce their earnings and stockholders' equity. A writedown could occur when oil and natural gas prices are low or if the Reorganized Debtors have substantial downward adjustments to their estimated proved reserves, increases in their estimates of development costs or deterioration in their exploration and development results.

The Debtors account for their crude oil and natural gas exploration and development activities utilizing the successful efforts method of accounting. Under this method, costs of productive exploratory wells, development dry holes and productive wells and undeveloped leases are capitalized. Oil and gas lease acquisition costs are also capitalized. Exploratory drilling costs are initially capitalized, but charged to expense if and when the well is determined not to have found reserves in commercial quantities. If the carrying amount of the Debtors' oil and gas properties exceeds the estimated undiscounted future net cash flows, they will adjust the carrying amount of the oil and gas properties to their estimated fair value.

The Debtors review their oil and gas properties for impairment quarterly or whenever events and circumstances indicate that the carrying value may not be recoverable. Once incurred, a writedown of oil and gas properties is not reversible at a later date even if gas or oil prices increase. Given the complexities associated with oil and gas reserve estimates and the history of price volatility in the oil and gas markets, events may arise that would require the Reorganized Debtors to record an impairment of the recorded carrying values associated with their oil and gas properties.

13.    **Inherent Risks in the Exploration, Development and Operation of Oil and Gas Properties**

The business of exploring for and, to a lesser extent, developing and operating oil and gas properties involves a high degree of business and financial risk, and thus a substantial risk of investment loss that even a combination of experience, knowledge and careful evaluation may

not be able to overcome.  Oil and gas drilling and production activities may be shortened, delayed or canceled as a result of a variety of factors, many of which are beyond the Debtors' control. These factors include: (i) availability of capital; (ii) unexpected drilling conditions; (iii) pressure or irregularities in formations; (iv) equipment failures or accidents; (v) adverse changes in prices; (vi) adverse weather conditions; (vii) title problems; (viii) shortages in experienced labor; and (ix) increases in the cost of, or shortages or delays in the delivery of equipment.

In the current financing environment and given the significant capital the Debtors have raised in recent years, the Debtors expect it to be more difficult to obtain that capital than in the past and it may limit the Reorganized Debtors' success in attracting joint venture or industry partners to develop their reserves.  The Reorganized Debtors may drill wells that are unproductive or, although productive, do not produce oil and/or natural gas in economic quantities.  Acquisition and completion decisions generally are based on subjective judgments and assumptions that are speculative.  It is impossible to predict with certainty the production potential of a particular property or well.  Furthermore, a successful completion of a well does not ensure a profitable return on the investment.  A variety of geological, operational, or market-related factors, including, but not limited to, unusual or unexpected geological formations, pressures, equipment failures or accidents, fires, explosions, blowouts, cratering, pollution and other environmental risks, shortages or delays in the availability of drilling rigs and the delivery of equipment, loss of circulation of drilling fluids or other conditions may substantially delay or prevent completion of any well or otherwise prevent a property or well from being profitable.  A productive well may become uneconomic in the event water or other deleterious substances are encountered which impair or prevent the production of oil and/or natural gas from the well, or in the event of lower than expected commodity prices.  In addition, production from any well may be unmarketable if it is contaminated with water or other deleterious substances.

## 14.    Third Party Gas Gathering Systems, Pipelines and Processing Facilities

The marketability of the Debtors' production depends upon the availability, operation and capacity of gas gathering systems, pipelines and processing facilities, which are owned by third parties.  The unavailability or lack of capacity of these systems and facilities could result in the shut-in of producing wells or the delay or discontinuance of development plans for properties. United States federal, state and foreign regulation of oil and gas production and transportation, tax and energy policies, damage to or destruction of pipelines, general economic conditions and changes in supply and demand could adversely affect the Reorganized Debtors' ability to produce and market oil and natural gas.  If market factors changed dramatically, the financial impact on the Reorganized Debtors could be substantial. The availability of markets and the volatility of product prices are beyond the Reorganized Debtors' control and represent a significant risk.

## 15.    Prices May be Affected by Regional Factors; Geographic Concentration

The prices received for the natural gas production from the Debtors' Rocky Mountain Region properties, where they conduct substantially all of their development activities, is determined to a significant extent by factors affecting the regional supply of and demand for natural gas, including the adequacy of the pipeline and processing infrastructure in the region to process, and transport, their production and that of other producers.  Those factors result in basis differentials between the published indices generally used to establish the price received for

regional natural gas production and the actual (frequently lower) price the Debtors receive for their production. The Debtors' reserves and production are concentrated in the Piceance Basin area of the Rocky Mountain Region, making them vulnerable to regulatory and operational risks associated with that area. This may place them at a disadvantage relative to competitors with more geographically diverse operations.

16.    **Industry Operating Hazards**

The exploration, development and operation of oil and gas properties involve a variety of operating risks including the risk of fire, explosions, blowouts, cratering, pipe failure, abnormally pressured formations, natural disasters, acts of terrorism or vandalism, and environmental hazards, including oil spills, gas leaks, pipeline ruptures or discharges of toxic gases. These industry-operating risks can result in injury or loss of life, severe damage to or destruction of property, natural resources and equipment, pollution or other environmental damage, clean-up responsibilities, regulatory investigation and penalties, and suspension of operations which could result in substantial losses.

The Debtors maintain insurance against some, but not all, of the risks described above. Such insurance may not be adequate to cover losses or liabilities. Also, the Debtors cannot predict the continued availability of insurance at premium levels that justify its purchase. Terrorist attacks and certain potential natural disasters may change the Debtors' ability to obtain adequate insurance coverage. The occurrence of a significant event that is not fully insured or indemnified against could materially and adversely affect the Reorganized Debtors' financial condition and operations.

17.    **Competition with Larger Companies**

The oil and natural gas industry is intensely competitive, and the Debtors compete with other companies that have greater resources. The Reorganized Debtors' ability to acquire additional properties and to discover reserves in the future will be dependent upon their ability to evaluate and select suitable properties and to consummate transactions in a highly competitive environment. Many larger competitors not only explore for and produce oil and natural gas, but also carry on refining operations and market petroleum and other products on a regional, national or worldwide basis. These companies may be able to pay more for productive oil and natural gas properties and exploratory prospects or define, evaluate, bid for and purchase a greater number of properties and prospects than the Reorganized Debtors' financial resources permit. In addition, these companies may have a greater ability to continue exploration and development activities during periods of low oil and natural gas market prices and to absorb the burden of present and future federal, state, local and other laws and regulations. The Reorganized Debtors' inability to compete effectively with larger companies could have a material adverse effect on their businesses, results of operations, and financial condition.

18.    **Hedging Transactions**

In order to manage exposure to price risks in the marketing of oil and gas, the Debtors periodically enter into oil and gas price hedging arrangements, typically fixed price swaps. While intended to reduce the effects of volatile oil and gas prices, such transactions, depending on the hedging instrument used, may limit the Reorganized Debtors' potential gains if oil and gas

prices were to rise substantially over the price established by the hedge. In addition, such transactions may expose the Reorganized Debtors to the risk of financial loss in certain circumstances, including instances in which: (i) production is substantially less than expected; (ii) the counterparties to their futures contracts fail to perform under the contracts; or (iii) a sudden, unexpected event materially impacts gas or oil prices.

19.    **Future Production**

The Debtors' revenues are derived principally from uncollateralized sales to customers in the oil and gas industry. The concentration of credit risk in a single industry affects the Debtors' overall exposure to credit risk because customers may be similarly affected by changes in economic and other conditions. Although the Debtors have not been directly affected, they are aware that some refiners have filed for bankruptcy protection, which has caused the affected producers to not receive payment for the production that was delivered. If economic conditions deteriorate, it is likely that additional, similar situations will occur which will expose the Reorganized Debtors to added risk of not being paid for oil or gas that they deliver. The Debtors do not attempt to obtain credit protections such as letters of credit, guarantees or prepayments from their purchasers. The Debtors are unable to predict what impact the financial difficulties of any of their purchasers may have on the Reorganized Debtors' future results of operations and liquidity.

20.    **No Long-Term Contracts to Sell Oil and Gas**

The Debtors do not have any long-term supply or similar agreements with governments or other authorities or entities for which they act as a producer. The Reorganized Debtors will therefore be dependent upon their ability to sell oil and gas at the prevailing wellhead market price. There can be no assurance that purchasers will be available or that the prices they are willing to pay will remain stable and not decline.

21.    **Terrorist Attacks**

The United States has been the target of terrorist attacks of unprecedented scale. The U.S. government has issued warnings that U.S. energy assets may be the future targets of terrorist organizations. These developments have subjected the Debtors' operations to increased risks. Any terrorist attack at the Debtors facilities, or those of their purchasers, could have a material adverse effect on the Reorganized Debtors' businesses.

22.    **Federal, State and Local Oil and Gas Operations Laws and Regulations**

The Debtors are affected significantly by a substantial amount of governmental regulations that increase costs related to the drilling of wells and the transportation and processing of oil and gas. It is possible that the number and extent of these regulations, and the costs to comply with them, will increase significantly in the future. In Colorado, for example, significant new governmental regulations have been adopted that are primarily driven by concerns about wildlife and the environment. These government regulatory requirements complicate the Debtors' plans for development and may result in substantial costs that are not possible to pass through to their customers and which could impact the profitability of their Colorado operations.

The Debtors' oil and gas operations are subject to stringent federal, state and local laws and regulations relating to the release or disposal of materials into the environment or otherwise relating to health and safety, land use, environmental protection or the oil and gas industry generally. Legislation affecting the industry is under constant review for amendment or expansion, frequently increasing the Debtors' regulatory burden. Compliance with such laws and regulations often increases the Debtors' costs of doing business and, in turn, decreases their profitability. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal penalties, the incurrence of investigatory or remedial obligations, or issuance of cease and desist orders.

The environmental laws and regulations to which the Debtors are subject may: (i) require applying for and receiving a permit before drilling commences; (ii) restrict the types, quantities and concentration of substances that can be released into the environment in connection with drilling and production activities; (iii) limit or prohibit drilling activities on certain lands lying within wilderness, wetlands and other protected areas; and (iv) impose substantial liabilities for pollution resulting from the Debtors' operations.

Changes in environmental laws and regulations occur frequently, and any changes that result in more stringent or costly waste handling, storage, transport, disposal or cleanup requirements could require the Reorganized Debtors to make significant expenditures to maintain compliance, and may otherwise have a material adverse effect on the Reorganized Debtors' earnings, results of operations, competitive position or financial condition. Over the years, the Debtors have owned or leased numerous properties for oil and gas activities upon which petroleum hydrocarbons or other materials may have been released by them or by predecessor property owners or lessees who were not under their control. Under applicable environmental laws and regulations, including CERCLA, RCRA and analogous state laws, the Reorganized Debtors could be held strictly liable for the removal or remediation of previously released materials or property contamination at such locations regardless of whether they were responsible for the release or if their operations were standard in the industry at the time they were performed.

23.    **Water Sources to Facilitate the Fracturing Process and Water Disposal**

New environmental regulations governing the withdrawal, storage and use of surface water or groundwater necessary for hydraulic fracturing of wells may increase operating costs and cause delays, interruptions or termination of operations, the extent of which cannot be predicted, all of which could have an adverse affect on the Reorganized Debtors' operations and financial performance.

Further, the Debtors must remove the water that they use to fracture their gas wells when it flows back to the well-bore. The Reorganized Debtors' ability to remove and dispose of water will affect their production and the cost of water treatment and disposal may affect their profitability. The imposition of new environmental initiatives and regulations could include restrictions on the Reorganized Debtors' ability to conduct hydraulic fracturing or disposal of waste, including produced water, drilling fluids and other wastes associated with the exploration, development and production of natural gas.

24.    **Federal and State Legislation and Regulatory Initiatives Relating to Hydraulic Fracturing**

Congress has considered legislation to amend the federal Safe Drinking Water Act to require the disclosure of chemicals used by the oil and natural gas industry in the hydraulic fracturing process and to restrict hydraulic fracturing in other ways.    The Environmental Protection Agency has also implemented rules relating to hydraulic fracturing and may implement additional rules on the subject. Hydraulic fracturing is an important and commonly used process in the completion of unconventional natural gas wells in shale formations, as well as tight conventional formations, including many of those that the Debtors complete and produce.    This process involves the injection of water, sand and chemicals under pressure into rock formations to stimulate natural gas production.    Sponsors of these bills have asserted that chemicals used in the fracturing process could adversely affect drinking water supplies.    In addition, some states and local governmental authorities have adopted and others are considering legislation to restrict, and in some cases prohibit, hydraulic fracturing.    Any additional level of regulation could lead to operational delays or increased operating costs and could result in additional regulatory burdens that could make it more difficult to perform hydraulic fracturing and increase the Reorganized Debtors' costs of compliance and doing business.

25.    **Credit Risk as it Affects Third Parties**

Third parties with whom the Debtors have contracted may lose existing financing or be unable to obtain additional financing necessary to continue their businesses.    The inability of a third party to make payments to the Reorganized Debtors for their accounts receivable, or the failure of the Reorganized Debtors' third party suppliers to meet their demands because they cannot obtain sufficient credit to continue their operations, may cause the Reorganized Debtors to experience losses and may adversely impact their liquidity and their ability to satisfy their payment obligations as they arise.

26.    **The Elimination of Certain Federal Income Tax Deductions Currently Available with Respect to Oil and Natural Gas Exploration and Development**

Changes contained in President Obama's 2013 budget proposal included the elimination of certain key U.S. federal income tax preferences currently available to oil and gas exploration and production companies. Such changes include, but are not limited to, (i) the repeal of the percentage depletion allowance for oil and gas properties; (ii) the elimination of current deductions for intangible drilling and development costs; (iii) the elimination of the deduction for certain U.S. production activities; and (iv) an extension of the amortization period for certain geological and geophysical expenditures.    It is unclear, however, whether any such changes will be enacted or how soon such changes could be effective.

The passage of any legislation as a result of the budget proposal, or any other similar change in U.S. federal income tax law, could eliminate certain tax deductions that are currently available with respect to oil and gas exploration and development, and any such change could negatively affect the Reorganized Debtors' financial condition and results of operations.

27.     **Potential Legislative and Regulatory Actions Addressing Climate Change**

Recent scientific studies have suggested that emissions of certain gases, commonly referred to as "greenhouse gases" and including carbon dioxide and methane, may be contributing to warming of the earth's atmosphere. In December 2009, the EPA issued proposed regulations that would require a reduction in emissions of greenhouse gases from motor vehicles and also could require permits for emitting greenhouse gas from certain stationary sources such as ours. Congress has also been considering various bills that would establish an economy-wide cap-and-trade program to reduce U.S. emissions of greenhouse gases and at least one-third of the states, either individually or through multi-state regional initiatives, have already taken legal measures to reduce emissions of greenhouse gases, primarily through the planned development of greenhouse gas emission inventories and/or greenhouse gas cap and trade programs. As an alternative to reducing emission of greenhouse gases under cap and trade programs, Congress may consider the implementation of a program to tax the emission of carbon dioxide and other greenhouse gases. The net effect of such legislation would be to impose increasing costs on the combustion of carbon-based fuels such as oil, refined petroleum products and natural gas.

Passage of climate change legislation or other regulatory initiatives by Congress or various states of the U.S. or the adoption of regulations by the EPA or analogous state agencies that regulate or restrict emissions of greenhouse gases in areas in which the Reorganized Debtors conduct business, could increase the costs of the Reorganized Debtors' operations, including new or increased costs to operate and maintain their equipment and facilities, install new emission controls on their equipment and facilities, acquire allowances to authorize their greenhouse gas emissions, pay taxes related to their greenhouse gas emissions and administer and manage a greenhouse gas emissions program. Moreover, incentives to conserve energy or use alternative energy sources could reduce demand for natural gas and oil. Reductions in the Reorganized Debtors' revenues or increases in the Reorganized Debtors' expenses as a result of climate control initiatives could have adverse effects on their businesses, financial position, results of operations and prospects.

28.     **Legal Proceedings**

The Debtors are currently involved in litigation arising in the ordinary course of business. A list of the various suits and proceedings is included as Exhibit 4a to Delta's amended *Statement of Financial Affairs* [D.I. 416]. In the Debtors' opinion, the outcome of these legal proceedings is not likely to have an adverse effect on the Debtors' financial condition or results of operation.

29.     **Certain Tax Considerations**

There are a number of income tax considerations, risks and uncertainties associated with consummation of the Plan. Interested parties should read carefully the discussions set forth in Article XII of this Disclosure Statement regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtors and the Reorganized Debtors and to certain Holders of Claims who are entitled to vote to accept or reject the Plan.

C.      **Certain Risk Factors Relating to Securities to Be Issued Under the Plan**

1.      **No Current Public Market for Securities**

On the Effective Date, or as soon as reasonably practicable thereafter, Reorganized Delta shall take all steps necessary to facilitate the public trading of the New Common Stock, provided, however, that Reorganized Delta's Tax Attributes shall be protected through provisions in Reorganized Delta's Restated Certificate of Incorporation and/or the New Stockholders' Agreement limiting transactions that might result in adverse consequences to Reorganized Delta's Tax Attributes.

Notwithstanding the foregoing, there is no guarantee of when, or if, the New Common Stock will be publicly traded, nor is there any guarantee that Reorganized Delta will list the New Common Stock on an exchange even if the New Common Stock is publicly traded.  Further, the New Common Stock to be issued pursuant to the Plan are securities for which there may be a limited market, and there can be no assurance as to the development or liquidity of any market for such securities.  The New Common Stock is subject to restrictions on transfer under Reorganized Delta's Restated Certificate of Incorporation and for the Supporting Noteholders, the New Stockholders' Agreement, and certain Holders may be restricted under applicable securities laws in their ability to transfer or sell their securities.  If a trading market does not develop or is not maintained, Holders of such securities may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, liquidity, prevailing interest rates, markets for similar securities, industry conditions and the performance of, and investor expectations for, Reorganized Delta.

Furthermore, Persons to whom such securities are issued pursuant to the Plan may prefer to liquidate their investments rather than hold such securities on a long-term basis.  Accordingly, any market that does develop for such securities may be volatile.

2.      **Potential Dilution**

The shares of New Common Stock distributed on the Effective Date pursuant to the Plan will be subject to dilution on account of potential future equity financings or other share issuances by Reorganized Delta.  Additionally, it is possible that the provider of the Exit Loan will require that a portion of the equity of Reorganized Delta be transferred to the Exit Loan lender in consideration for the Exit Loan financing being made available, which would further dilute the New Common Stock.  Finally, if Reorganized Delta were to default on its obligations under the Exit Loan, the result could be that the exit lender would enforce its remedies, which in turn could result in the equity interests in Reorganized Delta being extinguished.

3.      **Dividends**

The Debtors do not anticipate that cash dividends or other distributions will be paid with respect to the New Common Stock in the foreseeable future.

4.      **The Supporting Noteholders Will Control Reorganized Delta**

Consummation of the Plan will result in a small number of holders owning a substantial majority of the shares of the New Common Stock, with the Supporting Noteholders holding a controlling percentage of the New Common Stock.  These holders will, among other things, exercise a controlling influence over the business and affairs of Reorganized Delta. Further, it is possible that the provider of the Exit Loan will require that a portion of the equity of Reorganized Delta be transferred to the Exit Loan lender in consideration for the Exit Loan financing being made available. If the Exit Loan is provided by the Debtors' current DIP Lenders, who also hold Noteholder Claims and therefore will comprise the majority of the shareholders of Reorganized Delta, the effect of ceding a portion of the New Common Stock to the exit lenders would be to both increase the existing DIP Lenders' ownership stake in Reorganized Delta and create a structure in which the same parties would hold both the secured debt and the overwhelming majority of the equity in Reorganized Delta.

5.      **Transfer Restrictions on the New Common Stock Contained in the Restated Certificate of Incorporation**

The Restated Certificate of Incorporation shall contain restrictions on the transfer of the New Common Stock intended to minimize the likelihood of any potential adverse U.S. federal income tax consequences resulting from an ownership change (as defined in section 382 of the Tax Code) in Reorganized Delta. The restrictions will remain in effect until either (a) the board of directors of Reorganized Delta (with the approval of at least 66 2/3% of the shareholders of Reorganized Delta) (as set forth in the Restated Certificate of Incorporation) determines that (i) the "382(l)(5) Exception" (as described below in Section XII.B.2.b of this Disclosure Statement) is not available or not in the best interests of the Company, its affiliates and its shareholders, (ii) an ownership change (as defined in Section 382 of the Tax Code) would not substantially limit Reorganized Delta (or its direct or indirect subsidiaries) ability to use otherwise available tax attributes, or (iii) no significant value attributable to the tax attributes would be preserved from maintaining the transfer restrictions, or (b) such other date determined by the board of directors of Reorganized Delta, and approved by at least 66 2/3% of the shareholders of Reorganized Delta.  While in effect, the restrictions will prevent any person who is not a 5% or greater shareholder of Reorganized Delta (a **"5% Shareholder"**) at the Effective Date from acquiring sufficient shares to become a 5% Shareholder, unless such person obtains the permission of the board of directors of Reorganized Delta. All 5% Shareholders of Reorganized Delta at the Effective Date shall be permitted to acquire or dispose of shares of Reorganized Delta so long as, in the aggregate, Reorganized Delta does not undergo an "owner shift" (as that term is defined in section 382 of the Tax Code and the Treasury Regulations thereunder) of greater than 33% (as adjusted by the board of directors of Reorganized Delta from time to time to reflect transactions undertaken by Reorganized Delta) (the **"Permitted Owner Shift"**) in any "testing period" (as that term is defined in section 382 of the Tax Code and the Treasury Regulations thereunder). Each 5% Shareholder at the Effective Date shall not be permitted to cause a greater "owner shift" in any "testing period" than the product of (i) the Permitted Owner Shift and (ii) a fraction equal to such 5% Shareholder's ownership as of the Effective Date divided by the aggregate ownership of all 5% Shareholders as of the Effective Date (such product, the **"Owner Shift Limit"**). For any transaction occurring between 5% Shareholders, any resulting "owner shift" shall be allocated equally to each such 5% Shareholder's Owner Shift Limit. All transfers in violation of the transfer restrictions contained in Reorganized Delta's certificate of incorporation shall be

void *ab initio*. A copy of the Restated Certificate of Incorporation shall be filed as a Plan Supplement.

## VIII.   VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each eligible Holder of a General Unsecured Claim or Noteholder Claim should carefully review the Plan attached as <u>Exhibit 1</u>, and summarized above in Section I.B, "**Summary of the Chapter 11 Cases**."  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

IT IS IMPORTANT THAT THE HOLDERS OF CLASSES OF GENERAL UNSECURED CLAIMS AND NOTEHOLDER CLAIMS EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN.

### A.      Voting Deadline

The Debtors have engaged Epiq Bankruptcy Solutions, LLC as their voting agent (the "**Voting Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.  IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M., PREVAILING EASTERN TIME, ON AUGUST 8, 2012 (THE "**VOTING DEADLINE**").

INSTRUCTIONS FOR VOTING PROCEDURES ARE CONTAINED IN THE DISCLOSURE STATEMENT ORDER.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, Third Floor
New York, NY
Telephone:  (646) 282-2400

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the telephone number above.

### B.      Parties in Interest Entitled to Vote; Record Date

The Debtors are providing copies of this Disclosure Statement (including all exhibits, appendices, and schedules), related materials and a ballot (collectively, a "**Solicitation Package**") to all Classes entitled to vote, including registered Holders of the Notes.

In general, a holder of a claim may vote to accept or reject a plan of reorganization if (i) the holder's claim or interest is "allowed," (i.e., generally not disputed, contingent, or unliquidated), and (ii) such holder's claim or equity interest is "impaired" (as defined below) by the plan. However, if a holder of an allowed and impaired claim will not receive any distribution under a plan, than such holder is deemed to have rejected the plan and is not entitled to vote. In

the same vein, a holder of an allowed and unimpaired claim will be presumed to have accepted the plan and will not be entitled to vote.

Under section 1126 of the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan of reorganization.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.  DIP Facility Claims, Priority Non-Tax Claims and Other Secured Claims are unimpaired under the Plan, and holders of such Claims are therefore not entitled to vote.  Holders of Claims and Equity Interests in Classes A6, A8, and Existing Equity Interests are impaired and deemed to reject the Plan and therefore are not entitled to vote.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims whose holders cast ballots for acceptance or rejection of the plan.

The Claims in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

Class A4: General Unsecured Claims against Delta
Class A5 Noteholder Claims
Class B3: General Unsecured Claims against DPCA LLC
Class B4: Noteholder Claims against DPCA LLC
Class C3: General Unsecured Claims against Delta Exploration Company, Inc.
Class C4: Noteholder Claims against Delta Exploration Company, Inc.
Class D3: General Unsecured Claims against Delta Pipeline, LLC
Class D4: Noteholder Claims against Delta Pipeline, LLC
Class E3: General Unsecured Claims against DLC, Inc.
Class E4: Noteholder Claims against DLC, Inc.
Class F3: General Unsecured Claims against CEC, Inc.
Class F4: Noteholder Claims against CEC, Inc.
Class G3: General Unsecured Claims against Castle Texas Production Limited Partnership
Class G4: Noteholder Claims against Castle Texas Production Limited Partnership
Class H3: General Unsecured Claims against Amber Resources Company of Colorado
Class H4: Noteholder Claims against Amber Resources Company of Colorado

Class I3: General Unsecured Claims against Castle Exploration Company, Inc.
Class I4: Noteholder Claims against Castle Exploration Company, Inc.

The Record Date for determining which Holders are allowed to vote on the Plan is July 5, 2012.   Except as provided in the Disclosure Statement Order, unless the ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such ballot, the Debtors may, in their sole discretion, reject such ballot as invalid, and therefore decline to use it in connection with seeking confirmation of the Plan.

Where an impaired Class of Claims is otherwise entitled to vote on the Plan, but no Claim in such Class is voted, such Class may be deemed to have accepted the Plan for that Debtor.

The delivery of an accepting ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such ballot to accept (1) all of the terms of, and conditions to, this Solicitation; and (2) the terms of the Plan including the releases or exculpations set forth in Article X therein.   All parties in interest retain their right to object to confirmation of the Plan under section 1128(b) of the Bankruptcy Code.

## C.      Further Information; Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim or about the package of materials you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or order of the Bankruptcy Court), please contact the Voting Agent at:

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, Third Floor
New York, NY
Telephone:  (646) 282-2400
E-mail: tabulation@epiqsystems.com

## IX.      CONFIRMATION OF THE PLAN

### A.      Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold the Confirmation Hearing.   The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan on August 15, 2012 at 2:00 p.m. (prevailing Eastern time). Notice of the Confirmation Hearing will be provided to Holders of Claims and Equity Interests or their representatives (the "**Confirmation Hearing Notice**") as set forth in the scheduling order of the Bankruptcy Court.   The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.   Any objection to confirmation of the Plan must be in writing, must

conform to the Bankruptcy Rules, must set forth the name of the objecting party, the nature and amount of claims or interests held or asserted by the objecting party against the Debtors' Estates or property and the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon (1) Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, NY 10004, Attn.: Kathryn A. Coleman, Esq. and W. Peter Beardsley, Esq., (2) Morris Nichols Arsht & Tunnell LLP, 1201 North Market Street, 18th Floor, Wilmington, DE 19899, Attn.: Derek Abbott, Esq., (3) Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 207, Lockbox 35, Wilmington, DE 19801, Attn: Tiiara Patton, Esq. (4) Brown Rudnick LLP, Seven Times Square, New York, New York 10036, Attn: Robert Stark, Esq., (5) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Daniel H. Golden and 1333 New Hampshire Ave, NW, Washington, DC 20036, Attn: James R. Savin and (6) such other parties as the Bankruptcy Court may order, so as to be received no later than the date and time designated in the Confirmation Hearing Notice.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## B.    Requirements for Confirmation of the Plan – Consensual Confirmation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied:

➢ The Plan complies with the applicable provisions of the Bankruptcy Code.

➢ The Debtors have complied with the applicable provisions of the Bankruptcy Code.

➢ The Plan has been proposed in good faith and not by any means forbidden by law.

➢ Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

➢ The Debtors have disclosed (i) the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Chapter 11 Cases, (ii) any Subsidiary of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and (iii) the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the

Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

➢ Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtors has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

➢ With respect to each Class of Claims or Equity Interests, each Holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan on account of such Holder's Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

➢ Except to the extent the Plan meets the "Non-Consensual Confirmation" standards discussed below, each Class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan.

➢ Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding five (5) years after the date of the order for relief, of a value, as of the Effective Date, equal to the Allowed amount of such Claims with interest from the Effective Date.

➢ At least one (1) Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

➢ Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility" below.

➢ All fees payable under section 1930 of title 28 of the United States Code, as determined by the court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date.

➢ The Plan provides for the continuation after the Effective Date of payment of all Retiree Benefits (as defined in section 1114(a) of the Bankruptcy Code), at the level established under section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

1.      **Best Interests Test**

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired allowed claim or interest either (i) accept the plan of reorganization or (ii) receive or retain under the Plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the applicable debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  This is referred to as the "Best Interests Test."

To show that the Plan complies with section 1129(a)(7) of the Bankruptcy Code, the Debtors, together with Conway, prepared the liquidation analysis attached hereto as Exhibit 3 to the Disclosure Statement (the "**Liquidation Analysis**").  Based on the Liquidation Analysis, the Debtors believe that Holders of Claims will receive equal or greater value as of the Effective Date under the Plan than such Holders would receive in a chapter 7 liquidation and that the Plan will therefore meet the "Best Interests Test."

The first step in the Liquidation Analysis is to determine the dollar amount that would be generated from a hypothetical chapter 7 liquidation of the Debtors' Assets in which a chapter 7 trustee is appointed and charged with reducing to cash any and all of the Debtors' Assets.  In this hypothetical liquidation scenario, the trustee would be required to shut down the Debtors' businesses and sell the individual assets of the Debtors (and the stock of its non-Debtor Subsidiaries or their assets).  The gross amount of cash available from a liquidation of the Debtors' Assets would be the sum of the proceeds from the disposition of the Debtors' Assets and cash held by the Debtors at the time of the commencement of the hypothetical chapter 7 case.  The next step is to reduce that total by the costs and expenses of the liquidation, the amount of any Claims secured by such assets, and such additional Administrative Expense Claims and Priority Claims that may result from the termination of the Debtors' businesses and the use of chapter 7 for purposes of the hypothetical liquidation.  Any net cash would be allocated to creditors and stockholders in strict priority in accordance with section 726 of the Bankruptcy Code.  Finally, the Debtors compare the Liquidation Analysis with the value provided under the Plan.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtors believe that taking into account the Liquidation Analysis and the Valuation, the Plan meets the "Best Interests Test" of section 1129(a)(7) of the Bankruptcy Code.

The Debtors believe that the Holders of Claims in Classes A6, A8, and Holders of Existing Equity Interests would receive no recovery in a chapter 7 liquidation.  Creditors will receive at least as good a recovery through the distributions contemplated by the Plan because the continued operation of the Debtors as a going concern, rather than a forced liquidation, will allow realization of more value for the Debtors' Assets.  Moreover, as a result of the Debtors' reorganization, creditors such as the Debtors' employees would retain their jobs and most likely make few, if any, other Claims against the Estate.  Lastly, in the event of liquidation, the recovery of Holders of General Unsecured Claims and Noteholder Claims that would receive a small distribution in a liquidation would no doubt increase significantly under the treatment proposed in the Plan.  All of these factors lead to the conclusion that recoveries under the Plan would be at least as much as, and in many cases significantly greater than, the recoveries available in a chapter 7 liquidation.

2.      **Acceptance**

As a condition to confirmation, the Bankruptcy Code requires that each Class of impaired Claims vote to accept the Plan in most circumstances.  Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class.  For these purposes, only claims actually voting to accept or to reject the plan are counted.  Holders of claims who fail to vote are not counted as either accepting or rejecting a plan.

Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class whose holders vote on the plan.

3.      **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the court find that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors, together with their advisors, prepared the financial projections attached hereto as Exhibit 4 to the Disclosure Statement (the "**Financial Projections**").

The Financial Projections reflect estimates of the Debtors' expected financial position, results of operations and cash flows for the years 2012 through 2017 and indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and to fund their operations.  Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

C.      **Confirmation Without Acceptance of All Impaired Classes:  The "Cram Down" Alternative**

Notwithstanding rejection of the plan by an impaired class, the Bankruptcy Code permits confirmation of a plan of reorganization, so long as (a) the plan of reorganization otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan of reorganization without taking into consideration the votes of any insiders in such class, and (c) the plan of reorganization is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted such plan.  These so-called "cram down" provisions are set forth in section 1129(b) of the Bankruptcy Code.

1.      **Fair and Equitable**

The Bankruptcy Code establishes different tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors, and interest holders as follows:

### a.    Secured Creditors

A plan of reorganization is fair and equitable as to an impaired class of secured claims that rejects the plan if the plan provides: (a) that each of the holders of the secured claims included in the rejecting class (i) retains the liens securing its claim to the extent of the allowed amount of such claim, to the extent of the allowed amount of such claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (ii) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan of reorganization, at least equal to the value of such holder's interest in the Estate's interest in such property; (b) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (c) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds in accordance with clause (a) or (b) of this paragraph.

DIP Facility Claims and Other Secured Claims are unimpaired and thus deemed to accept the Plan.

### b.    Unsecured Creditors

A plan of reorganization is fair and equitable as to an impaired class of unsecured claims that rejects the plan if the plan provides that:  (i) each holder of a claim included in the rejecting class receives or retains property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (ii) the holders of claims and equity interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan on account of such junior claims or interests.

In view of the deemed rejection by Holders of Intercompany Claims in Class A6 and Securities Litigation Claims in Class A8, the Debtors will seek confirmation of the Plan pursuant to the "cram down" provisions of the Bankruptcy Code.  The Debtors believe that it will meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Intercompany Claims in Class A6 and Securities Litigation Claims in Class A8 because no Holders of junior Claims or Equity Interests will receive distributions under the Plan.

In the event that Classes of General Unsecured Claims or Noteholder Claims do not vote in favor of the Plan, the Debtors will also seek a cram down confirmation of the Plan with respect to any Class of General Unsecured Claims or Noteholder Claims.  No Class junior to General Unsecured Claims or Noteholder Claims will receive any recovery under the Plan.  The Debtors believe that it would meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of General Unsecured Claims and Noteholder Claims because no Holders of junior Claims or Equity Interests will receive distributions under the Plan.

Priority Non-Tax Claims (Classes A2 and H1) are unimpaired and thus are deemed to accept the Plan.

### c.      Holders of Interests

A plan of reorganization is fair and equitable as to an impaired class of interests that rejects the plan if the plan provides that: (a) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (i) any fixed liquidation preference to which such holder is entitled, (ii) the fixed redemption price to which such holder is entitled, and (iii) the value of the interest; or (b) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan on account of such junior interest.

In view of the deemed rejection by Holders of Existing Equity Interests, the Debtors will seek confirmation of the Plan pursuant to the "cram down" provisions of the Bankruptcy Code. The Debtors believe that they will meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Existing Equity Interests because no Holders of junior Claims or Equity Interests will receive distributions under the Plan.

### d.      Unfair Discrimination

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally to other classes similarly situated and no such class receives more than it is legally entitled to receive for its claims or interests.  The Debtors do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Equity Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

The Debtors believe the Plan does not discriminate unfairly with respect to the Classes of General Unsecured Claims or Noteholder Claims, the Intercompany Claims in Class A6, the Securities Litigation Claims in Class A8 and the Existing Equity Interests.  Such Claims and Equity Interests are subordinated to other Claims under sections 510(b) or (c) of the Bankruptcy Code or sections 726(a)(2)(C), (a)(3), (a)(4), or (a)(5) of the Bankruptcy Code as incorporated into section 1129(a)(7) of the Bankruptcy Code, or are otherwise not entitled to payment under the absolute priority rule until all other creditors have been paid in full.  Because all Holders of General Unsecured Claims or Noteholder Claims, the Intercompany Claims in Class A6, the Existing Equity Interests and the Securities Litigation Claims in Class A8 are treated similarly to Holders of Claims or Equity Interests in other Classes of equal rank, there is no unfair discrimination with respect to such Holders of General Unsecured Claims, Noteholder Claims, Intercompany Claims and Existing Equity Interests.

### D.      Valuation of the Debtors

Conway has advised the Debtors with respect to the reorganization value of the Reorganized Debtors on a going concern basis and has estimated the reorganization value of the Reorganized Debtors.  This estimated reorganization value includes (i) excess cash and (ii) consideration of NOLs.  Conway's estimate of an enterprise value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.  The valuation analysis is attached hereto as <u>Exhibit 5</u> to the Disclosure Statement (the "**Valuation Analysis**").

## X.    CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS

### A.    Exemption from Registration Requirements for Issuance of New Securities

The Debtors will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the New Common Stock issued pursuant to the Plan from the registration requirements of the Securities Act and any state securities laws.  Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against or equity in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor under the plan.  The Debtors believe that Reorganized Delta is a successor to the Debtors under the Plan for purposes of section 1145 of the Bankruptcy Code and that the issuance of the New Common Stock under the Plan will satisfy the requirements of section 1145 and is therefore exempt from the registration requirements of the Securities Act and state securities laws.

### B.    Restrictions in the New Stockholders' Agreement and the Restated Certificate of Incorporation

At the Supporting Noteholders' discretion and with the Supporting Noteholders' unanimous consent, Supporting Noteholders may execute and enter into the New Stockholders' Agreement containing, among other things, restrictions on the transfer of the New Common Stock to minimize the likelihood of any potential adverse federal income tax consequences resulting from an ownership change (as defined in section 382 of the Tax Code) in Reorganized Delta consistent with those described in Section VII.C.5 of this Disclosure Statement.

The Restated Certificate of Incorporation of Reorganized Delta will, among other things, authorize the New Common Stock and, at the Supporting Noteholders' discretion and with the Supporting Noteholders' unanimous consent, contain restrictions on the transfer of the New Common Stock to minimize the likelihood of any potential adverse federal income tax consequences resulting from an ownership change (as defined in section 382 of the Tax Code) in Reorganized Delta, consistent with those described in Section VII.C.5 of this Disclosure Statement.  Any modification to the originally filed Restated Certificate of Incorporation or Restated Bylaws of Reorganized Delta after the Confirmation Date but prior to the Effective Date may become effective; provided, however that, any such modification must be approved by the Supporting Noteholders.

### C.    Subsequent Transfers of Securities

In general, recipients of New Common Stock under the Plan will, subject to the Restated Certificate of Incorporation and/or New Stockholders' Agreement, as the case may be, be able to resell their securities without registration under the Securities Act pursuant to the exemption provided by section 4(1) of the Securities Act, unless the holder of such security is an "underwriter" within the meaning of section 2(a)(11) of the Securities Act.  In addition, the New Common Stock issued under the Plan generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of the New Common Stock issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from

registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is an issuer of the relevant security.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW COMMON STOCK, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE RIGHT OF ANY PERSON TO RESELL OR OTHERWISE TRANSFER THE SECURITIES ISSUED UNDER THE PLAN.   THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

## XI.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION

If the Plan is not confirmed and consummated, the alternatives to the Plan include (a) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (b) an alternative plan of reorganization.

### A.   Liquidation Under Chapter 7

If the Plan cannot be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In such a case, a trustee would be appointed to liquidate the assets of the Debtors for distribution to the creditors in accordance with the priorities established by the Bankruptcy Code.  The trustee would retain professionals at the expense of the Debtors' estates, liquidate the Debtors' remaining assets and, if necessary, investigate and pursue causes of action on the Debtors' behalf.  A discussion of the effects of a chapter 7 liquidation would have on the recoveries of Holders of Claims and Equity Interests is set forth in the Debtors' Liquidation Analysis attached hereto as Exhibit 3.

The Debtors believe that liquidation under chapter 7 would result in (a) significantly smaller distributions being made to its creditors than those provided for in the Plan because of (i) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time in extremely poor market conditions, (ii) additional administrative expenses involved in the appointment of a trustee and its professionals, and (iii) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations; and (b) significantly less recovery for Holders of General Unsecured Claims and Noteholder Claims.

### B.    Alternative Plan(s) of Reorganization

If the Plan is not confirmed, the Debtors (or, in certain circumstances, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of assets, or a combination of both.  With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan.  The Debtors believe that its Plan enables its creditors to realize the most value under the present circumstances.  In a liquidation under chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, possibly resulting in somewhat greater recoveries than would be obtained in chapter 7.  No trustee is required in a chapter 11 liquidation, so if a trustee were not appointed, the expenses and professional fees for a chapter 11 liquidation would most likely be lower than those incurred in a chapter 7 liquidation.  Although preferable to a chapter 7 liquidation, the Debtors believe that any alternative liquidation under chapter 11 is a much less attractive alternative to its creditors than the Plan because of the greater creditor recoveries provided by the Plan.

## XII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and certain Creditors and Interest Holders, including Holders of Allowed DIP Facility Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, Allowed General Unsecured Claims, Allowed Noteholder Claims and Existing Equity Interests.  This summary is based on the Tax Code, Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of the Disclosure Statement and all of which are subject to change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to Holders of Claims or Interests that are not United States persons (as such term is defined in the Tax Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, partnerships or entities treated as partnerships for U.S. federal income tax purposes; persons whose functional currency is not the U.S. dollar; banks; governmental authorities or agencies; financial institutions; insurance companies; pass-through entities; tax-exempt organizations; brokers and dealers in securities, currencies or commodities; small business investment companies; and regulated investment companies).  Except as specifically described in Section XII.A.2, below, this summary does not apply to persons whose Claims arose in connection with providing services to the Debtors, including in an employment capacity.  The following discussion assumes that Holders of Allowed DIP Facility Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, Allowed General Unsecured Claims, Allowed Noteholder Claims and Existing Equity Interests hold such Claims and Interests as "capital assets" within the meaning of section 1221 of the Tax Code.  Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and Holders of Allowed DIP Facility Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, Allowed General

Unsecured Claims, Allowed Noteholder Claims and Existing Equity Interests based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under U.S. federal estate tax law or any state, local, or foreign tax law.

THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED ON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST, INCLUDING HOLDERS OF ALLOWED DIP FACILITY CLAIMS, ALLOWED PRIORITY NON-TAX CLAIMS, ALLOWED OTHER SECURED CLAIMS, ALLOWED GENERAL UNSECURED CLAIMS, ALLOWED NOTEHOLDER CLAIMS AND EXISTING EQUITY INTERESTS. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT HIS, HER, OR ITS OWN TAX ADVISORS AS TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES, AS WELL AS OTHER TAX CONSEQUENCES, INCLUDING UNDER U.S. FEDERAL ESTATE TAX LAW OR ANY APPLICABLE STATE, LOCAL, AND FOREIGN LAW, OF THE RESTRUCTURING DESCRIBED IN THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS AND EXISTING EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EXISTING EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EXISTING EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    Certain U.S. Federal Income Tax Consequences to the Holders of Allowed Claims and Interests

1.    Consequences to Holders of Allowed DIP Facility Claims, Allowed Priority Non-Tax Claims, and Other Secured Claims

Pursuant to the Plan, each DIP Facility Claim, Priority Non-Tax Claim, and Other Secured Claim will be paid in full in Cash. If a Holder of an Allowed DIP Facility Claim, Allowed Priority Non-Tax Claim, or Allowed Other Secured Claim receives Cash in satisfaction of its Claim, the satisfaction should be treated as a taxable exchange under section 1001 of the Tax Code. Subject to the "market discount" rules described below in Article XII.A.6, the Holder should recognize capital gain or loss (which capital gain or loss will be long-term capital gain or loss if the Holder has held the debt instrument or other asset underlying its Claim for more than one year) equal to the difference between (x) the amount of Cash received and (y) the Holder's adjusted tax basis in the debt instrument underlying its Claim. To the extent that the Cash received in the exchange is allocable to accrued but unpaid interest that has not already been

taken into income by the Holder, the Holder may recognize ordinary interest income (*see* Article XII.A.5 below for further information).

If a Holder of an Allowed DIP Facility Claim receiving Cash under the Plan makes a new loan to Reorganized Delta as part of the Exit Facility Loan, the tax consequences to such Holder could differ from those discussed above. Any Holder of an Allowed DIP Facility Claim contemplating such a loan is urged to seek advice from an independent tax advisor regarding the tax consequences to it in light of its particular circumstances.

2.       **Consequences to Holders of Allowed General Unsecured Claims**

Pursuant to the Plan, General Unsecured Claims against Delta will be exchanged for New Common Stock of Reorganized Delta. Except as described below with respect to a Holder whose General Unsecured Claim against Delta arose in connection with the provision of services to Delta, a Holder of such General Unsecured Claims against Delta generally will be treated as exchanging its General Unsecured Claims for New Common Stock of Reorganized Delta in a taxable exchange under section 1001 of the Tax Code. Accordingly, each Holder of such an Allowed General Unsecured Claim should recognize gain or loss equal to the difference between: (i) the fair market value of the New Common Stock of Reorganized Delta (as of the date the stock is distributed to the Holder) received in exchange for the General Unsecured Claim; and (ii) the Holder's adjusted basis, if any, in the General Unsecured Claim. Subject to the "market discount" rules described below, such gain or loss should be capital gain or loss as long as the General Unsecured Claim is held as a capital asset and should be long-term capital gain or loss if the Holder has a holding period for a General Unsecured Claim of more than one year. A Holder's tax basis in New Common Stock of Reorganized Delta received should equal the fair market value of the New Common Stock of Reorganized Delta as of the date of the exchange. A Holder's holding period for New Common Stock of Reorganized Delta should begin on the day following the date of the exchange of the General Unsecured Claim against Delta for the New Common Stock of Reorganized Delta.

A Holder whose General Unsecured Claim against Delta arose in connection with the provision of services to the Debtors, including in an employment capacity, generally will be treated as receiving ordinary income equal to the fair market value of the New Common Stock of Reorganized Delta (as of the date the stock is distributed to the Holder) received in exchange for the General Unsecured Claim. If the Holder's General Unsecured Claim against Delta arose in connection with services provided to the Debtors in the Holder's capacity as an employee, rather than as an independent contractor, the amount treated as ordinary income in the preceding sentence generally will be characterized as wages and will be subject to income tax withholding and withholding pursuant to the Federal Insurance Contributions Act and Federal Unemployment Tax Act by Reorganized Delta. If the amount of Cash otherwise distributable to a Holder under the Plan in respect of other Claims is insufficient to satisfy the withholding tax obligations with respect to such Holder, the Holder may be required to deliver the necessary funds to satisfy the withholding obligation to the Company as a condition to the receipt of the New Common Stock. Each Holder whose General Unsecured Claim against Delta arose in connection with the provision of services to the Debtors is urged to consult his or her own tax advisors regarding the tax consequences to such Holder in light of his or her particular circumstances.

3.        **Consequences to Holders of Allowed Noteholder Claims**

Pursuant to the Plan, Noteholder Claims will be exchanged for New Common Stock of Reorganized Delta.    The U.S. federal income tax consequences to Holders of Allowed Noteholder Claims depend on whether: (i) the Noteholder Claims are treated as "securities" of Delta Corporation (as opposed to not being treated as "securities" or being treated as "securities" issued by Delta Corporation's subsidiaries) for purposes of the reorganization provisions of the Tax Code; and (ii) the Debtors' restructuring qualifies as a tax-free reorganization.

Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that term-length of a debt instrument at issuance is an important factor in determining whether such an instrument is a security for U.S. federal income tax purposes.    These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.    There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including, among others: the security for payment; the creditworthiness of the obligor; the subordination or lack thereof to other creditors; the right to vote or otherwise participate in the management of the obligor; convertibility of the instrument into an equity interest of the obligor; whether payments of interest are fixed, variable, or contingent; and whether such payments are made on a current basis, or accrued.    The Notes are generally expected to be treated as securities for this purpose and the remainder of this discussion assumes the Notes will be so treated.

The exchange of Noteholder Claims for New Delta Common Stock pursuant to the Plan should be treated as a tax-free reorganization under the rules applicable to recapitalizations. Each Holder of an Allowed Noteholder Claim should not recognize any gain or loss on the exchange, although a Holder may recognize ordinary income to the extent that New Common Stock of Reorganized Delta is treated as received in satisfaction of accrued but unpaid interest on such Noteholder Claims (s*ee* Article XII.A.5 below for further information).    Such Holder should obtain a tax basis in the New Common Stock of Reorganized Delta equal to the Holder's tax basis in the Noteholder Claim surrendered for the New Common Stock of Reorganized Delta and should have a holding period for the New Common Stock of Reorganized Delta that includes the Holder's holding period in the Noteholder Claim exchanged for the New Common Stock of Reorganized Delta; provided, however, that the tax basis of any share of New Common Stock of Reorganized Delta (or portion thereof) treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for such New Common Stock of Reorganized Delta (or portion thereof) should begin on the day following the date of the exchange of the Noteholder Claim for the New Common Stock of Reorganized Delta.

4.        **Consequences to Holders of Existing Equity Interests in Delta**

Holders of Existing Equity Interests in Delta, which are being cancelled under the Plan, will be entitled to claim a worthless stock deduction (assuming that the taxable year that includes the Effective Date of the Plan is the same taxable year in which such stock first became worthless and only if such Holder had not previously claimed a worthless stock deduction with respect to any Existing Equity Interest) in an amount equal to the Holder's adjusted basis in the Existing Equity Interests.    The loss will be treated as a capital loss.

5.        **Accrued But Unpaid Interest**

A portion of the New Common Stock of Reorganized Delta received by a Holder of a Claim may be attributable to accrued but unpaid interest on such Claim.  Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes.

If the fair market value of the New Common Stock of Reorganized Delta is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such New Common Stock of Reorganized Delta will be attributable to accrued but unpaid interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such Holders and any remaining consideration as satisfying accrued but unpaid interest, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes.  There can be no assurance, however, that the IRS will not take the position that the consideration received by a Holder should be allocated in some way other than as provided in the Plan.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

6.        **Market Discount**

Holders who exchange DIP Facility Claims, Priority Non-Tax Claims, or Other Secured Claims for Cash or General Unsecured Claims for New Common Stock of Reorganized Delta may be affected by the "market discount" provisions of sections 1276 through 1278 of the Tax Code.  Under these rules, some or all of the gain recognized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such DIP Facility Claims, Priority Non-Tax Claims, Other Secured Claims, General Unsecured Claims and Noteholder Claims not previously included as income by such Holder.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) generally is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Tax Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition.  However, a debt obligation is not a "market discount bond" if such excess is less than a statutory *de minimis* amount (equal to 0.25 percent of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Gain recognized by a Holder on the taxable disposition of a DIP Facility Claim, Priority Non-Tax Claim, Other Secured Claim, General Unsecured Claim or Noteholder Claim (each as determined as described above) that was acquired with market discount may be treated as ordinary income to the extent of the market discount that accrued thereon while the DIP Facility Claim, Priority Non-Tax Claim, Other Secured Claim, General Unsecured Claim was held by the Holder (unless the Holder elected to include market discount in income as it accrued).  To the

extent that Noteholder Claims that were acquired with market discount are exchanged in a tax-free transaction for New Common Stock of Reorganized Delta, any market discount that accrued on the Noteholder Claims (up to the time of the exchange) but was not recognized by the Holder may be carried over to the New Common Stock of Reorganized Delta received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such New Common Stock of Reorganized Delta will be treated as ordinary income to the extent of such accrued market discount.

Holders who purchased their DIP Facility Claims, Priority Non-Tax Claims, Other Secured Claims, General Unsecured Claims or Noteholder Claims with market discount are advised to consult their tax advisors regarding the tax consequences to them under the market discount rules.

7.      **Bad Debt Deduction**

A Holder who, under the Plan, receives in respect of a Claim, other than an Allowed Noteholder Claim, an amount less than the Holder's tax basis in the Claim may be entitled to a bad debt deduction in some amount under section 166(a) of the Tax Code. The rules governing character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Each Holder of a Claim, therefore, is urged to consult its tax advisors with respect to its ability to take such a deduction.

8.      **Limitation on Use of Capital Losses**

Holders of Claims are subject to limits on their use of capital losses. For non-corporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. Non-corporate holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income as described above for an unlimited number of years. Corporate holders cannot use capital losses to offset ordinary income and may carry over unused capital losses only to the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

9.      **Information Reporting and Backup Withholding**

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) falls within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax, provided that the required information is provided timely to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest.  The Debtors will comply with all applicable reporting requirements of the Tax Code.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY TAX LAWS, OTHER THAN FEDERAL INCOME TAX LAWS, ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

> **B.     Certain U.S. Federal Income Tax Consequences to Reorganized Debtors**

> 1.    **Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, and (y) the fair market value of any non-cash consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce certain of its tax attributes by the amount of COD Income that it excluded from gross income under section 108 of the Tax Code.  In general, tax attributes will be reduced in the following order: (a) NOLs; (b) general business tax credit carryovers, (c) minimum tax credits, (d) capital loss carryovers; (e) tax basis in assets; and (f) foreign tax credit carryovers.  A debtor with COD Income may elect first to reduce the basis of its depreciable assets under section 108(b)(5) of the Tax Code.

Because the Plan provides that Holders of Allowed General Unsecured Claims may, and Noteholder Claims will, receive New Common Stock of Reorganized Delta, the amount of COD Income, and accordingly the amount of the Debtors' tax attributes required to be reduced, will depend on the fair market value of the New Common Stock of Reorganized Delta exchanged therefor.  This value cannot be known with certainty until after the Effective Date.

2.       **Limitation of Net Operating Loss Carry Forwards and Other Tax Attributes**

As of the end of 2011, the Debtors believe they will have NOL carryovers in excess of $1.1 billion. The precise amount of NOL carryovers that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available NOLs include: the amount of tax losses incurred by the Debtors in 2012; the value of the New Common Stock of Reorganized Delta; and the amount of COD Income incurred by the Debtors in connection with consummation of the Plan.  The Debtors anticipate that, taking these factors into account, they will have substantial federal NOL carryovers following emergence, subject to the limitations discussed below.  The Reorganized Debtors' subsequent utilization of any losses and NOL carryovers remaining and possibly certain other tax attributes may be restricted as a result of and upon consummation of the Plan.

Following consummation of the Plan, the Debtors anticipate that any remaining NOL and tax credit carryovers and, possibly, certain other tax attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "**Pre-Change Losses**") may be subject to limitation under section 382 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions pursuant to the Plan.  Under section 382 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation.

a.       **General Section 382 Annual Limitation**

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the highest "adjusted federal long-term rate" in effect for the month in which the "ownership change" occurs and the prior two months (currently 3.26% for ownership changes occurring in July 2012).  However, the annual limitation is reduced to zero if the corporation fails to continue its business enterprise for the two years following the ownership change.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  In general, an ownership change will occur if there is a cumulative increase in ownership by "5% shareholders" (as defined in the Tax Code) that exceeds 50% over a rolling three-year period.

If the Debtors' assets in the aggregate have a fair market value less than the Debtors' tax basis therein (a "**Net Unrealized Built-in Loss**"), any built-in losses recognized during the following five years (up to the amount of the original Net Unrealized Built-in Loss), including loss on disposition of assets and depreciation and amortization deductions attributable to the excess of the tax basis of the assets of the Debtors over their fair market value as of the date of the ownership change, generally will be treated as Pre-Change Losses subject to the annual limitation.  While the Debtors have not completed a review and valuation of their assets, the Debtors expect to have a Net Unrealized Built-in Loss after the consummation of the Plan, although this Net Unrealized Built-in Loss is not expected to be substantial.

If the Debtors' assets in the aggregate have a fair market value greater than the Debtors' tax basis therein (such excess, a "**Net Unrealized Built-in Gain**"), any Net Unrealized Built-in Gain recognized by the Debtors in the five years immediately after the ownership change will generally increase the section 382 limitation in the year recognized, such that the Debtors would be permitted to use their pre-change NOLs against such gain in addition to their regular allowance.  For these purposes, the Debtors would be permitted to increase their annual section 382 limitation during the five years immediately after the ownership change by an amount determined by reference to the depreciation deductions that a hypothetical purchaser of the Debtors' assets would have been permitted to claim if it had acquired the Debtors' assets in a taxable transaction.  While the Debtors have not completed a review and valuation of their assets, the Debtors do not anticipate that they will have a substantial Net Unrealized Built-in Gain in their assets that would allow them to increase the otherwise applicable section 382 limitation.

### b.  Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock in the reorganization. After taking into account COD income and the reduction for interest deductions, the Debtors estimate that they would have remaining NOL carryovers in excess of $800 million.  If the 382(l)(5) Exception applies and the Debtors undergo another "ownership change" within two years after consummation of the Plan, then the Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "**382(l)(6) Exception**").  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without triggering the elimination of its NOLs.

The Debtors estimate, based on projections by Conway reflected in the Valuation Analysis, that the net present value of the Debtors' tax attributes under the Section 382(l)(5) Exception would exceed the net present value of the Debtors' tax attributes under the Section 382(l)(6) Exception by approximately $29 million.  Based on Conway's projected aggregate value of the New Common Stock of Reorganized Delta of approximately $95 million, the

Debtors estimate that the tax savings under the Section 382(l)(5) Exception compared to those under the Section 382(l)(6) Exception will equal approximately 30.5% of the aggregate value of the New Common Stock of Reorganized Delta.

Although a final determination will not be made until the Debtors' 2012 U.S. federal income tax return is filed, the Debtors believe there is a significant likelihood they will be eligible to elect, and will elect, to utilize the 382(l)(5) Exception.  In the event that the Debtors do not use the 382(l)(5) Exception, the Debtors expect that their use of their NOLs after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception.

3.     **Restrictions on Resale of Securities to Protect NOLs**

The Debtors expect to emerge from chapter 11 with valuable tax attributes, including substantial NOLs.  Regardless of whether the Debtors elect to utilize the 382(l)(5) Exception, the Reorganized Debtors' ability to utilize these NOLs could be subject to limitation if an "ownership change" with respect to the New Common Stock of Reorganized Delta were to occur after emergence.  In order to reduce the risk of an ownership change that might impose such a limitation, Delta's Restated Certificate of Incorporation shall contain restrictions on the transfer of New Common Stock consistent with those described in VII.C.5 of this Disclosure Statement.

4.     **Section 269 of the Tax Code**

Aside from the objective limitations of section 382 of the Tax Code, the IRS may disallow the subsequent use of a corporation's losses pursuant to section 269 of the Tax Code.  Under section 269, if the IRS determines that the "principal purpose" of an acquisition was to evade or avoid U.S. federal income tax by allowing the taxpayer to secure the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, the IRS may disallow such deduction, credit, or other allowance, including the use of NOL carryovers.  Section 269 applies to direct or indirect acquisition of 50% or more (by vote or value) of a corporation's stock, including such acquisition pursuant to a plan of reorganization in chapter 11.  The Debtors do not believe that securing a tax benefit is the principal purpose of the acquisition of control of Reorganized Delta by the Debtors' creditors pursuant to the Plan.  However, no assurance can be given in this regard.

5.     **Transfer of Assets to the Joint Venture Company**

The transfer of assets to the Joint Venture Company by the Debtors generally will be treated in part as a tax-free contribution by the Debtors to the Joint Venture Company in exchange for an interest in the Joint Venture Company and in part as a taxable sale of the Debtors' assets.  The Debtors generally will recognize gain or loss on the portion of the transfer treated as a sale in an amount equal to the difference between the Debtors' basis in the assets sold and the amount of Cash received.  To the extent the Debtors recognize gain on the sale of assets, such gain generally can be sheltered by the Debtors' NOLs to the extent such NOLs are unrestricted by Section 382 of the Tax Code.

6.       **Alternative Minimum Tax**

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's AMTI may be offset by available NOL carryforwards.  The effect of this rule could cause Reorganized Delta to owe federal income tax on taxable income in future years even if NOL carryforwards are otherwise available to offset that taxable income.  Additionally, under section 56(g)(4)(G) of the Tax Code, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for purposes of calculating Reorganized Delta's "Adjusted Current Earnings" that may increase Reorganized Delta's AMTI, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under section 382(h) of the Tax Code, immediately before the ownership change.

## XIII.   CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of the Holders of General Unsecured Claims and Noteholder Claims who are entitled to vote on the Plan, and preferable to any of the alternatives described above because it will result in the greatest recoveries to Holders of all Claims.  Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.  Consequently, the Debtors urge Holders of General Unsecured Claims and Noteholder Claims to vote to ACCEPT the Plan and to evidence their acceptance by duly completing and returning their ballots so that they are actually received by Epiq Bankruptcy Solutions, LLC on or before 4:00 p.m., Eastern Time, on August 8, 2012.

The Supporting Noteholders, the DIP Agent and the Plan Sponsor have reviewed the Plan in detail.  Subject to the approval of certain terms described in Plan Supplements prior to the Voting Deadline, the Supporting Noteholders, the DIP Agent and the Plan Sponsor support the Plan.

As noted above, however, due to the Creditors' Committee's recent appointment, the Creditors' Committee has not, as of the date of this Disclosure Statement, had an opportunity to thoroughly review this Disclosure Statement, the Plan and the various transactions contemplated by the Plan, including the Contribution Agreement and Joint Venture Company with the Plan Sponsor. As such, the Creditors' Committee does not, as of the date of this Disclosure Statement, have a view with respect to whether the Plan is confirmable as a matter of law or whether the Plan and the transactions contemplated by the Plan are in the best interest of unsecured creditors.

Respectfully Submitted,

Dated:   As of July 5, 2012
       Denver, Colorado

**DELTA PETROLEUM CORPORATION**

By:  /s/ John T. Young, Jr.
John T. Young, Jr.
Chief Restructuring Officer

**DPCA LLC**

By:  /s/ John T. Young, Jr.
John T. Young, Jr.
Chief Restructuring Officer

**DELTA EXPLORATION COMPANY, INC.**

By:  /s/ John T. Young, Jr.
John T. Young, Jr.
Chief Restructuring Officer

**DELTA PIPELINE, LLC**

By:  /s/ John T. Young, Jr.
John T. Young, Jr.
Chief Restructuring Officer

**DLC, INC.**

By:   /s/ John T. Young, Jr.
John T. Young, Jr.
Chief Restructuring Officer

**CEC, INC.**

By:   /s/ John T. Young, Jr.
John T. Young, Jr.
Chief Restructuring Officer

**CASTLE TEXAS PRODUCTION LIMITED PARTNERSHIP**

By:   /s/ John T. Young, Jr.
John T. Young, Jr.
Chief Restructuring Officer

**AMBER RESOURCES COMPANY OF COLORADO**

By:   /s/ John T. Young, Jr.
John T. Young, Jr.
Chief Restructuring Officer

**CASTLE EXPLORATION COMPANY, INC.**

By:   /s/ John T. Young, Jr.
John T. Young, Jr.
Chief Restructuring Officer